**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE RECONNAISSANCE ENERGY AFRICA LTD. SECURITIES LITIGATION

Case No. 1:21-cv-06176-DG-RML

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

JURY TRIAL DEMANDED

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 5

III. PARTIES ..... 6

IV. BACKGROUND REGARDING RECONAFRICA ..... 9

A. ReconAfrica Was A Small Startup With No Petroleum Reserves And No Revenue That Required Constant Infusions Of Investor Cash To Survive ..... 9

B. ReconAfrica's Business Prospects Depended On Discovering Commercially Viable Oil And Gas Deposits In Namibia ..... 13

C. ReconAfrica Paid Penny Stock Promoters, a YouTube Personality, and Conflicted "Analysts" To Artificially Pump Up Its Stock Price ..... 16

D. ReconAfrica Personnel Were Implicated In Bribery Schemes In Support Of Previous Petroleum Exploration Ventures ..... 19

E. ReconAfrica Disregarded Local Communities And Ecosystems That Would Be Harmed By Its Planned Operations, Which Included Controversial Hydraulic Fracturing ..... 24

V. DEFENDANTS FAILED TO DISCLOSE MATERIAL FACTS REGARDING RECONAFRICA'S PROSPECTS FOR DISCOVERING AND EXTRACTING COMMERCIALLY VIABLE OIL AND GAS DEPOSITS ..... 28

A. ReconAfrica Had Not Determined Whether Namibia Would Allow Fracking, Which Had Never Been Done In Namibia, And Which Was Central To ReconAfrica's Business Plans ..... 28

B. When Namibia Came Out Against Fracking ReconAfrica Abruptly Shifted To Pretending It Did Not Intend To Frack, While Fracking Secretly Remained A Key Aspect Of Its Business Plans ..... 29

C. ReconAfrica's Test Wells Produced Poor Results, Which The Company Withheld From Investors While Misleadingly Disclosing Cherry-Picked Information ..... 31

VI. DEFENDANTS SOLD TENS OF MILLIONS OF DOLLARS OF ARTIFICIALLY INFLATED RECONAFRICA STOCK ..... 32

VII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ..... 36

A. February 28, 2019 Management Information Circular Touting Unconventional Resources .......... 36

B. October 7, 2019 Announcement Regarding Shales as Test Wells' Main Target .......... 39

C. July 27, 2020 ReconAfrica 2019 Annual Information Form Touting Unconventional Resources .......... 39

D. August 4, 2020 Investor Presentation Touting Unconventional Resources .......... 43

E. October 20, 2020 Announcement Regarding No Hydraulic Fracturing Planned For Test Wells .......... 45

F. November 2020 Investor Presentation Removing All References To Unconventional Resources .......... 46

G. April 15, 2021 Announcement Regarding First Test Well Results .......... 48

H. May 19, 2021 Revised 2020 Annual Information Form Removing All References To Unconventional Resources .......... 49

I. June 3, 2021 Announcement Regarding Second Test Well Results .......... 52

VIII. THE TRUTH EMERGES, CAUSING RECONAFRICA'S STOCK PRICE TO CRASH .......... 54

A. June 24-28, 2021 Viceroy Report & ReconAfrica Responses .......... 54

B. July 14-15, 2021 ReconAfrica Announcements & Viceroy Report .......... 57

C. August 5-9, 2021 ReconAfrica Discloses Additional Test Well Data .......... 59

D. August 16-17, 2021 Viceroy Report & ReconAfrica Response .......... 61

E. September 2-7, 2021 ReconAfrica Announcement Regarding First Test Well Analysis & Viceroy Report .......... 64

IX. CLASS ACTION ALLEGATIONS .......... 66

X. UNDISCLOSED ADVERSE FACTS .......... 68

XI. LOSS CAUSATION .......... 69

XII. ADDITIONAL SCIENTER ALLEGATIONS .......... 69

A. Defendants Possessed Undisclosed Adverse Information When Making Their Misleading Statements .......... 71

B. Key ReconAfrica Personnel Departed The Company Under Suspect Circumstances ..... 73

XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ..... 75

XIV. NO SAFE HARBOR ..... 77

XV. FIRST CLAIM ..... 77

XVI. SECOND CLAIM ..... 81

XVII. PRAYER FOR RELIEF ..... 82

XVIII. JURY TRIAL DEMANDED ..... 82

Lead Plaintiff Robert Partovy ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following based upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Reconnaissance Energy Africa Ltd. ("ReconAfrica" or the "Company") with the United States Securities and Exchange Commission ("SEC") and the Canadian Securities Administrators System for Electronic Document Analysis and Retrieval ("SEDAR"); (b) review and analysis of press releases and media reports issued and disseminated by ReconAfrica; and (c) review of other publicly available information concerning ReconAfrica.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired the publicly traded securities of ReconAfrica between February 28, 2019 and September 7, 2021, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2. ReconAfrica is a small, but internationally notorious, startup oil and gas exploration company. Its executives are located in the United States, Canada, and the United Kingdom, though its only oil and gas exploration activities have been in Namibia. ReconAfrica stock trades on U.S., Canadian, and German exchanges, and the Company has raised substantial amounts of money from investors based on materially incomplete, and therefore highly misleading, information.

3. At all relevant times, ReconAfrica's business plans have centered on using highly controversial hydraulic fracturing (commonly known as "fracking") techniques to extract hypothetical, unsubstantiated oil and gas deposits it claims may be present on its licensed properties in Namibia. Fracking requires the high-pressure injection of fluids into a well to crack open deep underground rock formations through which previously trapped oil and gas can then flow up to the surface. But Namibia will not allow fracking because of serious environmental, health, and safety concerns. And ReconAfrica's limited test well data has revealed poor prospects for conventional (*i.e.*, without fracking) oil and gas production.

4. From the time ReconAfrica was introduced to public stock markets in February 2019 and over the following year and a half, the Company touted its plans to frack in Namibia as its primary (for all practical purposes, only) business plan. Then, in September 2020, in response to concerns about ReconAfrica's fracking plans raised in reporting by Namibia's largest daily newspaper, *The Namibian*, the government of Namibia publicly clarified that the Company had not been authorized to frack.

5. In response to these developments and additional reporting by *National Geographic* magazine that further detailed ReconAfrica's fracking plans and related environmental, health, and safety concerns, the Company misleadingly and abruptly changed its tune. From October 2020 on, ReconAfrica stated that it was focused on conventional oil and gas production and had no plans to frack at the time. All the while, however, ReconAfrica very carefully avoided ruling out use of fracking in the future (despite being pointedly asked to do so on multiple occasions).

6. Simultaneously with this about-face in its public messaging, ReconAfrica hired an individual named Knowledge Katti as a "media consultant." While Mr. Katti does not appear to

have done any substantial media consulting for ReconAfrica, he is known for his key role in a prior oil and gas bribery scandal in Namibia and for his close ties to high-level Namibian politicians, including the President.

7. ReconAfrica's fracking plans, its apparent flouting of Namibian environmental protection laws, and its disregard for the local communities and ecosystems that would be affected by its planned operations have been well-documented in a variety of prominent international media outlets, including *National Geographic*, Canada's *The Globe and Mail* newspaper, and *The Namibian*. The public outcry over ReconAfrica's activities has been so great that it has even reached the highest levels of the U.S. government, with Senator Patrick Leahy and Congressman Jeff Fortenberry making a bipartisan call for investigation of ReconAfrica by the State Department, SEC, and U.S. Agency for International Development. These lawmakers stated that ReconAfrica's activities are "potentially counter to stated United States foreign policy goals," citing the risk of "serious and potentially irreparable harm" from the Company's planned activities.

8. Shortly following the controversy surrounding ReconAfrica's fracking plans first became public, in early 2021, the Company made a number of announcements hyping its plans to begin drilling test wells in Namibia in order to evaluate (supposedly "conventional") oil and gas production potential on its licensed properties. ReconAfrica also paid substantial sums of money to stock promoters, a YouTube personality, and deeply conflicted "analysts" to echo these announcements and further hype its prospects. The Company's stock price more than quadrupled in the early months of 2021.

9. On April 15, 2021, ReconAfrica announced what it called the discovery of a "working conventional petroleum system" from its first test well in Namibia. The announcement

selectively disclosed only a handful of details, while omitting key technical data in the Company's possession that would have enabled investors to assess the test-well results for themselves. Due to ReconAfrica's material omissions and misleading positive spin regarding these test-well results, the Company's stock price promptly doubled. On June 3, 2021, ReconAfrica followed up with a similarly promotional, and materially incomplete, announcement regarding the results of its second test well. The Company's stock gained another 16%.

10. ReconAfrica sold tens of millions of dollars of stock following its artificial share price surge, and Company insiders similarly seized the opportunity to unload substantial amounts of their own Company stock holdings at large gains.

11. Defendants' fraud began to unravel on June 24, 2021. On that date, Viceroy Research LLC, a research firm that gained fame for exposing massive fraud at the now-bankrupt German payment processing company Wirecard AG, published a report titled "ReconAfrica – No Oil? Pump Stock." The 29-page report detailed Defendants' fraud and was based on Viceroy's comprehensive research, its consultation with industry experts, and its interview with Namibia's Petroleum Commissioner. The report detailed ReconAfrica's deceit regarding its fracking intentions, and the material omissions of reliable data from the Company's promotional test well announcements. Over the following two days, ReconAfrica stock crashed by 18%. ReconAfrica weakly called the Viceroy report incorrect while failing to respond to its key points.

12. Over the summer of 2021, ReconAfrica dribbled out additional details regarding its test-well results, while Viceroy published additional reports further revealing Defendants' fraud and ReconAfrica's dismal prospects for conventional oil and gas production on its licensed

lands in Namibia. While ReconAfrica stock reached a Class Period high of $11.23 per share, it ended the Class Period at only $4.65 per share, a staggering 58% loss.[1]

13. Throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose to investors that: (1) they had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans; (2) even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans; and (3) Defendants possessed data from ReconAfrica's first and second test wells that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable. As a result of the foregoing material omissions, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

14. As a result of Defendants' scheme and omissions, and the resulting precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

15. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

[1] Unless otherwise noted, all share prices and trading volumes herein refer to ReconAfrica's publicly traded stock listed on the U.S.-based OTC markets. Unless otherwise noted, "$" refers to U.S. dollars, and "C$" refers to Canadian dollars.

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

17. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements entered and subsequent damages took place within this judicial district. Additionally, Defendant James Granath, as repeatedly stated by the Company, teaches at the State University of New York at Stony Brook. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

18. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

19. Lead Plaintiff Robert Partovy, as set forth in his previously filed certification (Dkt. No. 9-2), incorporated by reference herein, purchased ReconAfrica shares during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20. Defendant Reconnaissance Energy Africa Ltd. is incorporated in British Columbia, Canada and maintains its principal executive offices at PO Box 48326 Bentall, Vancouver, BC, V7X 1A1, Canada. ReconAfrica's shares are listed and trade on the OTCQX market under the ticker symbol "RECAF." Prior to a reverse takeover transaction completed on or about August 30, 2019 (the "Reverse Takeover"), the Company was essentially a corporate shell named Lund Enterprises Corp. ("Lund"), which then changed its name to Reconnaissance Energy Africa Ltd. upon the completion of the Reverse Takeover. From the beginning of the

Class Period up until September 30, 2020, the Company's shares were listed and traded on the OTC Pink Sheets under the symbol "LGDOF". Prior to the Reverse Takeover, the business that is now ReconAfrica operated under the names "Reconnaissance," "Reconnaissance Oil," or "Reconnaissance Energy," and consisted of various related companies and subsidiaries.

21. Defendant James Jay Park served as one of two directors and the sole executive officer of Reconnaissance prior to the Reverse Takeover. Following the Reverse Takeover, he served as CEO of ReconAfrica from September 2019 to August 2020. He served as the Chairman of ReconAfrica's Board of Directors from August 30, 2019 until January 2022. Since January 2022, he has remained as outside counsel to ReconAfrica through Park Energy Law where he is Managing Partner. Company regulatory filings list his residence as London, United Kingdom.

22. Defendant Scot Evans joined ReconAfrica on November 4, 2019, became Chief Operating Officer in April 2020, and has served as the Company's CEO since August 2020. Company regulatory filings list his residence as Texas, United States.

23. Defendant Ian D. Brown served as CFO of Lund prior to the Reverse Takeover. He served as CFO of ReconAfrica from the time of the Reverse Takeover until January 15, 2020. Company regulatory filings list his residence as Vancouver, British Columbia.

24. Defendant Carlos Escribano has served as the Company's CFO since January 2020, prior to which he served as CFO of related company Renaissance Oil Corp. (and in which role he continued after joining ReconAfrica, up until ReconAfrica's acquisition of Renaissance in July 2021). Company regulatory filings list his residence as British Columbia, Canada.

25. Defendant Shiraz Dhanani served as a Director of the Company from February 18, 2020 until February 2021. Currently, Defendant Dhanani is an advisor and consultant to the

Company, and a member of its Advisory Committee. Company regulatory filings list his residence as London, United Kingdom.

26. Defendant Mark Gerlitz has served as a Director of the Company since February 17, 2021. Company regulatory filings list his residence as Alberta, Canada.

27. Defendant James Granath served as a Director of ReconAfrica from August 30, 2019 until January 2022, and member of the Company's "technical team." After retiring from the Board, he continues to serve ReconAfrica as a Geoscience Advisor. Company regulatory filings list his residence as Colorado, United States.

28. Defendants Park, Evans, Brown, Escribano, Dhanani, Gerlitz, and Granath (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC and SEDAR, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that Defendants made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

29. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. BACKGROUND REGARDING RECONAFRICA

### A. ReconAfrica Was A Small Startup With No Petroleum Reserves And No Revenue That Required Constant Infusions Of Investor Cash To Survive

30. At all relevant times, ReconAfrica and its predecessor Reconnaissance business were small startups with no oil and gas reserves and no revenues, which needed constant infusions of fresh investor cash in order to survive and continue operations.

31. In the February 28, 2019 Management Information Circular ("2019 Circular") filed on SEDAR in connection with the planned Reverse Takeover, the Reconnaissance group of ReconAfrica's predecessor companies purported to be "a junior oil and gas company currently engaged in the acquisition, exploration and eventual development of oil and gas mineral leases in Namibia." Reconnaissance had entered into a petroleum agreement and license with the Namibian government in January 2015 relating to oil and gas exploration on certain properties located in northeastern Namibia. Reconnaissance's 90% interest (the Namibian government retained the other 10%) in the license was its primary asset. The following map, reproduced form Company regulatory filings, depicts the licensed properties' location:




32. Prior to the August 2019 Reverse Takeover, the predecessor Reconnaissance group had not completed any substantial work. It had not undertaken any drilling, seismic testing, or other similar standard steps in oil and gas exploration. It had not even completed the environmental impact assessment or taken many of the numerous other steps necessary to obtain permits and approvals for exploration. All that the Reconnaissance group had done was to, in

2015, acquire and analyze pre-existing geomagnetic data from an aerial survey of the licensed property. The Reconnaissance group claimed that this analysis led it to discover a previously unidentified area it dubbed the "Kavango Basin," which it claimed was a promising target for oil and gas exploration.

33. The Reconnaissance group admitted in the 2019 Circular that it had "not yet established reserves on any of its properties due to the fact that its oil and gas activities are currently in the preliminary stages."

34. The Reconnaissance group also admitted in the 2019 Circular that it had a history of losses, no revenues, few assets, and liabilities in excess of its assets, presenting the following summary financial information:

| | Nine Months Ended September 30, 2018 | Year Ended December 31, 2017 | Year Ended December 31, 2016 |
|---|---|---|---|
| Total Revenues | Nil | Nil | Nil |
| Income (Loss) from Continuing Operations | $(275,986) | $(375,582) | $(264,989) |
| Total Comprehensive Income (Loss) | $(298,192) | $(339,033) | $(246,653) |
| Total Assets | $99,389 | $79,516 | $175,133 |
| Total Liabilities | $1,120,403 | $802,338 | $558,922 |
| Cash Dividends Declared | Nil | Nil | Nil |

35. The purpose of the Reverse Takeover was for the Reconnaissance group to raise funds from investors and to obtain the public stock market listings that belonged to Lund, while avoiding the more rigorous initial public offering process that incorporates due diligence protections and other investor safeguards. Lund was essentially a shell company with limited operations (which would be divested in connection with the Reverse Takeover) and a listing on Toronto's TSX-V stock exchange and the U.S. OTC Pink Sheets exchange. Upon the completion of the Reverse Takeover on August 30, 2019, ReconAfrica obtained C$3.4 million from a concurrent private placement of its securities and became a publicly traded company. ReconAfrica repeatedly sought to raise additional investor funds over the following two years.

36. ReconAfrica remained a small, zero-revenue startup through the end of the Class Period. In its Annual Information Form for the Financial Year Ended December 31, 2019, dated July 27, 2020 (the "2019 AIF"), ReconAfrica disclosed that "[a]s at December 31, 2019, ReconAfrica had three employees and three contractors." The 2019 AIF also confirmed that "[a]s at December 31, 2019, ReconAfrica had no reserves and hence no related future net revenue."

37. ReconAfrica's Annual Information Form for the Financial Year Ended December 31, 2020, dated April 30, 2021 (the "Original 2020 AIF") similarly disclosed that "[a]s at December 31, 2020, ReconAfrica did not have any employees and had 11 contractors," and that "[a]s at December 31, 2020, ReconAfrica had no reserves and hence no related future net revenue."

38. On April 20, 2021, ReconAfrica filed on SEDAR Consolidated Financial Statements for the years ended December 31, 2020 and 2019. These financial statements confirmed that the Company continued to earn no revenue, while incurring substantial expenses:

| | | Year Ended December 31, 2020 | | Year Ended December 31, 2019 |
|---|---|---|---|---|
| EXPENSES | | | | |
| Management and consulting | $ | 1,807,169 | $ | 271,843 |
| Listing expense | | - | | 1,095,506 |
| Marketing | | 2,705,482 | | 435,436 |
| Office and general | | 654,094 | | 50,966 |
| Professional fees | | 630,379 | | 528,453 |
| Share-based payments (Note 11) | | 1,469,467 | | 343,697 |
| Transaction costs | | - | | 314,134 |
| | | 7,266,591 | | 3,040,035 |
| Other Items | | | | |
| Interest expense | | 15,547 | | 25,855 |
| Exchange loss | | 197,537 | | 55,688 |
| | | 213,084 | | 81,543 |
| Net Loss | | 7,479,675 | | 3,121,578 |

39. At all relevant times, ReconAfrica was a small startup with no oil and gas reserves and no revenues. As such, ReconAfrica needed, and sought, constant infusions of fresh investor cash in order to survive and continue its operations.

### B. ReconAfrica's Business Prospects Depended On Discovering Commercially Viable Oil And Gas Deposits In Namibia

40. During the Class Period, ReconAfrica's prospects for future success were almost entirely dependent on discovering commercially viable oil and gas deposits in Namibia.

41. At the beginning of the Class Period, the only properties on which ReconAfrica's predecessor Reconnaissance had licenses to conduct oil and gas exploration were the Company's licensed properties in northeastern Namibia.

42. On June 11, 2020, the Company announced that it had acquired a license for petroleum exploration in northwestern Botswana, on properties adjacent to its Namibian licensed properties. The Company published the following map of the licensed areas:




43. According to the Company, the licensed Botswana properties were part of the same geological formation as the licensed Namibian properties, and merely represented an extension of its planned Namibian exploration activities.

44. As with ReconAfrica's Namibian licensed properties, the Company had not undertaken any drilling, seismic testing, or other similar standard steps in oil and gas exploration with respect to the Botswana licensed properties. Likewise, it had not taken many of the numerous other steps necessary to obtain permits and approvals for exploration.

45. Also, as with ReconAfrica's Namibian operations, the Company had not determined whether Botswana would allow fracking on the licensed properties.

46. Throughout the Class Period, the Botswana licensed properties remained largely an afterthought for ReconAfrica, which was focused on its Namibian operations. Up to the end of the Class Period and beyond, ReconAfrica did not drill any wells, gather any seismic data, or

undertake similar standard steps in oil and gas exploration with respect to the Botswana licensed properties.

47. On April 19, 2021, ReconAfrica announced its intent to acquire the related company Renaissance Oil Corp. ("Renaissance"), which had overlapping major shareholders with ReconAfrica, and which shared the same CFO, Defendant Escribano. In a series of murky related-party transactions, Renaissance had come to own an option to acquire a 50% interest in ReconAfrica's Botswana petroleum license.

48. ReconAfrica stated that its intent in acquiring Renaissance was to acquire that option so as to consolidate all interests in the "Kavango Basin" that ReconAfrica claimed to have discovered. Although Renaissance owned interests in certain petroleum production operations in Mexico, ReconAfrica intended to dispose of those and to focus solely on the so-called Kavango Basin. ReconAfrica's April 19, 2021 press release quoted Renaissance CEO and ReconAfrica major shareholder Craig Steinke as stating "[t]he combined company will solely focus on the development of the deep Kavango basin while exploring strategic alternatives for the Mexican assets."

49. On July 27, 2021, ReconAfrica announced the completion of its Renaissance acquisition in yet another murky related-party transaction. The transaction substantially enriched Renaissance shareholders, some of whom were also ReconAfrica major shareholders and executives, at the expense of ReconAfrica's public shareholders whose interests in the Company were substantially diluted as a result. Following the completion of the acquisition, the Company has continued to state that it intends to dispose of the acquired Mexican assets, which it does not consider to be material.

50. Apart from its Namibian, Botswanan, and Mexican oil and gas operations, ReconAfrica had no other business activities. Its focus has always been on the Namibian operations, on which its business prospects and future success have always depended.

51. Despite prior exploration activities by other companies over several decades, Namibia has never produced significant quantities of oil or gas, and through the end of the Class Period, no significant oil or gas discoveries had ever been made in Namibia.[2]

### C. ReconAfrica Paid Penny Stock Promoters, a YouTube Personality, and Conflicted "Analysts" To Artificially Pump Up Its Stock Price

52. Throughout the Class Period, ReconAfrica paid substantial sums of money to stock promoters for positive coverage of the Company in a successful effort to artificially pump up the Company's stock price.

53. On January 14, 2020, stock promoter Günther Godlherz, doing business as the Gold Herz Report, published an article about ReconAfrica titled "Special edition 1/2020 – The oil of the dinosaurs." The article contained various hyperbolic claims about ReconAfrica's access to oil deposits potentially worth "billions," its "brilliant" management, and potential stock gains of "+21,053%." On the date this report was published, ReconAfrica's stock traded at more than ten times the volume of the previous day and increased in price by 33.8%.

54. Canadian regulator the Investment Industry Regulatory Organization of Canada took note of the unusual trading activity, and compelled ReconAfrica to issue a press release on

[2] Several months after the end of the Class Period, major energy companies Shell, TotalEnergies, and QatarEnergy announced discoveries in wells drilled in ocean waters off the coast of Namibia. This area is hundreds of miles away from ReconAfrica's licensed properties and these discoveries by sophisticated and established major companies do not indicate that ReconAfrica's distant licensed properties contain commercially viable oil and gas deposits.

January 17, 2020 that disclosed it had paid Goldherz's company, Bull Markets Media GmbH, C$120,000 for work including the article:

> The article was published as part of a European public relations campaign that is being conducted by Bull Markets Media GmbH ("Bull Markets") on behalf of the Company. Bull Markets is a leading German online publishing house focused on providing information services about small cap investment opportunities. The arrangement with Bull Markets is for an initial term of twelve months, which expires in September 2020. The Company agreed to pay Bull Markets a sum of Cdn$120,000 in connection with the public relations campaign.

55. ReconAfrica also paid Advanced Media Solutions Ltd, the company behind various promotional "articles" published on the website oilprice.com, including the following, among many others:

- Six Oil Trends to Watch in 2020 (Jan. 8, 2020)
- Is This The Most Exciting Oil Play Of The Decade (Jan. 11, 2021)
- The World's Next Giant Oil Discovery Could Be Here (Jan. 12, 2021)
- The Most Important Oil Find Of The Next Decade Could Be Here (Jan. 14, 2021)
- Big Oil Missed This, Now It Could Be Worth Billions (Jan. 15, 2021)
- The World's Next Great Onshore Oil Discovery Could Be Here (Jan. 22, 2021)
- Is This The Most Exciting Oil Play Of The Last 20 Years (Jun. 11, 2021)
- Why Namibia Could Become The Biggest Oil Story of the Decade (Jun. 28, 2021)
- Is Namibia Emerging As The Most Exciting Oil Story Of The Year (Jul. 9, 2021)
- Trends To Watch As Oil Prices Explode (Jul. 16, 2021)
- Nothing Can Stop Namibia's Incredible Oil Boom (Jul. 21, 2021)
- Short Sellers Are Descending On This New Oil Hotspot (Jul. 26, 2021)
- Series Of Big Announcements Spark Excitement In Namibia's Kavango Oil Play (Aug. 3, 2021)
- Will This Exciting Discovery Create The World's Next Oil Nation (Aug. 6, 2021)
- 5 Interesting Facts About The World's Hottest Oil Play (Aug. 17, 2021)

56. ReconAfrica similarly paid at least $250,000 to Digitonic Ltd., the company behind various promotional "articles" published on the website valuethemarkets.com, including the following:

- ReconAfrica – Opening Up One Of The Largest Onshore Hydrocarbon Basins In The World (Sept. 30, 2020)
- ReconAfrica: The Key To Unlocking 120 Billion Barrels Of Oil Potential In The Kavango Basin (Oct. 9, 2020)
- Unlocking One Of The Last Undeveloped Onshore Oil Basins In The World (Jan. 21, 2021)
- Did The Majors Miss The Last Great Onshore Oil Discovery? (Jan. 22, 2021)
- Are Oil and Gas Stocks Preparing to Soar in 2021? (Feb. 16, 2021)
- ReconAfrica's share price soars 1,881% in a year! Is there further upside? (May 6, 2021)

57. The same company that ReconAfrica paid to publish articles on valuethemarkets.com, Digitonic Ltd, in turn paid $1,000 to Zac Hartley, a YouTube personality who purports to specialize in "stocks, crypto, finance," to post an online video about ReconAfrica titled "Reconnaissance Energy Africa Making Major Progress" (Jan. 20, 2021), in which he claims to analyze ReconAfrica and enthuses about the Company's prospects.

58. ReconAfrica also paid for a promotional "analyst report" from Jenny Xenos, doing business under the name Quester Advisors. Quester Advisors does not appear to have any employees apart from Ms. Xenos, or to have published any analyst reports other than its single report on ReconAfrica. Xenos's report is titled "Namibia: Africa's next oil and gas frontier awaits," and dated April 18, 2021. ReconAfrica posted the report to its public website.

59. The only other "analyst reports" to have been published regarding ReconAfrica are from Haywood Securities Inc. ("Haywood") and its employee Christopher Jones. Haywood is a small, Canada-based investment firm. Haywood, its affiliates and employees participated in many of the Company's securities offerings during the Class Period. David Elliott, a long-

standing member of Haywood's Board of Directors and Management, was a major shareholder of ReconAfrica for much of the Class Period.

60. Haywood's reports generally repeat the Company's promotional press release statements unquestioningly and provide aggressive "target prices" and "projected returns," and uniformly maintain a "BUY" rating on the Company's stock. ReconAfrica previously posted a number of these reports to its public website, but has since removed most or all of them.

61. Haywood's reports on ReconAfrica contain a laundry list of conflict-of-interest disclosures, for example stating, "either Haywood Securities, Inc., one of its subsidiaries, its officers or directors beneficially owned 1% or more of ReconAfrica," and "Haywood Securities Inc. or one of its subsidiaries has received compensation for investment banking services from ReconAfrica."

### D. ReconAfrica Personnel Were Implicated In Bribery Schemes In Support Of Previous Petroleum Exploration Ventures

62. From approximately October 2020 through an unknown time prior to May 29, 2021, ReconAfrica employed an individual named Knowledge Katti, ostensibly as a consultant on relations with Namibian media. Mr. Katti is a highly controversial Namibian businessman, who is frequently the subject of Namibian news reports. Mr. Katti is known for his wealth, his close ties to high level Namibian politicians, his involvement in various speculative energy industry ventures, and his connection to allegations of bribery and corruption.

63. ReconAfrica's retention of Mr. Katti's services occurred shortly after, as discussed further *infra*, the Namibia Ministry of Mines and Energy issued a press release on September 18, 2020, stating in relevant part:

> no Licence for the development of unconventional resources (*E.g. Shale gas*) has ever been applied for/or granted in Namibia. This means that on record, no hydraulic fracking activities are planned in Namibia. It also means that the

> company Recon will not be conducting any fracking activities in the Okavango Delta.

64. ReconAfrica's connection with Mr. Katti was first reported by *The Globe and Mail* in a May 29, 2021 article. *The Globe and Mail* interviewed Defendant Park for that article, who stated that ReconAfrica had no involvement with Mr. Katti. However, after that interview but prior to publication of the article, a ReconAfrica spokesperson admitted to *The Globe and Mail* that Mr. Katti was "briefly engaged as a media relations consultant for ReconAfrica in Namibia, starting in October 2020." The spokesperson stated that Mr. Katti no longer had any business relationship with the Company.

65. The only public indication that Mr. Katti performed any media relations work on behalf of ReconAfrica in the October 2020 to May 2021 time period previously consisted of three tweets from his @knowledgekatti Twitter account. This account no longer exists, presumably having been deleted by Mr. Katti.

66. Mr. Katti is reported to be a close friend and financial backer of Namibia's President, Hage Geingob. Mr. Geingob has a long career in Namibian government, including serving as Minister of Trade and Industry from April 2008 – December 2012; Prime Minister from December 2012 – March 2015; and President from March 2015 to present. Mr. Katti paid N$200,000 for Mr. Geingob's medical bills and airfare when he was Minister of Trade and Industry.[3]

67. According to emails reviewed by *The Namibian*, and reported in an August 18, 2017 article titled "Katti's 'magic' leaked," Mr. Katti owned 30% of a company called Namibia Industrial Development Group ("NIDG"), which the Namibian government awarded certain oil

---

[3] "N$" refers to Namibian dollars. In the 2008-2012 period Namibian dollars traded in a range of approximately $0.10 to $0.14 U.S. dollars.

exploration rights in 2006. In 2008 the government threatened to revoke these rights due to NIDG's failure to pay license fees and to carry our exploration work. In an email to his business partners in NIDG, Mr. Katti suggested that he would convince the government not to revoke its rights, stating, "I will hit them with the following: I will announce the UNX-Cumoxi deal immediately. *Then use some funds to work the magic*." (emphasis added). Mr. Katti's email continued, "[b]ut then you have to as soon as possible finalise your negotiations and sign with them quickly – pay the outstanding fee, then I will tell them here to back off."

68. According to the emails reviewed by *The Namibian*, Mr. Katti claimed to be working with government "insiders," including a government minister. One such insider was former petroleum commissioner Immanuel Mulunga, who went on to become the National Petroleum Corporation of Namibia (aka NAMCOR) managing director. Mr. Katti is reported to have transferred almost N$2 million to Mr. Mulunga in 2009-2010.

69. Another of Mr. Katti's government insiders was the former Public Service Commissioner, Tekla Lameck, with whom Mr. Katti co-owned Cumoxi Investment, one of the companies involved in the NIDG joint venture. Mr. Katti was previously reported to have participated in a corruption scandal involving Ms. Lameck by laundering certain payments for her through a bank account under his control.

70. Mr. Katti is reported to be friends or business partners with other high-level Namibian politicians, including Obeth Kandjoze (formerly Minister of Mining and Energy) and Pendukeni Iivula-Ithana (formerly Minister of Home Affairs).

71. According to *The Namibian*, Mr. Katti bragged to his former business partners, saying that he had government ministers in his pockets. *The Namibian* has also reported that

Namibia's Anti-Corruption Commission has conducted multiple investigations relating to Mr. Katti.

72. On March 4, 2022 *The Namibian* reported, based on leaked records from Credit Suisse, that during 2010-2013 Mr. Katti held more than 20 million Swiss francs in three secret Swiss bank accounts.[4] By 2014, all of the accounts had been closed. In 2018, Namibia's First National Bank closed Mr. Katti's account, reportedly after asking him to explain the source of the funds he deposited.

73. Defendant Park has likewise on multiple occasions been implicated in alleged bribery schemes in connection with oil and gas exploration projects.

74. During 2009-2011, Canadian junior oil and gas company Griffiths Energy International Inc. ("Griffiths") was in negotiations with Chadian government officials to secure rights to develop oil and gas properties in Chad. In early 2011, Griffiths hired a small team of Calgary-based lawyers at the Macleod Dixon law firm as its outside counsel, which team was led by Defendant Park. The Calgary office transferred C$2 million to a Nevada limited liability company named Chad Oil Consulting LLC, which was owned by the wife of Chad's ambassador to the United States, Canada, Brazil, Argentina and Cuba. This money was a bribe. After a change in management, Griffiths self-reported the bribe to Canadian police, ultimately admitting to the misconduct and paying a C$10.35 million fine in January 2013. The Norton Rose law firm acquired Macleod Dixon in January 2012. Commenting for an article in *The Globe and Mail* in January 2013, Norton Rose's global chairman confirmed that the Calgary office had facilitated the C$2 million payment. Defendant Park left Norton Rose in May 2013.

---

[4] In the 2010-2013 period, Swiss francs traded in a range of approximately $0.86 to $1.26 U.S. dollars.

75. From June 2013 through the present, Defendant Park has been the Managing Partner of Petroleum Regimes Advisory, which purports to have "extensive expertise in petroleum laws and regulations, as well as the many types of host government contracts that States use to award petroleum rights to operators." Also from June 2013 through the present, Defendant Park has been Managing Partner of Park Energy Law, which purports to "provide[] legal advice on energy projects globally."

76. In 2013, British company Soma Oil and Gas ("Soma") signed an energy exploration contract with Somalia's oil ministry. As detailed in a report from experts on the U.N. Somalia and Eritrea Monitoring Group to the U.N. Security Council's Somalia/Eritrea sanctions committee, which was reviewed and reported on by *Reuters*, Soma made a number of highly suspect payments in connection with this contract. Soma paid $590,000 to Somalia's oil ministry as part of efforts to protect and expand the contract. The report concluded that these payments "created a serious conflict of interest, in a number of cases appearing to fund systematic payoffs to senior ministerial officials." The report found that at least six officials who drew Somali government salaries (including the director general of the oil ministry and his deputy) were also on Soma's payroll, which would in some cases have almost tripled their government salaries. The report further concluded that payments were "likely part of a quid pro quo arrangement," whereby the oil ministry would protect the contract when a panel chaired by the Somali finance ministry began conducting a review of all its contracts. Soma also paid $495,000 to Defendant Park and his company Petroleum Regimes Advisory. Park and his company were advising the Somali government at the same time that Soma and the Somali government were in contract negotiations.

**E. ReconAfrica Disregarded Local Communities And Ecosystems That Would Be Harmed By Its Planned Operations, Which Included Controversial Hydraulic Fracturing**

77. At all relevant times, Defendants have operated with disregard for local communities that would be affected by ReconAfrica's planned operations, drawing widespread condemnation both within Namibia and internationally.

78. At all relevant times, ReconAfrica's business plans have centered on the use of hydraulic fracturing (commonly known as "fracking") techniques to extract oil and gas deposits it claims may be present on its licensed properties in Namibia. Fracking requires the high-pressure injection of fluids into a well to crack open deep underground rock formations through which previously trapped oil and gas can then flow up to the surface.

79. Fracking is a highly controversial practice. While fracking supporters point to the economic benefits of increased energy production, opponents cite a variety of environmental, health and safety concerns. These concerns include groundwater and surface water contamination, noise and air pollution, and the triggering of earthquakes. Research has found adverse health effects in populations living near hydraulic fracturing sites, including cancer, birth defects, migraine headaches, chronic rhinosinusitis, severe fatigue, asthma exacerbations and psychological stress.

80. The legal status of fracking varies from jurisdiction to jurisdiction. While some countries and states allow its use, many others (including New York) have banned the practice altogether.

81. Conventional oil and gas exploration is also associated with substantial environmental, health and safety risks.

82. Defendants' problematic practices and plans have been extensively reported in a series of articles in *National Geographic* magazine, including the following:

- Oil drilling, possible fracking planned for Okavango region—elephants' last stronghold (Oct. 28, 2020)
- When oil drilling meets threatened wildlife (Oct. 29, 2020)
- Test drilling for oil and gas begins in Namibia's Okavango region (Jan. 28, 2021)
- Test drilling for oil in Namibia's Okavango region poses toxic risk (Mar. 12, 2021)
- Oil company exploring in sensitive elephant habitat accused of ignoring community concerns (May 11, 2021)
- Oil exploration company in Okavango wilderness misled investors, complaint to SEC says (May 21, 2021)
- Members of Congress urge investigation into Okavango oil exploration (Jun. 23, 2021)
- Oil company accused of drilling in African wildlife reserve, offering jobs for silence (Dec. 13, 2021)
- Canadian oil company illegally bulldozes protected land in Africa (Feb. 23, 2022)

83. *National Geographic*'s reporting has highlighted concerns including the extreme sensitivity of the ecosystems on and near ReconAfrica's licensed properties, threats to the region's scarce water resources posed by oil and gas exploration, and Defendants' chronic failures to carry out adequate environmental impact assessments or to consult with affected communities.

84. *National Geographic* explained in its October 28, 2020 article that, "[c]onservationists and community leaders in the spectacular Okavango wilderness region of Namibia and Botswana are raising alarms over oil and gas exploration and potential production that they fear would threaten the water resources of thousands of people and endangered wildlife." According to the magazine:

> ReconAfrica's drilling areas overlap with a multicountry conservation park, six locally managed wildlife reserves, and one UNESCO World Heritage site (and could affect another, the Okavango Delta, nearby). The Okavango region is home to the largest herd of African elephants left on Earth and myriad other animals—African wild dogs, lions, leopards, giraffes, amphibians and reptiles, birds—and rare flora.

*National Geographic* further reported that, "ReconAfrica's license encompasses the territories of seven endangered animal species, among them the gray crowned crane and the African wild dog, and four critically endangered animals, including the black rhinoceros and white-backed vulture."

85. *National Geographic* reported that "ReconAfrica's licensed exploration area abuts the main river that feeds the Okavango Delta for some 170 miles. Few other water sources are available during the long dry season here." According to one expert consulted by the magazine, "People in the area get their water from hand-dug wells and small hand pumps . . . What happens if the company drops the groundwater table and people who live there can no longer access the water they have relied upon for generations?"

86. *National Geographic* further reported, "[e]xperts who have reviewed the [Company's] Namibian environmental impact assessment for the test wells point to serious problems in the way it was carried out," further explaining that:

> National Geographic asked three independent experts to evaluate ReconAfrica's environmental impact assessment (EIA) for its operations in Namibia.
>
> The experts pointed to the lack of physical assessments of fauna and flora and to the possible effects on local communities and other people, on archaeological sites, and on groundwater and surface water. They said that the assessment, consisting only of desktop studies without any fieldwork, is not sufficient to justify the proposed drilling.

According to a former environmental consultant in the mining sector consulted by the magazine, "It is shocking that this EIA was authorized at all."

87. *National Geographic* further reported that many local residents were completely unaware of ReconAfrica's plans, despite Namibian legal requirements for the Company to consult with interested and affected communities. *National Geographic* detailed how ReconAfrica's hired environmental assessment practitioner, Sindila Mwiya, refused to comply

with requests for information he was legally mandated to provide, and acted as an aggressive promoter for the Company instead of performing his ostensibly objective role.

88. Over time, the concerns initially highlighted by *National Geographic* and its sources have proven to be well-founded. In the ensuing year and a half since beginning its coverage of ReconAfrica, *National Geographic*, *The Namibian*, *The Globe and Mail*, and other media outlets worldwide have revealed ReconAfrica hastily pushing forward its operations despite deficient environmental protections and community consultations, and a host of other problems. For example, the Company has been reported to clear land and drill without obtaining required permits. Reports indicate that ReconAfrica has stored drilling waste in un-lined pits from which it can seep into the ground and cause environmental contamination. ReconAfrica's consultant Mr. Mwiya has repeatedly been documented belittling and berating those who raise concerns about the Company's activities, despite his ostensible role as an objective environmental practitioner.

89. The public outcry over ReconAfrica's activities has been so great that it has even reached the highest levels of the U.S. government. In a bipartisan letter dated June 16, 2021, Senator Patrick Leahy and Congressman Jeff Fortenberry called for a broad investigation of ReconAfrica. The letter was addressed to Secretary of State Antony Blinken, Attorney General Merrick Garland, SEC Chairman Gary Gensler, and Agency for International Development (USAID) Administrator Samantha Power. The letter stated that ReconAfrica's activities are "potentially counter to stated United States foreign policy goals," explaining that "when extractive industries fail to follow international standards, such development risks serious and potentially irreparable harm to unique, vulnerable, and irreplaceable areas such as the Okavango Delta and its water resources." The letter noted "serious concerns about whether [Namibia's]

laws were actually followed." The Congressman and Senator concluded, "[w]e believe the concerns raised by National Geographic warrant careful attention by the United States government."

## V. DEFENDANTS FAILED TO DISCLOSE MATERIAL FACTS REGARDING RECONAFRICA'S PROSPECTS FOR DISCOVERING AND EXTRACTING COMMERCIALLY VIABLE OIL AND GAS DEPOSITS

90. Throughout the Class Period, Defendants knew, but failed to disclose to investors, material information that created risks for ReconAfrica's business. Defendants failed to disclose that: (1) they had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans; (2) even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans; and (3) Defendants possessed data from ReconAfrica's first and second test wells that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable. These undisclosed facts severely undermined Defendants' misleading public statements during the Class Period.

### A. ReconAfrica Had Not Determined Whether Namibia Would Allow Fracking, Which Had Never Been Done In Namibia, And Which Was Central To ReconAfrica's Business Plans

91. During the Class Period, ReconAfrica's prospects for future success substantially depended not only on finding previously undiscovered, commercially viable oil and gas deposits in Namibia, but also on being able to obtain permission from the Namibian government to extract those deposits, if found.

92. From the February 28, 2019 beginning of the Class Period until October 2020, Defendants repeatedly and consistently told investors that ReconAfrica's plans centered on

"shales" and "unconventional" resources, *i.e.* oil and gas deposits that would require fracking to extract.

93. Defendants gave no public indication that there would be any particular difficulty, or even that there was any substantial uncertainty, in obtaining approval to frack in Namibia. Defendants went so far as to report to investors a 90% probability of obtaining regulatory approval to extract any oil and gas deposits they found.

94. But Defendants' statements regarding their targeting of "shales" and "unconventional" resources, and their prospects for obtaining regulatory approval for extraction, were materially misleading due to Defendants' failure to inform investors of hard facts that severely undermined these statements.

95. Defendants failed to disclose to investors that they had not determined whether Namibia would allow fracking.

96. This omission was all the more materially misleading because Namibia had never granted any company permission to frack, another critical hard fact that Defendants failed to disclose to investors while touting their fracking plans.

97. Defendants' failure to determine if Namibia would allow fracking, and the fact that Namibia had never before allowed fracking, presented material risks to ReconAfrica's business plans.

### B. When Namibia Came Out Against Fracking ReconAfrica Abruptly Shifted To Pretending It Did Not Intend To Frack, While Fracking Secretly Remained A Key Aspect Of Its Business Plans

98. After Defendants had spent over a year and half misleadingly touting their fracking plans to investors, reporting and official statements seriously called into doubt whether ReconAfrica would in fact be allowed to frack on its licensed properties.

99. On September 16, 2020, *The Namibian* published an article titled "Oil drillers threaten Okavango ecosystem," discussing ReconAfrica's apparent intent to use fracking, and related environmental, health and safety concerns. On September 18, 2020, the Namibia Ministry of Mines and Energy responded, issuing a press release which stated:

> no Licence for the development of unconventional resources (*E.g. Shale gas*) has ever been applied for/or granted in Namibia. This means that on record, no hydraulic fracking activities are planned in Namibia. It also means that the company Recon will not be conducting any fracking activities in the Okavango Delta.

100. In response to these developments and inquiries from *National Geographic*, Defendants abruptly overhauled ReconAfrica's public messaging to focus exclusively on conventional resources, while stripping all references to shales, unconventional resources, and fracking, from their published statements. Defendants did not even acknowledge their about-face, but brazenly acted as though their plans had all along focused on conventional resources.

101. However, Defendants' public messaging was the only thing that changed. Despite the dramatic reversal, fracking remained a key aspect of Defendants' business plans, just as before. While Defendants could change their messaging overnight, they could not change the geology of their licensed properties, which Defendants' own preliminary analysis had shown to be potentially viable primarily for fracking, not for conventional production. From October 2020 through at least the end of the Class Period, Defendants still secretly planned to eventually seek permission to frack from the Namibian government.

102. Defendants' public statements from October 2020 on have attempted to walk a fine line, on the one hand giving the strong impression that Defendants have no intentions to frack, while on the other hand refusing to categorically rule out the possibility. Indeed, despite being repeatedly challenged to pledge never to frack in Namibia, Defendants have failed to do

so. Instead, Defendants have made cryptic statements such as "the Namibian people and authorities will determine if and how they will extract" any oil and gas that ReconAfrica finds.

103. Defendants' numerous statements from October 2020 on regarding their purported focus on conventional resources were materially misleading for omitting the critical fact that ReconAfrica still intended to eventually seek permission to frack in Namibia. This remained a key focus of ReconAfrica's business plans, which now faced additional material risks after the immense public backlash over the Company's previously stated fracking plans and after Namibia's publicly stated its opposition to fracking.

### C. ReconAfrica's Test Wells Produced Poor Results, Which The Company Withheld From Investors While Misleadingly Disclosing Cherry-Picked Information

104. Shortly after pivoting to tout ReconAfrica's purported focus on conventional resources, Defendants released a barrage of promotional press releases and articles from paid stock promoters hyping the drilling of the Company's first two test wells in Namibia.

105. Defendants' statements about these wells selectively touted what they called "a working conventional petroleum system" and "oil and gas indicators," along with other positive spin and cherry-picked data points.

106. But Defendants' statements omitted critical hard facts in the form of key technical data in the Company's possession that was necessary for investors to adequately evaluate the test well results. Such standard technical information includes, for example, well depth, mud log data[5] and wireline log data.[6]

---

[5] Mud logging is the creation of a detailed record of subsurface geology prepared during the drilling of a well by examining the cuttings of rock brought to the surface by the circulating drilling medium (most commonly drilling "mud"). The mud log is an important record of drilling activity containing parameters such as drill time, drilling rates, mud characteristics, lithology,

107. When Defendants did belatedly reveal some of this information for ReconAfrica's first test well it showed, in the words of Viceroy Research, that the well was "effectively a failure," that one of the geological zones Defendants had touted as promising for petroleum production was on the contrary "completely saturated with water," and that the other was "too tight for a conventional commercial play or even reliable readings of water saturation" (*i.e.*, it may be suitable for fracking, but not conventional production).

108. Defendants' decision to hype certain cherry-picked test well results materially misled investors due to Defendants' omission of the key data in their possession which revealed that the wells showed poor prospects for conventional oil and gas production.

## VI. DEFENDANTS SOLD TENS OF MILLIONS OF DOLLARS OF ARTIFICIALLY INFLATED RECONAFRICA STOCK

109. ReconAfrica, the Individual Defendants, and other Company insiders collectively sold tens of millions of dollars of ReconAfrica stock during the Class Period in order to benefit from the artificially inflated price of the Company's stock.

110. The Company's publicly traded stock price more than quadrupled over the early months of 2021, in response to Defendants' misleading omissions. This included the more than doubling of the Company's stock price over just two trading sessions following its April 15, 2021 press release announcing that it had found "clear evidence of a working conventional petroleum system" from the results of its first test well on its licensed property in Namibia. As

---

total combustible gas in mud and individual hydrocarbon compounds in the gas, and visual hydrocarbon indicators (*i.e.*, oil and gas "shows").

[6] Wireline logging is a related but distinct process from mud logging, both of which are standard practice in oil and gas exploration. Wireline logging is performed by lowering a logging tool - or a string of one or more instruments - on the end of a wireline into a well and recording petrophysical properties using a variety of sensors. Wire logging tools may measure a variety of data including electrical, acoustic, pressure and other properties. This data is used to infer rock type, porosity, permeability and other characteristics.

discussed below, this press release touted "over 200 meters . . . of oil and gas indicators" encountered in the well results, while omitting critical data that was necessary for investors to be able to accurately assess the results of the test well.

111. Shortly following this artificial quadrupling of ReconAfrica's stock price, on May 27, 2021, the Company completed a public offering of 4,358,040 units at a price of C$9.50 per unit for aggregate gross proceeds of C$41,401,380 with each unit comprising one Common Share and one-half common share purchase warrant. The May 27, 2021 public offering was a dramatic departure from the Company's prior fundraising, more than doubling the total amount of investor funds that the Company had raised in the entire 21-month period since it became publicly listed in the August 2019 Reverse Takeover.

112. Also following shortly after Defendants' misleading omissions and the early 2021 quadrupling of ReconAfrica's stock price, certain Individual Defendants and other ReconAfrica insiders made substantial sales of Company stock, which were out of line with their prior trading histories. Certain of these sales came shortly before the Company released material adverse information that caused substantial decreases in its share price.

113. Defendant Escribano joined ReconAfrica as CFO in January 2020. Up until May 2021, he never sold any ReconAfrica stock. On May 7, 2021, mere weeks after the Company's April 15, 2021 press release and the doubling of its stock price, Escribano sold 10,000 ReconAfrica shares (10% of his holdings at the time) for C$10.00 each, generating cash proceeds of C$100,000.

114. From joining ReconAfrica up until July 2021, Defendant Escribano never exercised any stock options. On July 20, 2021, he exercised options to purchase 80,000 shares of ReconAfrica stock for C$0.76 per share, and then immediately sold 75,000 of those shares (43%

of his holdings at the time) for C$10.01 each, generating net cash proceeds of C$689,950 from the combined options exercise and sale. This sale occurred approximately two weeks before ReconAfrica published data from its first test well, which caused a roughly 29% decrease in the Company's stock price.

115. Defendant Evans joined ReconAfrica in November 2019, was promoted to COO in April 2020, and promoted to CEO in August 2020. Up until May 2021, he never sold any ReconAfrica stock or exercised any ReconAfrica warrants. On May 3, 2021, Evans exercised warrants to purchase 44,118 shares of ReconAfrica stock for C$0.50 per share. Then, on May 4, 2021, Evans sold 35,000 of these shares (29% of his holdings at the time) for approximately C$9.28 each,[7] generating net cash proceeds of approximately C$302,741 from the combined warrants exercise and sale.

116. Nicholas Steinsberger joined ReconAfrica in June 2020 as Senior Vice President, Drilling and Completions. Up until August 2021 he never sold any ReconAfrica stock. On August 16, 2021, Steinsberger sold 28,200 ReconAfrica shares (5% of his holdings at the time) for approximately C$7.03 per share, generating cash proceeds of C$198,367.26. This sale occurred on the same day that Viceroy published a report further partially revealing the Defendants' fraud, and one day prior to ReconAfrica's issuance of a weak rebuttal press release that failed to refute Viceroy's key claims. Over August 16 and 17, 2021 the Company's stock price decreased by a total of almost 20%.

[7] Insider trading records on file with Canadian regulators generally provide prices in Canadian dollars. However, Defendant Evans' insider trading records filed with Canadian regulators list a unit price for this transaction of 7.56, despite the fact that the Company's stock traded in a range of C$9.17 to C$9.75 on the Canadian TSX exchange on May 4, 2021. As such, the reported price appears to be quoted in U.S. dollars. On May 4, 2021, one U.S. dollar was worth C$1.22807 at prevailing exchange rates, so $7.56 was approximately equivalent to C$9.28. On May 4, 2021 the Company's stock traded in a range of $7.26 to $7.93 on the U.S. OTCQX exchange.

117. Anna Tudela joined ReconAfrica in January 2020 as Corporate Secretary. On April 22, 2021, she apparently exercised options or warrants[8] to purchase 25,000 shares of ReconAfrica stock at C$0.51 per share, and then immediately sold all of those shares (63% of her holdings at the time) for C$7.25 each, generating net cash proceeds of C$168,500 from the combined exercise and sale. This was only one week after the Company's April 15, 2021 press release that selectively disclosed only limited information from its first test well.

118. Then on April 29, 2021, Tudela exercised options to purchase 12,500 shares of ReconAfrica stock at C$2.19 per share, and then immediately sold all of those shares (46% of her holdings at the time) for C$8.37 each, generating net cash proceeds of C$77,250 from the combined options exercise and sale. On May 7, 2021, Tudela sold another 4,706 shares (32% of her holdings at the time) for C$10.08 each, generating additional cash proceeds of C$47,436.48.

119. On July 20, 2021, approximately two weeks before ReconAfrica published data from its first test well, Tudela exercised options to purchase 50,000 shares of ReconAfrica stock at C$6.88 per share, and then immediately sold all of those shares (80% of her holdings at the time) for C$10.00 each, generating net cash proceeds of C$156,000 from the combined options exercise and sale. That same day, she also exercised options to purchase another 25,000 shares of ReconAfrica stock at C$0.51 per share, and then immediately sold all of those shares (67% of her holdings at the time) for C$9.75 each, generating an additional C$231,000 of net cash proceeds from the combined options exercise and sale.

---

[8] Ms. Tudela's insider trading records filed with Canadian regulators list this transaction as an "[a]cquisition . . . in the public market," despite listing a per unit price of C$0.51 and despite the fact that the Company's stock traded in a range of C$6.35 to C$7.48 on the Canadian TSX exchange on April 22, 2021. As such, the transaction appears to be an exercise of options or warrants, not an open market purchase.

## VII. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

120. Defendants made numerous, similar statements over the Class Period,[9] that misleadingly omitted to disclose that: (1) they had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans; (2) even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans; and (3) Defendants possessed data from ReconAfrica's first and second test wells that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable.

### A. February 28, 2019 Management Information Circular Touting Unconventional Resources

121. The Class Period begins on February 28, 2019. On that day the Company, at that time known as Lund Enterprises Corp., filed on SEDAR a Management Information Circular ("2019 Circular"). The 2019 Circular described a planned reverse takeover by Lund of 1163631 BC Ltd. Lund was essentially a shell company with limited operations (which would be divested in connection with the Reverse Takeover) and listings on Toronto's TSX-V stock exchange and the U.S.-based OTC Pink Sheets exchange. 1163631 BC Ltd. was a holding company recently formed to acquire corporate ownership of the business that is now ReconAfrica, then doing business as Reconnaissance. The purpose of the RTO was essentially for Reconnaissance to gain a public stock listing, while avoiding the more rigorous initial public offering process. In

---

[9] For the sake of brevity, Lead Plaintiff only alleges herein certain key and/or representative misleading statements.

connection with the planned Reverse Takeover, the 2019 Circular contained certain information regarding the business of ReconAfrica's predecessor, Reconnaissance.

122. The 2019 Circular stated that "Reconnaissance is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa." In this context, "unconventional" refers to oil and gas deposits that require fracking to extract.

123. In describing the chance of discovering a significant accumulation of petroleum on the licensed lands of Reconnaissance, the 2019 Circular described the Company's target as an "unconventional play," and used this classification to justify a higher reported probability of discovery:

> As no data is available for the Kavango Basin, the value of 0.5 for each component (50/50 chance of success) was used representing low confidence for most geological components. The exception was the trap/seal component where 0.7 was used as it has a lower risk to be an issue in this unconventional play.

124. The 2019 Circular stated that after Reconnaissance's initial work program to confirm the presence of an active petroleum system on its licensed lands in Namibia, "Reconnaissance anticipates it will begin further exploration and development of conventional and unconventional hydrocarbons in commercial quantities."

125. The 2019 Circular stated "Reconnaissance has interpreted high-resolution aero-magnetic data documenting a very deep untested sub-basin (Kavango) with optimal conditions for preserving a thick interval of organic rich marine shales in the lower portion of the Karoo Super Group." In this context, "shales" refers to oil and gas deposits that require fracking to extract.

126. The 2019 Circular states that Reconnaissance's evaluation of the prospects for a commercial oil and gas discovery on its licensed lands in Namibia were based on data regarding other shale developments. For example, it stated "[t]he ratios were also checked for

reasonableness against the shale and 'hybrid' shale plays in North America," and "[t]he recovery factor ranges for gas and oil were estimated using Sproule's internal data and general knowledge of the shale and 'hybrid' plays in North America."

127. In describing the chance of being able to develop any petroleum deposits found, assuming a successful discovery, the 2019 Circular listed the probability of "Regulatory Approval" for development as "0.9," *i.e.* 90%.

128. The 2019 Circular contained a "Certificate of Lund Enterprises Corp." stating "The foregoing document constitutes full, true and plain disclosure of all material facts relating to the securities of Lund Enterprises Corp. assuming completion of the proposed Reverse Takeover of 1163631 B.C. Ltd.," which was signed by Defendant Brown as CFO of Lund.

129. The 2019 Circular contained a "Certificate of 1163631 B.C. Ltd." stating "The foregoing document as it relates to 1163631 B.C. Ltd. constitutes full, true and plain disclosure of all material facts relating to the securities of 1163631 B.C. Ltd.," which was signed be Defendant Park as President and Director of 1163631 B.C. Ltd.

130. Nowhere did the 2019 Circular disclose that no one had ever been granted permission to frack in Namibia.

131. Nowhere did the 2019 Circular disclose that Reconnaissance had not determined whether Namibia would allow fracking.

132. The above statements identified in ¶¶122-29 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that Defendants had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans.

**B. October 7, 2019 Announcement Regarding Shales as Test Wells' Main Target**

133. On October 7, 2019, ReconAfrica issued a press release titled "ReconAfrica Announce Grant of Environmental Clearance Certificate for Namibia Drilling Operations."

134. The press release stated in relevant part, "[t]he primary objective of the initial multi well drilling program is to establish an active petroleum system, of which the main target is the Permian marine shales. The secondary objective is the evaluation of conventional hydrocarbon bearing stratigraphy." In this context "shales" refers to oil and gas deposits that require fracking to extract, and "conventional" refers to such deposits that do not require fracking to extract.

135. Nowhere did the press release disclose that no one had ever been granted permission to frack in Namibia.

136. Nowhere did the press release disclose that ReconAfrica had not determined whether Namibia would allow fracking.

137. The above statements identified in ¶134 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that Defendants had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans.

**C. July 27, 2020 ReconAfrica 2019 Annual Information Form Touting Unconventional Resources**

138. On July 28, 2020, ReconAfrica filed on SEDAR its Annual Information Form for the Financial Year Ended December 31, 2019, dated July 27, 2020.

139. Similar to the 2019 Circular and the October 7, 2019 press release, the 2019 AIF emphasized ReconAfrica's focus on unconventional resources and shales, *i.e.* oil and gas deposits that would require fracking to extract.

140. The 2019 AIF stated "[t]he Company is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa."

141. The 2019 AIF described a report by Sproule International Limited ("Sproule") estimating the possible oil and gas resources on ReconAfrica's licensed properties. The 2019 AIF stated:

> The undiscovered petroleum initially-in-place and prospective resources included in the Sproule Report represent the unconventional (tight gas, shale gas and tight oil) resources of the Company's lands and do not include potential conventional prospective resources. There could be additional potential conventional hydrocarbon accumulations on the Company's lands that will be better defined after drilling one or several wells on the Company's lands.

142. In describing the chance of discovering a significant accumulation of petroleum on the licensed lands of ReconAfrica, the 2019 AIF described the Company's target as an "unconventional play," and used this classification to justify a higher reported probability of discovery:

> As no data is available for the Kavango Basin, the value of 0.5 for each component (50/50 chance of success) was used representing low confidence for most geological components. The exception was the trap/seal component where 0.7 was used as it has a lower risk to be an issue in this unconventional play.

143. The 2019 AIF stated:

> Depending on the success of the initial work program, the Company anticipates it will begin further exploration and development of conventional and unconventional hydrocarbons in commercial quantities or seek potential partnering opportunities to assist in its exploration and development of conventional and unconventional hydrocarbons in the Kavango Basin.

144. The 2019 AIF described Defendant Evans as "an expert in developing unconventional resources."

145. The 2019 AIF described ReconAfrica's Senior Vice President for Drilling and Completions, Nick Steinsberger, as "working with ReconAfrica on their Namibia Licence to drill

and test their block for conventional and unconventional targets." The 2019 AIF described Mr. Steinsberger as:

> responsible for the first slickwater stimulation in the Barnett Shale in 1997, what is referred to as the first modern shale frac. During his time at Mitchell Energy, Mr. Steinsberger helped turn the Barnett Shale into the industry's first commercial shale play.

The 2019 AIF stated that Mr. Steinsberger "has been involved in over 600 horizontal shale wells." The 2019 AIF further stated "Mr. Steinsberger has authored many technical papers on completion techniques in shales and has been written about in several, the most well-known being 'The Frackers'."

146. The 2019 AIF described ReconAfrica Geochemist Daniel Jarvie as having been the Chief Geochemist for "the largest producer of shale oil resource plays in North America." The 2019 AIF further describes Mr. Jarvie as:

> the President of Worldwide Geochemistry, LLC, working as a consultant to industry, focused on unconventional shale resource plays and prospects, and has also established a research lab to evaluate various aspects of unconventional shale-gas and shale-oil petroleum systems as well as conventional petroleum systems.

147. The 2019 AIF describes ReconAfrica Geologist Dale Mitiska as having:

> an extensive background in evaluation and description of horizontal shale oil resource plays throughout North America, including the Williston Basin/Bakken shale, the San Juan, the DJ Basins, the Niobrara and Barnett shale. Additionally, Mr. Mitiska has valued expertise in major North American shale plays.

148. The 2019 AIF describes Defendant Dhanani as "involved with a drilling and appraisal program at the Silurian black shales in Northern Africa (Tunisia)."

149. The 2019 AIF stated that ReconAfrica's planned three initial test wells "will be designed to test organic rich shales and more shallow conventional structures through the sedimentary basin."

150. The 2019 AIF stated that "[t]he Company has interpreted high-resolution aero-magnetic data documenting a very deep untested sub-basin (Kavango) with optimal conditions for preserving a thick interval of organic rich marine shales in the lower portion of the Karoo Super Group."

151. In describing the chance of being able to develop any petroleum deposits found, assuming a successful discovery, the 2019 AIF listed the probability of "Regulatory Approval" for development as "0.9," *i.e.* 90%.

152. On the same date that ReconAfrica filed the 2019 AIF on SEDAR, it also filed two "Certification of Annual Filings" forms, one signed by each of Defendants Escribano and Park, in which they certified:

> 1. *Review*: I have reviewed the AIF, annual financial statements and annual MD&A, including for greater certainty all documents and information that are incorporated by reference in the AIF (together, the "Annual Filings") of the Issuer for the financial year ended December 31, 2019.
>
> 2. *No misrepresentations*: Based on my knowledge, having exercised reasonable diligence, the Annual Filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to make a statement not misleading in light of the circumstances under which it was made, for the period covered by the Annual Filings.
>
> 3. *Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the Annual Filings fairly present in all material respects the financial condition, financial performance and cash flows of the Issuer, as of the date of and for the periods presented in the Annual Filings.

153. Nowhere did the 2019 AIF disclose that no one had ever been granted permission to frack in Namibia.

154. Nowhere did the 2019 AIF disclose that ReconAfrica had not determined whether Namibia would allow fracking.

155. The above statements identified in ¶¶140-52 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that Defendants had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans.

### D. August 4, 2020 Investor Presentation Touting Unconventional Resources

156. On August 4, 2020, ReconAfrica filed on SEDAR an investor presentation dated August 4, 2020 (the "August 2020 Presentation").

157. Similar to the 2019 Circular, the October 7, 2019 press release, and the 2019 AIF, the August 2020 Presentation emphasized ReconAfrica's focus on unconventional resources and shales, *i.e.* oil and gas deposits that would require fracking to extract.

158. The August 2020 Presentation described ReconAfrica's licensed properties as a "8.75 [million] acre conventional and unconventional play."

159. The August 2020 Presentation estimated that ReconAfrica's licensed properties contained a total of over 18 billion barrels of oil in the form of "Unconventional Resource," while indicating that estimation of any "Conventional Resource" was a "Work in Progress."

160. The August 2020 Presentation indicated that two wells of ReconAfrica's "Initial 3 Well Drilling Program" would be located on "Unconventional Plays," and that both planned "Secondary Wells" would be located on "Unconventional Plays":




161. Nowhere did the August 2020 Presentation disclose that no one had ever been granted permission to frack in Namibia.

162. Nowhere did the August 2020 Presentation disclose that ReconAfrica had not determined whether Namibia would allow fracking.

163. The above statements identified in ¶¶158-60 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that Defendants had not determined whether Namibia would allow fracking, which had never been done in Namibia, and which was central to the Company's business plans.

**E. October 20, 2020 Announcement Regarding No Hydraulic Fracturing Planned For Test Wells**

164. On October 20, 2020, ReconAfrica published a press release titled "Kavango Basin Operations Update."

165. Shortly prior to the publication of the October 20, 2020 press release, reporting and official statements had raised questions regarding whether ReconAfrica would be allowed to frack on its licensed properties.

166. On September 16, 2020, *The Namibian*, the largest daily newspaper in Namibia, published an article titled "Oil drillers threaten Okavango ecosystem," discussing ReconAfrica's apparent intent to use fracking, and related environmental, health and safety concerns. On September 18, 2020, the Namibia Ministry of Mines and Energy issued a press release in response to that article, stating that:

> no Licence for the development of unconventional resources (*E.g. Shale gas*) has ever been applied for/or granted in Namibia. This means that on record, no hydraulic fracking activities are planned in Namibia. It also means that the company Recon will not be conducting any fracking activities in the Okavango Delta.

National Geographic magazine sent ReconAfrica questions regarding ReconAfrica's fracking intentions, to which ReconAfrica responded, in advance of National Geographic publishing its October 28, 2020 article, "Oil drilling, possible fracking planned for Okavango region-elephants' last stronghold," which similarly discussed related environmental, health and safety concerns.

167. In response to these developments, ReconAfrica's October 20, 2020 press release titled "Kavango Basin Operations Update," attempted to deflect concerns, questions and criticisms surrounding the Company by misleadingly indicating that it did not intend to frack, while omitting critical information about ReconAfrica's true intentions.

168. The October 20, 2020 press release stated regarding ReconAfrica's initial three well test drilling program, "[t]here is no hydraulic fracturing or other stimulation in the well program, as the targets are conventional reservoirs."

169. The press release also stated that ReconAfrica was performing seismic testing to obtain additional geological data, and that the seismic program "is designed to delineate conventional hydrocarbon traps throughout the Kavango Basin."

170. In stark contrast to ReconAfrica's prior public statements, the press release contained no mention of unconventional resources or shales.

171. Nowhere in the press release did ReconAfrica state whether or not it intended to frack on its licensed properties in the future.

172. The above statements identified in ¶¶166-68 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans.

**F. November 2020 Investor Presentation Removing All References To Unconventional Resources**

173. ReconAfrica published on its website an investor presentation dated November 2020 (the "November 2020 Investor Presentation").

174. The November 2020 Presentation was substantially similar to the August 2020 Presentation, except that it removed all references to unconventional resources or shales.

175. The November 2020 Presentation included the same map of planned wells as the August 2020 Presentation, except that the two "secondary wells" located on "unconventional

traps" had been removed, and the word "unconventional" had twice been replaced by references to "source rock":




176. Nowhere in the November 2020 Presentation did ReconAfrica state whether or not it intended to frack on its licensed properties in the future.

177. The above statements identified in ¶174 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans.

**G. April 15, 2021 Announcement Regarding First Test Well Results**

178. On April 15, 2021, ReconAfrica and the Namibia Ministry of Mines and Energy published a press release titled "ReconAfrica's First of Three Wells Confirms a Working Petroleum System in the Kavango Basin, Namibia."

179. The press release stated that "preliminary analysis of the data from the 6-2 well, the first of a three well drilling program, provides clear evidence of a working conventional petroleum system in the Kavango Basin."

180. Nowhere did the April 15, 2021 press release state whether or not ReconAfrica intended to frack on its licensed properties in the future.

181. The above statements identified in ¶178 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans.

182. The April 15, 2021 press release stated that:

> The well sample log of the 6-2 provides over 200 meters (over 660 feet) of oil and natural gas indicators/shows over three discrete intervals in a stacked sequence of reservoir and source rock. Extraction of oil from these samples and subsequent fingerprinting for key characteristics of the liquids, supports an active petroleum system with multiple source intervals.

183. The press release quoted Dan Jarvie, who it identified as a "petroleum systems chemist and member of ReconAfrica's Advisory Board," as stating:

> These shows are indicative of migrated, thermogenic petroleum and occur over three different intervals in the 6-2 test well. The intervals penetrated include highly porous, permeable sediments and marine source rocks as predicted, and an extensive marine carbonate lithofacies. Mud gas results indicate a high BTU gas with the presence of light oil in numerous cutting samples. Based on these initial results, the components and processes for a working petroleum system are all present.

184. Nowhere did the April 15, 2021 press release disclose well depth, mud log data, wireline log data, or the other information necessary for investors to adequately evaluate the results from ReconAfrica's first test well.

185. The above statements identified in ¶¶181-82 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors data from ReconAfrica's first test well that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable.

186. On this news, the Company's share price rose $1.62 as compared to the prior day closing price, or 58.1%, to close at $4.41 per share on April 15, 2021, on heavy trading volume. In the next trading session on April 16, 2021, the Company's share price continued rising on heavy trading volume by an additional $1.69, or 38.3%. And in the following trading session on April 19, 2021, the Company's share price continued to rise by an additional $0.70, or 11.5%, to close at $6.80, again on heavy trading volume. In total the Company's share price had risen by $4.01, or 143.7% as compared to its closing price on April 14, 2021.

### H. May 19, 2021 Revised 2020 Annual Information Form Removing All References To Unconventional Resources

187. On April 30, 2021, ReconAfrica filed on SEDAR its Annual Information Form for the Financial Year Ended December 31, 2020, dated April 30, 2021.

188. Apparently forgetting to use the Company's misleading new public messaging regarding fracking, the Original 2020 AIF failed to remove references to unconventional resources and shales as most other ReconAfrica public statements had done since October 20, 2020. Instead, the Original 2020 AIF repeated verbatim numerous statements regarding unconventional resources and shales that had been contained in the 2019 AIF, apparently having copied and pasted the disclosures for the prior year's AIF.

189. For example, the Original 2020 AIF stated "[t]he Company is targeting equivalent rocks to the hydrocarbon-prone unconventional deposits within the Karoo Group of the Main Karoo Basin in South Africa." And the Original 2020 AIF stated that ReconAfrica's planned three initial test wells "will be designed to test organic rich shales and more shallow conventional structures through the sedimentary basin."

190. Then, on May 19, 2021, ReconAfrica filed on SEDAR an Amended and Restated Annual Information Form for the Financial Year Ended December 31, 2020, dated May 19, 2021 (the "Revised 2020 AIF").

191. ReconAfrica did not explain why it was filing a revised annual information form only 19 days after filing the original. Once again, this appears to have been in response to questions submitted to the Company by *National Geographic*. On May 18, 2021, the magazine sent ReconAfrica questions, to which ReconAfrica responded, in connection with *National Geographic*'s upcoming May 21, 2021 article, "Oil exploration company in Okavango wilderness misled investors, complaint to SEC says."

192. In an apparent effort to correct ReconAfrica's failure to use the Company's misleading new public messaging regarding fracking in the Original 2020 AIF, the Revised 2020 AIF removed all references to unconventional resources and almost all references to shales, as most other ReconAfrica public statements had done since October 20, 2020. The Revised 2020 AIF deleted a 20-page section of the Original 2020 AIF titled "Properties of the Company," that had described estimates of the unconventional resources located on ReconAfrica's licensed properties. This reduced the length of the AIF from 64 to 44 pages.

193. The Revised 2020 AIF stated, "The first well ('6-2') of the three well program in the deep Kavango Basin of North East Namibia achieved total depth in early April 2021. There

was no hydraulic fracturing or other stimulation in the well program, as all targets for the drilling program are conventional reservoirs."

194. Nowhere did the Revised 2020 AIF disclose whether or not ReconAfrica intended to frack on its licensed properties in the future.

195. The above statements identified in ¶192 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans.

196. The Revised 2020 AIF repeated the selective information from ReconAfrica's April 15, 2021 press release, stating:

> The well sample log of the 6-2 provides over 200 metres (over 660 feet) of oil and natural gas indicators/shows over three discrete intervals in a stacked sequence of reservoir and source rock. Extraction of oil from these samples and subsequent fingerprinting for key characteristics of the liquids, supports an active petroleum system with multiple source intervals.

The Revised 2020 AIF similarly stated that ReconAfrica found "clear evidence of a working conventional petroleum system in the Kavango Basin" from its first test well.

197. On the same date that ReconAfrica filed the Revised 2020 AIF on SEDAR, it also filed two "Certification of Annual Filings" forms, one signed by each of Defendants Escribano and Evans, in which they certified:

> 1. *Review*: I have reviewed the AIF, annual financial statements and annual MD&A, including for greater certainty all documents and information that are incorporated by reference in the AIF (together, the "Annual Filings") of the Issuer for the financial year ended December 31, 2020.
>
> 2. *No misrepresentations*: Based on my knowledge, having exercised reasonable diligence, the Annual Filings do not contain any untrue statement of a material fact or omit to state a material fact required to be stated or that is necessary to

> make a statement not misleading in light of the circumstances under which it was made, for the period covered by the Annual Filings.
>
> 3. *Fair presentation*: Based on my knowledge, having exercised reasonable diligence, the annual financial statements together with the other financial information included in the Annual Filings fairly present in all material respects the financial condition, financial performance and cash flows of the Issuer, as of the date of and for the periods presented in the Annual Filings.

198. Nowhere did the Revised 2020 AIF disclose the well depth, mud logs, wireline logs, or other information necessary for investors to adequately evaluate the results from ReconAfrica's first test well.

199. The above statements identified in ¶¶195-96 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors data from ReconAfrica's first test well that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable.

**I. June 3, 2021 Announcement Regarding Second Test Well Results**

200. On June 3, 2021 ReconAfrica published a press release titled "First Section Of The Second Well (6-1) Provides Further Confirmation Of A Working Petroleum System And First Report of Progress On ESG."

201. The press release stated, "on May 5, 2021 the Company commenced drilling operations of its second well (6-1), of an initial three well program to continue the evaluation of working conventional hydrocarbon systems confirmed in the first well (6-2) in the Kavango Sedimentary Basin." The June 3, 2021 press release also stated, "[t]his second well (6-1), like the first well (6-2), is in the same subbasin, shows clear evidence of a working conventional petroleum system."

202. Nowhere did the June 3, 2021 press release disclose whether or not ReconAfrica intended to frack on its licensed properties in the future.

203. The above statements identified in ¶200 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors that even after Namibia came out against fracking and Defendants stated their focus was on conventional resources, ultimately gaining approval for, and engaging in, fracking remained a key aspect of ReconAfrica's business plans.

204. The June 3, 2021 press release stated, "Based on initial analysis of this first section, ReconAfrica is pleased to report 134m (440 feet) of light oil and gas shows from the 6-1 well. The shows are similar in character to those seen in the 6-2 well, 16 km to the south. This second well (6-1), like the first well (6-2), is in the same subbasin, shows clear evidence of a working conventional petroleum system."

205. The press release quoted Defendant Granath as stating, "In these first two wells, the many oil and gas shows, with such variety, is certainly remarkable. It is highly encouraging to see clastic and thick carbonate sections which appear to have similar reservoir characteristics as observed in many other petroleum provinces."

206. Nowhere did the June 3, 2021 press release disclose the well depth, mud log data, wireline log data, or the other information necessary for investors to adequately evaluate the results from ReconAfrica's second test well.

207. The above statements identified in ¶¶203-04 were materially false and/or misleading, and/or failed to disclose material adverse facts because Defendants failed to disclose to investors data from ReconAfrica's first and second test wells that revealed poor prospects for achieving conventional oil and gas production that would be commercially viable.

208. On this news, the Company's share price rose $1.08 as compared to the prior day closing price, or 16.1%, to close at $7.78 per share on June 3, 2021, on heavy trading volume.

## VIII. THE TRUTH EMERGES, CAUSING RECONAFRICA'S STOCK PRICE TO CRASH

209. Over the period from June 24, 2021 to September 7, 2021, the material risks and adverse information previously concealed by Defendants' false and misleading statements and omissions were revealed in a series of research reports issued by Viceroy Research LLC ("Viceroy") and in public statements by ReconAfrica. As a result, ReconAfrica's stock price suffered steep losses.

### A. June 24-28, 2021 Viceroy Report & ReconAfrica Responses

210. On June 24, 2021, Viceroy published online a report titled "ReconAfrica – No Oil? Pump Stock." The 29-page report detailed certain aspects of Defendants' fraud, and was based on Viceroy's comprehensive research, its consultation with industry experts, and its interview with Namibia's Petroleum Commissioner, Maggy Shino.

211. The June 24 Viceroy report revealed that "Namibia's Petroleum Commissioner, Maggy Shino, confirmed to Viceroy 'there is no way we will license RECO or any other company to carry out fracking or unconventional hydrocarbon exploration in Namibia'."

212. The report also revealed that the "clear evidence of a working conventional petroleum system" touted by the Company in its April 15, 2021 press release:

> means a lot less than it seems. A petroleum system is any indication of oil or gas in an area, excluding any economic considerations of exploration. Drill deep enough in any basin on the planet and you will find a "petroleum system". These press releases are akin to announcing RECO found a shell at the beach.

213. The June 24 Viceroy report revealed that ReconAfrica's April 15, 2021 and June 3, 2021 press releases regarding its test well results "have left out key information" including:

> - Any mention of mud logs, which are records of the drilling unit, subsurface geology and oil and gas encountered.
> - Any mention of drill depth.
> - Any mention of hydrocarbon intercept depth.

The report also revealed that the Company's omission of mud log data from its press releases was "a tacit admission of failure" because "these are easily readable and most companies include mentions of mud logs in their drilling updates. RECO's prospectus laid out a budget for 'mudlogging and communications' for both wells but [ReconAfrica] have not mentioned them since."

214. The report further revealed that "[i]n an interview with Viceroy Research, Namibia's Petroleum Commissioner, Maggy Shino confirmed that the government had received cuttings and mud logs but these were proprietary data." Viceroy challenged ReconAfrica "to release these logs to clarify the actual results of their drilling."

215. Viceroy also revealed that "RECO's approach to exploration is at odds with industry practice," and that "[m]any industry experts agree that the company has a near-zero chance of finding a commercial deposit."

216. Also on June 24, 2021, following publication of the Viceroy report, ReconAfrica's Manager of Investor Relations, Grayson Anderson, tweeted from his @Grayson_Anderse account:

> Similar to the G&M[10] article last week and previous attacks against the company, this Viceroy report is full of dated references and incorrect information. Please see the Company's press releases which address some of the inaccuracies. @Recon_Africa $RECO $RECAF $0XD

ReconAfrica then immediately retweeted this message from its @Recon_Africa account.

217. On this news, the Company's share price fell $0.16 as compared to the prior day closing price, or 1.5%, to close at $10.81 per share on June 24, 2021, on heavy trading volume. In the next trading session, the Company's share price continued falling on heavy trading volume

[10] An apparent reference to *The Globe and Mail*.

by an additional $1.90, or 17.6%. In total the Company's share price had fallen by $2.06, or 18.8% as compared to its closing price on June 23, 2021.

218. On June 28, 2021, ReconAfrica published a press release titled "ReconAfrica Responds to Short Seller's Biased and False Short Report," which generally cast aspersions on Viceroy and the June 24, 2021 Viceroy report, while failing to rebut the report's key claims detailed above.

219. Nowhere did the June 28, 2021 press release address the statements of Namibia's Petroleum Commissioner that "there is no way we will license RECO or any other company to carry out fracking or unconventional hydrocarbon exploration in Namibia," or the effect this would have on ReconAfrica's business prospects.

220. The June 28, 2021 press release simply reiterated the selective information about the two test wells previously disclosed by ReconAfrica, stating:

> As reported on April 15, 2021, the mud/well sample log, conducted by Horizon Well Logging Inc., of the 6-2 well provides over 200 meters (over 660 feet) of light oil and natural gas indicators/shows over three discrete intervals in a stacked sequence of reservoir and source rock. Extraction of oil from these samples and subsequent fingerprinting for key characteristics of the liquids, supports an active petroleum system with multiple source intervals. As reported on June 3 and 24, 2021, the 6-1 well has so far encountered 343 meters (1,125 feet) of oil and gas indicators/shows, further confirming an active petroleum system in the Kavango Basin.

221. The press release quoted Defendant Granath as stating:

> The 6-2 and 6-1 wells are stratigraphic tests, science wells if you like, but the data from the wells including hydrocarbon shows have hinted at something very interesting, and they emphatically scream the imperative to follow through on a comprehensive exploration program. These wells suggest there is commercial potential in the basin. It took 30 wells in offshore Norway to get to this point, we've been lucky enough to do it in the first two.

222. Nowhere did the June 28, 2021 press release provide the mud log data or other well data that Viceroy had expressly challenged the Company to disclose, or the other information

necessary for investors to adequately evaluate the results from ReconAfrica's first and second test wells.

**B. July 14-15, 2021 ReconAfrica Announcements & Viceroy Report**

223. On July 14, 2021 ReconAfrica published a press release titled "ReconAfrica & NAMCOR Complete Drilling Operations On The 6-1 In The Kavango Basin, Namibia."

224. The press release stated that ReconAfrica had "successfully completed drilling operations of the second stratigraphic test well (6-1) in the Kavango basin of NE Namibia."

225. The press release did not provide any data, results, well depths, mud logs, or other information related to the drilling of the well.

226. Also on July 14, 2021, ReconAfrica published a pamphlet titled "Best Practices: Environment, Social & Governance (ESG)," and published via its @Recon_Africa twitter account a link to this pamphlet on the ReconAfrica website.

227. The ESG pamphlet contained certain "Frequently Asked Questions," including "Many reports say ReconAfrica is fracing. Is this true?", and provided the following response:

> No. ReconAfrica is conducting a conventional oil exploration program. To date, ReconAfrica has been granted licence by Namibia to explore and confirm the resource. And if this exploratory phase confirms an environmentally and economically viable reserve, the Namibian people and authorities will determine if and how they will extract that reserve.

228. Also on July 14, 2021, Viceroy published online a report titled "ReconAfrica – Polarization & Disengagement."

229. The July 14 Viceroy report revealed that ReconAfrica's press release of the same day was "almost entirely devoid of all other information including the depth achieved, and the age or depth of any shows," and that "[t]his total lack of any information is like their announcement of the 6-2 well achieving its total depth which was also lacking in key information."

230. The Viceroy report identified ReconAfrica's statement in the ESG pamphlet that "the Namibian people and authorities will determine if and how they will extract that reserve," as a "clear admission that the company has not completely ruled out fracking."

231. Citing video footage from a ReconAfrica "consultation session" with experienced geologists and community members who would be affected by its planned operations, the Viceroy report noted that "[d]espite being asked on multiple occasions if ReconAfrica would categorically state no fracking would be conducted, [ReconAfrica spokesperson] Ms. Preece avoided the question and cut off members of the gallery, one time even stating that she 'won't be around' at that point."

232. The Viceroy report challenged ReconAfrica to "unequivocally state that, once the seismic and well results show you have no conventional oil: Will the project will be abandoned?"

233. On this news, the Company's share price fell $0.516 as compared to the prior day closing price, or 5.7%, to close at $8.59 per share on July 14, 2021.

234. On July 15, 2021, in an apparent response to the July 14, 2021 Viceroy report, ReconAfrica tweeted from its @Recon_Africa account:

> We continue to believe that the people of Namibia and Botswana will determine how they will manage their natural resources. We are pleased to see OKACOM[11] place stakeholder consultation as a key in safeguarding the participation of communities.
> Read more:
> https://okacom.org/press-releases

235. Nowhere did ReconAfrica's tweet address Viceroy's challenge to clearly state whether the Company would rule out future fracking on its licensed properties.

---

[11] An acronym for The Permanent Okavango River Basin Water Commission.

236. ReconAfrica's share price continued falling on July 15, 2021 on heavy trading volume by an additional $0.72, or 8.4%. In total the Company's share price had fallen by $1.236, or 13.6% as compared to its closing price on July 13, 2021.

**C. August 5-9, 2021 ReconAfrica Discloses Additional Test Well Data**

237. On August 5, 2021, ReconAfrica published a press release titled "ReconAfrica & NAMCOR Provide Additional Drilling Results And Plans For Next Exploration Phase In The Kavango Basin."

238. The press release stated that ReconAfrica was "pleased to provide, based on the mud logging report and geochemical analysis, more comprehensive data confirming a working conventional petroleum system," listing "highlights" including the following:

> • The 6-2 well and 6-1 well reached total depths of 2,294 meters (7,526 feet) and 2,780 meters (9,121 feet) respectively.
>
> • The 6-2 well had over 250 meters (820 feet) of hydrocarbon shows while the 6-1 had over 350 meters (1,148 feet) of hydrocarbon shows.

239. The press release provided a link to ReconAfrica's website for a document bearing the logos of ReconAfrica and Horizon Well Logging, Inc., which provided three "Hydrocarbon Show Reports" relating to ReconAfrica's first test well and providing certain technical data and interpretation.

240. The press release also provided a link to ReconAfrica's website for a document titled "Hydrocarbon show analysis, well 6-2," relating to ReconAfrica's first test well, and providing certain technical data and interpretation. This document listed its author as Daniel M. Jarvie of Worldwide Geochemistry, LLC. ReconAfrica's August 5, 2021 press release identifies Mr. Jarvie as "a member of the ReconAfrica Technical Advisory Board."

241. While still materially incomplete, the information provided by the August 5, 2021 press release and the linked reports from Horizon Well Logging and Mr. Jarvie provided

investors with at least some information by which to evaluate the results of ReconAfrica's first two test wells.

242. On this news, the Company's share price fell $1.05 as compared to the prior day closing price, or 12.2%, to close at $7.55 per share on August 5, 2021, on heavy trading volume. In the next trading session, the Company's share price continued falling on heavy trading volume by an additional $0.40, or 5.3%. The Company's share price continued to fall further, again on heavy trading volume, losing an addition $1.05 on August 9, 2021, to close at $6.10. In total the Company's share price had fallen by $2.50, or 29.1% as compared to its closing price on August 4, 2021.

243. Commenting on the dramatic selloff in the Company's stock following its belated release of certain well data, on August 9, 2021 ReconAfrica's Manager of Investor Relations, Grayson Anderson, tweeted from his @Grayson_Anderse account:

> $RECO $RECAF $0XD as per our press release, our first two wells exceeded expectations in the ways noted, core data belongs to the government, however, we expect to be able to release more data as and when it is available and approved. Full analysis is not yet complete....1/2

In a follow-up tweet, Mr. Anderson stated:

> $RECO $RECAF $0XD our wells have had the data confirmed by third parties; matrix and fracture porosity, multiple reservoir types, and different oil & gas shows...seismic is ongoing for the next phase of exploration and to help further confirm our initial results...2/2 end.

244. Later on August 9, 2021, Mr. Anderson tweeted:

> Despite the move in share price, nothing has changed with respect to the potential of our project. Timelines and expectations will be better managed going forward with the goal of reducing share price volatility. $RECO $RECAF $0XD 1/...

Mr. Anderson stated in a follow-up tweet:

> Additional information will be released on the wells we have drilled once we have reviewed the data with our partners and government and have the approvals. The

data will drive future activity, not a pressing timeline, do it right, not fast. $RECO $RECAF $0XD 2/...

**D. August 16-17, 2021 Viceroy Report & ReconAfrica Response**

245. On August 16, 2021, Viceroy published online a report titled "ReconAfrica – Drilling Update Response." This report analyzed the information disclosed by ReconAfrica in its August 5, 2021 press release and the linked documents, based in part on Viceroy's consultation with geologists, and concluded that "results have failed to live up to RECO's exaggerated claims of a world-class reservoir and instead showed an area of limited to negligible production potential."

246. The August 16 Viceroy report revealed that, as regards the limited data disclosed by ReconAfrica on August 5, 2021, "[a]ll significant data presented in the press release was from RECO's first well (6-2), which ceased drilling on April 7, 2021, almost 4 months ago. There is no reason to delay findings this long unless, as we believe, RECO have run these results through every process known to man to report indicators of oil."

247. The Viceroy report also revealed that whereas "RECO previously claimed that their well logging would be conducted by respected industry giant Schlumberger," the logging data disclosed by ReconAfrica on August 5, 2021 "was in fact done by Horizon Well Logging, an unknown minor player."

248. Viceroy revealed that "According to Horizon Well Logging's show report, the majority of the oil and gas shows are at extremely shallow depths with lower depths showing no real production potential," which "disprove[s] ReconAfrica's claim of '6,000ft of Permian aged source rock'."

249. Viceroy similarly revealed that the "Hydrocarbon show analysis" from ReconAfrica employee Mr. Jarvie provided poor results, and that for the three well "zones" analyzed by Mr. Jarvie:

> - Zone 1 contains ~100m of oil and wet gas potential with extremely low oil saturation and production potential.
>
> - Zone 2 contains ~200m of even fewer and more sporadic mud gas shows where Total Gas measurements never exceed more than 5 units (equivalent to 0.05% mud gas concentration — likely within the mud gas detector's zero calibration margin of error). Geologists consulted by Viceroy believe this zone is, at best, fractured carbonate stringers.[12]
>
> - Zone 3 and below is unremarkable correlating with Viceroy Research's previous view that drilling in a gravity high was likely to result in a shallower basin than expected.

250. The Viceroy report further revealed that "[g]eologists consulted by Viceroy believe that the Zone 2 and Zone 3 carbonates are far older than Permian, a fact that would unravel the company's overhyped 30,000ft deep Permian basin model. In their view, Zones 2 and 3 are far more likely to be Cambrian to Precambian aged."

251. In addition, the Viceroy report further revealed that "RECO appear to have withheld the most significant Wireline results." The report continued:

> Wireline log data are the key data used by the industry to determine success or failure for all wells. Every oil and gas company bases their press releases around this data which can be acquired in a few days and interpreted in a couple of hours. The fact that RECO are withholding this data from the 6-2 well, completed 4 months ago, and the 6-1 well, completed 1 month ago, is a clear indication of failure.

252. The Viceroy report further revealed serious concerns raised by ReconAfrica's failure to achieve the planned target depths for the first two test wells:

> Neither their 6-2 or 6-1 wells reached their planned target depths of 12,500ft instead finishing at 7,526ft and 9,121 ft. The company stated that this was due to

---

[12] A "stinger" is a thin, discontinuous mineral vein or rock layer.

> safety concerns which would likely have been mitigated by conducting 2D seismic analysis prior to drilling. We suspect the real reason was their drill bits penetrating basement rock at TD, debunking their deep basin theory.

253. In light of the poor and incomplete results contained in ReconAfrica's public disclosures, Viceroy concluded "[i]nvestors should demand full mud log and wireline data instead of overly positive interpretations."

254. On this news, the Company's share price fell $0.71 as compared to the prior day closing price, or 12.1%, to close at $5.16 per share on August 16, 2021, on heavy trading volume.

255. On August 17, 2021, ReconAfrica published a press release titled "ReconAfrica Responds to New Misinformation Campaign," which generally cast aspersions on Viceroy and the August 16, 2021 Viceroy report, while failing to rebut the report's key claims detailed above.

256. Nowhere did the August 17, 2021 press release address ReconAfrica's delays in disclosing any mud log data, why ReconAfrica only disclosed analysis from Horizon Well Logging and not Schlumberger, or the substantive analysis by Viceroy and its consulting geologists of the limited data that was disclosed by ReconAfrica.

257. Nowhere did the August 17, 2021 press release address ReconAfrica's failure to disclose wireline log results.

258. Nowhere did the August 17, 2021 press release address why ReconAfrica stopped drilling for its two test wells far short of their planned 12,500 ft target depths.

259. The August 17, 2021 press release simply reiterated ReconAfrica's prior vague and selective statements, such as "[w]e are confident that this data confirms we have a conventional petroleum system."

260. ReconAfrica's share price continued falling on August 17, 2021 on heavy trading volume by an additional $0.46, or 8.9%. In total the Company's share price had fallen by $1.17, or 19.9% as compared to its closing price on August 13, 2021.

**E. September 2-7, 2021 ReconAfrica Announcement Regarding First Test Well Analysis & Viceroy Report**

261. On September 2, 2021, ReconAfrica published a press release titled "Netherland Sewell Study Identifies 5 Potential Conventional Oil and Gas Reservoir Rock Zones In The First Well (6-2) In The Kavango Basin, Namibia."

262. The press release stated that it was providing "preliminary analysis" of ReconAfrica's first test well, performed by Core Laboratories and Netherland Sewell & Associates Inc. The press release contained a link to a slide presentation on ReconAfrica's website bearing the logo of Netherland Sewell.

263. The press release stated that, "The NSAI petrophysical study, the first in the Kavango basin, has identified five potential conventional reservoir zones in the 6-2 well," and continued "[t]his study, which brings together wireline log data, core data, and sample and hydrocarbon show data from the 6-2 well, confirms 198 meters (650 feet) of net reservoir over five separate intervals."

264. The press release quoted Defendant Evans as stating "[o]il and gas data previously released confirms an active petroleum system. Now, the NSAI reservoir study confirms at least five good quality conventional reservoir targets and top seal to pursue throughout the basin."

265. Also on September 2, 2021, following publication of the ReconAfrica press release, ReconAfrica's Manager of Investor Relations, Grayson Anderson, tweeted from his @Grayson_Anderse account:

> Getting ahead of some of the FUD[13] we are bound to get as per the image below, we have found water bearing intervals, but also 44% and 38% oil saturation in two net intervals (testable) which is incredibly impressive for a random strat well drilled off aeromag. $RECO $RECAF $0XD 1/

266. On September 7 2021, Viceroy published online a report titled "ReconAfrica – Another swing, another miss." This report analyzed the data disclosed by ReconAfrica on September 2, 2021, concluding that the Netherland Sewell presentation "is a clear attempt to put a positive spin on disappointing drill results but fails to do so under further scrutiny." Viceroy noted that "log interpretation was released almost 5 months after the completion of drilling on the 6-2 well even though this log interpretation data would have been available days after they logged the well."

267. Viceroy revealed that ReconAfrica had in fact published some of their data in an illegible form, stating "[w]e would have liked to analyze the logs further, but some parts have been compressed so heavily they are unreadable."

268. The Viceroy report revealed that, according to the data, ReconAfrica's first test well "is effectively a failure with the porous 950 zone completely saturated with water and the 1350 zone too tight for a conventional commercial play or even reliable readings of water saturation."

269. Viceroy continued its analysis of the reported results, stating "[t]he 950 zone would have potential to be a developable reservoir with decent porosity of 19-20%, if only there were any hydrocarbons in the zone. Instead, the zone it appears to be almost completely saturated with water." Viceroy further revealed that:

---

[13] This appears to be an acronym, primarily used online among cryptocurrency enthusiasts, for "fear, uncertainty, and doubt."

> The deeper zones from 1350 below, which RECO are focused on promoting as validation of the geologic model, are even more disappointing. It appears to be a thin, slightly porous zone within an extremely tight section. Viceroy's expert consultants view it as a real stretch to consider this zone as reservoir rock considering the lack of top seal and porous carbonate underneath.

270. Viceroy also revealed that while Mr. Anderson and ReconAfrica "interpret the 56% and 61% water saturation values as indicative of 44% and 38% oil saturation. This is a major misrepresentation of the drill results." Viceroy revealed that the data published by ReconAfrica itself directly contradicted this claim, showing "hydrocarbon saturations reading at near zero."

271. Viceroy further revealed that, based on the published data, "[e]ven if the [1350] zone were to be hydrocarbon-bearing, it would require fracking to exploit."

272. On this news, the Company's share price fell $0.683 as compared to the prior day closing price, or 12.8%, to close at $4.65 per share on September 7, 2021, on heavy trading volume.

## IX. CLASS ACTION ALLEGATIONS

273. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired the publicly traded securities of ReconAfrica between February 28, 2019 and September 7, 2021, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

274. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ReconAfrica's shares actively traded on the OTCQX and/or OTC Pink Sheets markets. While the exact number of Class members is unknown to

Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of ReconAfrica shares were traded publicly during the Class Period on the OTCQX and/or OTC Pink Sheets. Record owners and other members of the Class may be identified from records maintained by ReconAfrica or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

275. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

276. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

277. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ReconAfrica; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

278. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. UNDISCLOSED ADVERSE FACTS

279. The market for ReconAfrica's shares was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements, and/or failures to disclose, ReconAfrica's shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired ReconAfrica's shares relying upon the integrity of the market price of the Company's shares and market information relating to ReconAfrica and have been damaged thereby.

280. During the Class Period, Defendants materially misled the investing public thereby inflating the price of ReconAfrica's shares, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading for the reasons set forth herein and because they failed to disclose material adverse information and/or misrepresented the truth about ReconAfrica's business, operations, and prospects as alleged herein.

281. At all relevant times, the material misrepresentations and omissions and undisclosed scheme particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ReconAfrica's prospects and engaged in a scheme to do the same. These material misstatements and/or omissions and/or

conduct had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its prospects, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements and/or conduct during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI. LOSS CAUSATION

282. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

283. During the Class Period, Plaintiff and the Class purchased ReconAfrica's shares at artificially inflated prices and were damaged thereby. The price of the Company's shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XII. ADDITIONAL SCIENTER ALLEGATIONS

284. The scienter of the Individual Defendants is imputable to ReconAfrica because they were directors and/or officers of ReconAfrica acting within the scope of their authority.

285. The misrepresentations and omissions of ReconAfrica as alleged herein are of such a nature that they would have been approved by corporate officials sufficiently knowledgeable about ReconAfrica to know that those statements and omissions were misleading.

286. As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

287. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ReconAfrica, their control over, and/or receipt and/or modification of ReconAfrica's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ReconAfrica, participated in the fraudulent scheme alleged herein.

288. The positions of the Individual Defendants, as ReconAfrica's senior directors and officers, give rise to a strong inference of their scienter with respect to issues relating to fracking and the results of the Company's test wells. Specifically, the Individual Defendants were knowledgeable regarding ReconAfrica's intentions regarding fracking, its communications with the Namibian government, and the results of its first and at the time only two test wells.

289. As alleged herein, the Individual Defendants repeatedly held themselves out as knowledgeable regarding the operational details of ReconAfrica and the subject matter of Defendants' misrepresentations and omissions, which gives rise to a strong inference of their scienter.

290. During and leading up to the Class Period ReconAfrica was an extremely small organization. As of year-end 2019 ReconAfrica had only three employees and three contractors. As of year-end 2020 ReconAfrica had no employees and only 11 contractors. This allowed the Individual Defendants to have in-depth knowledge of all aspects of ReconAfrica's operations.

291. Leading up to and during the Class Period, oil and gas exploration in Namibia was ReconAfrica's core, indeed its only significant, operation, which gives rise to a strong inference of the Individual Defendants' scienter.

**A. Defendants Possessed Undisclosed Adverse Information When Making Their Misleading Statements**

292. Defendants' scienter is further established by statements indicating that they in fact possessed detailed data from the two test wells while publicly disclosing only limited cherry-picked information.

293. Regarding its first test well, on January 11, 2021 ReconAfrica published a press release quoting Nick Steinsberger, SVP of Drilling and Completions as stating, "I anticipate the first well will take up to 45 days to reach total depth and initial analysis of all prospective productive targets."

294. In a February 25, 2021 press release the Company stated in relevant part:

> Over the interval drilled thus far, ReconAfrica has been continuously sampling and testing cuttings, successfully run a full suite of wireline logs, and taken thirty-four sidewall cores. ReconAfrica is using industry leaders to provide analysis of this critical well, with Schlumberger providing wireline logging services (as per 1/11/21 press release), Netherland Sewell and Associates (Dallas, Texas) performing well log analysis, and Geomark Research (Houston, Texas) evaluating petroleum geochemistry.

295. ReconAfrica similarly stated in an April 7, 2021 press release:

> ReconAfrica has achieved total depth on the 6-2 well, the first well of a three well drilling program in the deep Kavango basin. This stratigraphic test well has accomplished all the goals ReconAfrica set for it which includes the acquisition of an abundance of whole and sidewall core along with cuttings and significant well log data. The well has been drilled safely and in an environmentally responsible manner. All data is undergoing a comprehensive analysis by ReconAfrica's Namibian and North American technical team and consultants.

296. ReconAfrica then released limited and materially misleading selective information regarding the first well on April 15, 2021. Later on August 5, 2021 ReconAfrica disclosed certain additional data from the first test well, including certain mud log data.

297. According to Viceroy's August 16, 2021 report, "[i]n an interview with Viceroy Research, Namibia's Petrol Commissioner Maggy Shino confirmed that the Ministry of Mines and Energy had access to the mud logs from the 6-2 well far in advance of their release."

298. Regarding the second test well, ReconAfrica stated in a May 5, 2021 press release:

> The Company will take whole core, side-wall core and conduct a full logging suite of all zones of interest (conventional targets and source rocks). As with the 6-2, a comprehensive state of the art logging program over both sections will be provided by Schlumberger.

299. In the Company's June 3, 2021 press release misleadingly providing selective and incomplete information regarding the second test well, ReconAfrica again confirmed:

> ReconAfrica is again using industry leaders to provide analysis of this critical well, including Schlumberger, Geomark Research (Houston, Texas) and Netherland Sewell and Associates (Dallas, Texas).

300. On July 7, 2021, the Company announced:

> ReconAfrica is currently drilling ahead on the 6-1 well, anticipating reaching total depth on or before July 11th. Immediately after reaching total depth, ReconAfrica will commence logging and coring operations designed to maximize hydrocarbon recovery. These operations will be conducted using Schlumberger technology.

301. On July 14, 2021, the Company stated in a press release that it had:

> completed drilling operations of the second stratigraphic test well (6-1) in the Kavango basin of NE Namibia. The 6-1 well is now being prepared for wireline logging. Multiple logging runs will be made and up to 50 sidewall cores taken, all designed to maximize hydrocarbon recovery.

302. On July 30, 2021, the Company announced:

> With multiple logging runs completed and 86 sidewall cores now taken in the 6-1 well, ReconAfrica is preparing to run and cement casing to isolate the prospective hydrocarbon bearing zones.

303. Defendants' scienter is further confirmed by the fact that they repeatedly touted data analysis planned to be performed by well-known and respected industry participant Schlumberger, but then refused to ever disclose Schlumberger's results.

### B. Key ReconAfrica Personnel Departed The Company Under Suspect Circumstances

304. Suspiciously timed resignations of senior ReconAfrica personnel also give rise to a strong inference of Defendants' scienter.

305. Defendant Shiraz Dhanani served as a Director of the Company from February 18, 2020 until February 2021.

306. When Defendant Dhanani joined ReconAfrica's board of directors the Company touted his arrival in a press release emphasizing his 40 years of expertise in oil and gas exploration, including at major companies including BP and ExxonMobil. That press release quoted Defendant Dhanani as stating "[w]ith ReconAfrica's discovery of a new rift-sedimentary basin in Namibia, I'm delighted to join the Company in its formative stage of development," and "[a]fter reviewing the data, I believe the Kavango basin is optimally conducive to host a resource rich and active petroleum system that must be drilled."

307. Then, on February 18, 2021, only one year after Defendant Dhanani joined the board, and simultaneously with the Company's obtaining preliminary data from its first test well, the Company announced that Defendant Dhanani was leaving the board. This announcement did not provide a reason for Dhanani's departure.

308. Doug Allen served as ReconAfrica's Senior Vice President, Investor Relations form July 8, 2020 to March 22, 2021.

309. On July 8, 2020, ReconAfrica published a press release touting Mr. Allen's "more than 38 years-experience in the financial services and financial communications industries."

310. In a January 18, 2021 question and answer session conducted via Zoom with ReconAfrica investors (the audio for which has been posted to YouTube and shared online),[14] Mr. Allen was asked by an investor, "[y]our drilling program, how long it will take . . . when you will get the confirmation that we have an active petroleum system so when can the company make an announcement . . . ?"

311. Mr. Allen responded in relevant part:

> This is a very important point to your question about communication, because it's our intention currently to treat well number one and well number two as tight, which is oil and gas speak for confidential, we're going to try to release the data from all three wells en masse . . . at the same time when the third well has been drilled, and we're not naïve everybody in Africa has a cell phone and so that's our goal but it's an important goal that from an investor communications you should be aware of . . .

312. Mr. Allen continued:

> That's not to say we won't have news releases with operational updates, we will have lots of operational updates, we're just going to attempt . . . to be tight lipped about the geology of what we encounter, so we may know early on that we've encountered an active petroleum system, but until we can provide the market with a comprehensive data set from all three wells our plan is to treat as I said the data from hole one, well one, and well two as tight, or confidential.

313. On March 22, 2021, less than 10 months after Mr. Allen had joined ReconAfrica, the Company published a press release stating that he had "retired from the Company effective March 19, 2021." The press release did not provide a reason for the retirement. ReconAfrica did not name a replacement for Mr. Allen until April 26, 2021.

[14] Audio available at https://www.youtube.com/watch?v=-Kknjo3ygU4

314. On April 15, 2021, ReconAfrica released misleading partial results from its first test well, before even moving its drilling rig to begin work at the second well location, directly contradicting what Mr. Allen had recently told investors the Company would do.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

315. The market for ReconAfrica's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, ReconAfrica's shares traded at artificially inflated prices during the Class Period. On …, the Company's share price closed at a Class Period high of $... per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of ReconAfrica's shares and market information relating to ReconAfrica, and have been damaged thereby.

316. During the Class Period, the artificial inflation of ReconAfrica's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ReconAfrica's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of ReconAfrica and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

317. At all relevant times, the market for ReconAfrica's shares was an efficient market for the following reasons, among others:

(a) ReconAfrica shares met the requirements for listing, and were listed and actively traded on the OTCQX and/or OTC Pink Sheets, a highly efficient and automated market;

(b) As a regulated issuer, ReconAfrica filed periodic public reports with SEDAR, the OTCQX, and/or the OTC Pink Sheets;

(c) ReconAfrica regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases and through other wide-ranging public disclosures; and/or

(d) ReconAfrica was followed by securities analysts who wrote and disseminated reports about the Company. Each of these reports was publicly available and entered the public marketplace.

318. As a result of the foregoing, the market for ReconAfrica's shares promptly digested current information regarding ReconAfrica from all publicly available sources and reflected such information in ReconAfrica's share price. Under these circumstances, all purchasers of ReconAfrica's shares during the Class Period suffered similar injury through their purchase of ReconAfrica's shares at artificially inflated prices and a presumption of reliance applies.

319. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the

Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIV. NO SAFE HARBOR

320. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ReconAfrica who knew that the statement was false when made.

## XV. FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5(a) -- (c) Promulgated Thereunder**
**<u>Against All Defendants</u>**

321. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

322. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) engage in nondisclosed related party transactions that lacked economic substance and were instead designed to boost revenue; and (iii) cause Plaintiff and other members of the Class to purchase ReconAfrica's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

323. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for ReconAfrica's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

324. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ReconAfrica's financial well-being and prospects, as specified herein.

325. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ReconAfrica's value and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the

statements made about ReconAfrica and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

326. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

327. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ReconAfrica's prospects from the investing public and supporting the artificially inflated price of its shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, and prospects

throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

328. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ReconAfrica's shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired ReconAfrica's shares during the Class Period at artificially high prices and were damaged thereby.

329. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were unaware of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding ReconAfrica, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ReconAfrica shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

330. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

331. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI. SECOND CLAIM

**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

332. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

333. Individual Defendants acted as controlling persons of ReconAfrica within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

334. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

335. As set forth above, ReconAfrica and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 11, 2022

**GLANCY PRONGAY & MURRAY LLP**

By: _/s/ Garth A. Spencer_
Ex Kano S. Sams II (*pro hac vice*)
Garth A. Spencer (GS-0298)
Charles H. Linehan (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
esams@glancylaw.com
gspencer@glancylaw.com
clinehan@glancylaw.com

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Robert Partovy and the Proposed Class*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On April 11, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Eastern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 11, 2022.

*s/ Garth Spencer*
Garth Spencer