**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

IN RE RECONNAISSANCE ENERGY AFRICA LTD. SECURITIES LITIGATION

Case No. 1:21-cv-06176-NRM-RML

Honorable Nina R. Morrison

**DECLARATION OF GARTH SPENCER IN SUPPORT OF: (I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 2

II.    PROSECUTION OF THE ACTION ................................................................... 5

     A.    Commencement Of The U.S. Action And Appointment Of U.S. Lead Plaintiff And U.S. Lead Counsel ................................................................. 5

     B.    The Comprehensive Investigation And The Preparation Of The Complaint ......... 5

     C.    Defendants' Motion To Dismiss The Complaint And U.S. Lead Plaintiff's Response ...................................................................................... 6

     D.    Fact Discovery .................................................................................................... 8

     E.    Settlement Negotiations, And The Settlement's Preliminary Approval ................ 9

     F.    The Canadian Court Has Approved The Canadian Settlement ........................... 11

III.   THE RISKS OF CONTINUED LITIGATION .................................................. 12

     A.    Risks To Proving Liability.................................................................................. 13

     B.    Risks To Proving Loss Causation And Damages ................................................. 14

     C.    Risks Faced In Obtaining And Maintaining Class Action Status ........................ 16

     D.    Other Risks, Including Trial And Appeals .......................................................... 16

     E.    Risks To Collecting Any Judgment .................................................................... 17

     F.    The U.S. Settlement Is Reasonable In Light Of Potential Recovery In The U.S. Action ..................................................................................................... 18

IV.   U.S. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE ............................ 19

V.    ALLOCATION OF THE NET PROCEEDS OF THE U.S. SETTLEMENT .................. 22

VI.   U.S. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES ...................................................... 25

     A.    The Fee Application........................................................................................... 25

          1.    The Excellent Outcome Achieved Is The Result Of The Significant Time And Labor That U.S. Lead Counsel Devoted To The Action ......... 26

2. The Magnitude And Complexity Of The Action ................................... 28

3. The Significant Risks Borne By U.S. Lead Counsel .............................. 29

4. The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of U.S. Lead Counsel, And The Standing And Caliber Of Defendants' Counsel ....................................................... 30

5. The Requested Fee In Relation To The U.S. Settlement ......................... 30

6. The Reaction Of The U.S. Settlement Class Supports U.S. Lead Counsel's Fee Request ........................................................................... 31

7. U.S. Lead Plaintiff Supports U.S. Lead Counsel's Fee Request ............. 31

B. Reimbursement Of The Requested U.S. Litigation Expenses Is Fair and Reasonable ...................................................................................... 32

VII. CONCLUSION ....................................................................................... 35

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration of Morgan Kimball Regarding: (A) Mailing of Notice; (B) Publication of U.S. Summary Notice; and (C) Report on Requests for Exclusion and Objections |
| 2 | Declaration of U.S. Lead Plaintiff Robert Partovy in Support of: (1) U.S. Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (2) U.S. Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Firm résumé of U.S. Lead Counsel Glancy Prongay & Murray LLP |
| 4 | Excerpts of Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) |
| 5 | Table of Law Firm Billing Rates |
| 6 | Chart of Select Second Circuit Cases with 33% or Higher Fee Awards |
| 7 | ReconAfrica U.S. Securities Class Action Litigation Confirmation of U.S. Settlement Amount and Release, dated October 7, 2024 |
| 8 | Order Made After Application (Settlement Approval), *Bowles v. Reconnaissance Energy Africa Ltd.*, Supreme Court of British Columbia Case No. VLC-S-S-233808 (June 20, 2024) |
| 9 | ReconAfrica, Condensed Consolidated Interim Financial Statements, June 30, 2024 and 2023 |
| 10 | Transcript of Civil Cause For Oral Argument Before The Honorable Nina R. Morrison United States District Judge, *Owen v. Reconnaissance Energy Africa Ltd.*, No. 21-cv-6176 (NRM) (Apr. 26, 2023) |
| 11 | *In re NYSE Specialists Sec. Litig.*, No. 03-cv-8264, ECF No. 403 (S.D.N.Y. June 10, 2013) |
| 12 | *Levine v. Atricure, Inc.*, No. 1:06-cv-14324-RJH, ECF No. 85 (S.D.N.Y. May 27, 2011) |

I, Garth Spencer, declare the following pursuant to 28 U.S.C. §1746:

1.      I am an attorney duly licensed to practice law before all of the courts of the State of New York and admitted to practice in this District. I am a partner in the law firm of Glancy Prongay & Murray LLP ("GPM" or "U.S. Lead Counsel"), lead counsel for Court-appointed lead plaintiff Robert Partovy ("U.S. Lead Plaintiff") in the above-entitled action (the "U.S. Action").[1]

2.      I respectfully submit this declaration, together with the attached exhibits, in support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and the concurrently filed memorandum in support thereof ("Final Approval Memorandum"). As set forth in the Final Approval Memorandum, U.S. Lead Plaintiff seeks final approval of the settlement (the "U.S. Settlement") that the Court preliminarily approved by Order dated August 13, 2024 (the "Preliminary Approval Order," ECF No. 60), as well as approval of the proposed U.S. Plan of Allocation of the U.S. Net Settlement Fund to eligible U.S. Settlement Class Members. Pursuant to the Stipulation and the Preliminary Approval Order, $9,524,433.75 Canadian dollars and $18,432.20 U.S. dollars have been paid into the U.S. Escrow Account.[2]

3.      I also respectfully submit this declaration in support of U.S. Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses and the concurrently filed memorandum in support thereof ("Fee Memorandum"). As set forth in the Fee Memorandum, U.S. Lead Counsel seek an award of attorneys' fees in the amount of 33⅓% of the U.S. Settlement Fund (which, by definition, includes interest accrued thereon), and reimbursement of U.S. Litigation Expenses in the total amount of $108,332.37, which includes U.S. Lead Counsel's total out-of-pocket

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Global Stipulation and Agreement of Settlement, dated February 27, 2024 (the "Stipulation"). ECF No. 55-1.

[2] The Canadian dollars were converted, after conversion fees, into $6,991,327.28 U.S. dollars. Therefore, the total amount of U.S. dollars initially in the U.S. Escrow Account, after conversion fees and before receipt of interest, was $7,009,759.48. *See infra* Part II.E.

litigation costs in the amount of $96,332.37, and a total of $12,000 to U.S. Lead Plaintiff, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for his costs, including lost wages, incurred in connection with his representation of the U.S. Settlement Class.

## I.    INTRODUCTION

4.    The proposed U.S. Settlement now before the Court provides for the resolution of all claims in the U.S. Action in exchange for a non-reversionary cash payment of $9,425,000 CAD, with certain adjustments to account for fluctuation in the exchange rate between the U.S. dollar and the Canadian dollar (*see* Stipulation ¶12). Pursuant to the Stipulation, $9,524,433.75 Canadian dollars and $18,432.20 U.S. dollars (totaling $7,009,759.48 U.S. dollars after conversion and related fees, and before any receipt of interest) were deposited into the U.S. Escrow Account. As detailed herein, U.S. Lead Plaintiff and U.S. Lead Counsel submit that the proposed U.S. Settlement represents a favorable result for the U.S. Settlement Class considering the posture of the U.S. Action, as well as the significant risks U.S. Lead Plaintiff would need to overcome had the U.S. Action continued. U.S. Lead Plaintiff's damages consultant estimates that if U.S. Lead Plaintiff had *fully prevailed* on his claims at both summary judgment and after a jury trial, if the Court certified the proposed class, and if the Court and jury accepted U.S. Lead Plaintiff's damages theory—*i.e.*, U.S. Lead Plaintiff's *best case scenario*— the total maximum damages would be approximately $56.3 million U.S. dollars. Under this best-case scenario, the $7,009,759.48 USD settlement amount represents approximately 12.4% of the total *maximum* damages *potentially* available in the U.S. Action. Of course, Defendants had advanced, and would continue to advance, serious arguments with respect to liability, loss causation, and damages. If any of these arguments were accepted, the putative class's potential recovery would have been substantially reduced or completely eliminated. Moreover, there were very real ability to pay issues

in this case, and there was no guarantee that there would have been any money to satisfy a judgment equal to, or more than, the U.S. Settlement Amount many years from now.

5.       As explained in greater detail herein, the U.S. Settlement was reached only after comprehensive inquiry into the merits of the claims alleged and the likely damages that could be recovered by the U.S. Settlement Class. U.S. Lead Counsel's vigorous efforts involved, among other things: (a) conducting an extensive investigation into Defendants' allegedly wrongful acts; (b) drafting a comprehensive amended complaint based on this investigation; (c) researching,  briefing, and arguing the opposition to Defendants' motion to dismiss; (d) conducting substantial fact discovery, including propounding and responding to document requests and interrogatories, and conducting targeted review and analysis of the more than 80,000 documents (totaling over 540,000 pages) produced by Defendants and third-parties; (e) participating in a private, full-day mediation session under the auspices of a highly-experienced neutral, which included exchanging detailed mediation statements and exhibits; and (f) engaging in extensive settlement negotiations.

6.       Based on the foregoing efforts, U.S. Lead Plaintiff and U.S. Lead Counsel were well informed on both the strengths and weaknesses of the claims and defenses in this action. Armed with this knowledge, U.S. Lead Counsel engaged in extensive arm's-length bargaining, which I believe resulted in the fair and reasonable U.S. Settlement for the U.S. Settlement Class.

7.       The U.S. Settlement confers a substantial immediate benefit to the U.S. Settlement Class that I believe is eminently fair, reasonable, and adequate given the legal hurdles and risks involved in proving liability and damages. The U.S. Settlement also avoids the further risk, delay, and expense had this case continued through class certification, discovery, summary judgment, and to trial. U.S. Lead Counsel respectfully submits that, under the circumstances, the U.S. Settlement is in the best interest of the U.S. Settlement Class and should be approved.

3

8.      In addition to seeking final approval of the U.S. Settlement, U.S. Lead Plaintiff seeks approval of the proposed U.S. Plan of Allocation as fair and reasonable.  As discussed in further detail below, U.S. Lead Counsel developed the U.S. Plan of Allocation with the assistance of an expert consultant with substantial experience formulating plans of allocation for securities class action settlements.  The U.S. Plan of Allocation provides for the distribution of the U.S. Net Settlement Fund to U.S. Settlement Class Members who submit U.S. Claim Forms that are approved for payment by the Court on a *pro rata* basis.  Specifically, an Authorized U.S. Claimant's *pro rata* share shall be the Authorized U.S. Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized U.S. Claimants, multiplied by the total amount in the U.S. Net Settlement Fund.

9.      Finally, U.S. Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of U.S. Litigation Expenses as set forth in the Fee Memorandum.  As discussed in detail in the Fee Memorandum, the requested 33⅓% fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the result achieved. Likewise, the requested out-of-pocket litigation costs of $96,332.37 and the requested reimbursement of U.S. Lead Plaintiff's costs, including lost wages, totaling $12,000 pursuant to the PSLRA are also fair and reasonable. Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, U.S. Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of U.S. Litigation Expenses should be approved.

4

## II.    PROSECUTION OF THE ACTION

### A.    Commencement Of The U.S. Action And Appointment Of U.S. Lead Plaintiff And U.S. Lead Counsel

10.    On November 5, 2021, the initial complaint in the U.S. Action was filed in the United States District Court for the Eastern District of New York.  ECF No. 1.  On December 13, 2021, a related action styled *Huq v. Reconnaissance Energy Africa Ltd.*, Case No. 21-cv-06864 was filed in the United States District Court for the Eastern District of New York.

11.    On February 17, 2022, lead plaintiff movants Robert Partovy, Jeff Owen, and Ahmed Huq filed a stipulation to consolidate the U.S. Action and the *Huq* action, appoint Robert Partovy as Lead Plaintiff, and approve Partovy's selection of GPM as Lead Counsel for the proposed class.  ECF 20.  On March 1, 2022, the U.S. Court granted that stipulation.

### B.    The Comprehensive Investigation And The Preparation Of The Complaint

12.    In preparation for filing the amended complaint, U.S. Lead Counsel conducted an extensive factual and legal investigation that included, among other things: (a) reviewing and analyzing (i) ReconAfrica's publicly-filed documents with the Canadian Securities Administrators System for Electronic Document Analysis and Retrieval ("SEDAR"), (ii) research reports prepared by securities and financial analysts, news and wire articles, and other information available online concerning Defendants, (iii) ReconAfrica's investor presentations, (iv) reports regarding ReconAfrica published by Viceroy Research LLC ("Viceroy"), and (v) other publicly available material concerning Defendants; (b) retaining and working with private investigators to conduct an investigation involving, *inter alia*, attempts to interview former ReconAfrica employees and other sources of relevant information; and (c) consulting with a loss causation and damages expert.

13.    On April 11, 2022, U.S. Lead Plaintiff filed the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint," ECF No. 31), alleging that Defendants made

5

material misstatements and omissions in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The 82-page (335-paragraph) Complaint alleged, among other things, that Defendants made material omissions and misleading statements about: (a) ReconAfrica's lack of regulatory approval to use hydraulic fracturing to extract oil and gas in Namibia; (b) ReconAfrica's intent to use hydraulic fracturing to extract oil and gas in Namibia; and (c) the results of ReconAfrica's test wells in Namibia. As alleged in the Complaint, these misrepresentations proximately caused investors' losses when the truth was revealed over a series of partial corrective disclosures throughout the class period, including Viceroy's publication of reports about ReconAfrica, and ReconAfrica's subsequent publication of additional test well results.

**C.    Defendants' Motion To Dismiss The Complaint And U.S. Lead Plaintiff's Response**

14.    On June 10, 2022, Defendants filed a letter requesting a pre-motion conference concerning their planned motion to dismiss the Complaint. *See* ECF No. 33. In that letter, Defendants argued that the Complaint failed to allege misleading statements, scienter, and loss causation. On June 17, 2022, U.S. Lead Plaintiff filed his response to Defendants' letter, arguing that the Complaint sufficiently states a claim and pleads falsity, scienter, and loss causation. *See* ECF No. 34. On July 13, 2022, Judge Gujarati held a pre-motion conference at which the Parties elaborated on their arguments. *See* ECF No. 37 (transcript). Judge Gujarati directed the Parties to propose a briefing schedule for Defendants' motion to dismiss. *See id.* at 23:2-9.

15.    On August 29, 2022, Defendants served their motion to dismiss the Complaint in the U.S. Action (Defendants subsequently filed all fully briefed motion papers on November 29, 2022). ECF No. 42-43. Among other things, Defendants argued that U.S. Lead Plaintiff failed to plead: (a) the existence of materially misleading statements or omissions; (b) a strong inference of scienter; and (c) loss causation. Specifically, Defendants argued that U.S. Lead Plaintiff's falsity allegations failed

6

because: (a) the challenged statements were not misleading; (b) ReconAfrica disclosed the relevant risks; (c) the allegedly omitted facts were publicly available; and (d) the challenged statements related to future events that had yet to occur.  Defendants also argued that U.S. Lead Plaintiff failed to adequately plead scienter because: (a) no facts were pled to show Defendants' specific knowledge that any of the challenged statements were misleading; (b) scienter cannot be pled solely based on ReconAfrica's corporate structure and the Individual Defendants' roles; (c) no facts were pled to show motive to commit fraud; and (d) allegations concerning personnel changes do not create a strong inference of scienter.  Defendants further argued that U.S. Lead Plaintiff failed to adequately plead loss causation because, *inter alia*, the allegedly concealed facts had already been publicly disclosed, and there was no rapid reaction by ReconAfrica's stock price to the alleged corrective disclosures.

16.    On October 28, 2022, U.S. Lead Plaintiff served his opposition papers.  ECF. Nos. 44-45.  U.S. Lead Plaintiff argued that the Complaint adequately pled actionable misrepresentations and omissions made by Defendants.  Specifically, U.S. Lead Plaintiff argued, among other things, that: (a) the omitted facts were not publicly available; (b) Defendants' concealed presently existing facts; and (c) ReconAfrica's risk disclosures were ineffective boilerplate.  U.S. Lead Plaintiff argued that the Complaint adequately alleged scienter based in part on Defendants' statements showing that they consciously withheld material information from investors, and also based on Defendants' sales of ReconAfrica stock.  U.S. Lead Plaintiff argued that the Complaint adequately alleged loss causation by pleading disclosures of previously concealed information followed by substantial stock price declines.

17.    On November 29, 2022, Defendants served their reply papers in support of their motion to dismiss, and filed all of the motion briefing on the docket.  ECF No. 46.

7

18.    On April 26, 2023, Judge Morrison (this action was reassigned from Judge Gujarati to Judge Morrison on October 26, 2022) held oral argument and denied Defendants' motion from the bench.  *See* Ex. 10 (hearing transcript).  The Court found that the Complaint sufficiently alleges misleading statements, scienter, loss causation, and control person liability.  *See id.* at 59-69.

19.    On June 9, 2023, Defendants filed their answer.  ECF No. 52.

**D.    Fact Discovery**

20.    On May 16, 2023, U.S. Lead Plaintiff and the Defendants held their Rule 26(f) conference in this action, and thereafter began to conduct discovery.  *See* ECF No. 51 (parties' report and discovery plan).  Following the denial of Defendants' motion to dismiss the Complaint, and negotiation over the scope and manner of document production and the treatment of electronically stored information, the Defendants and the U.S. Lead Plaintiff began discovery pursuant to a stipulated confidentiality order and discovery protocol approved by the Court on May 18, 2023.  *See* ECF Nos. 49-50.

21.    From May through October, 2023, Defendants and the U.S. Lead Plaintiff exchanged and responded to initial disclosures, document requests, and interrogatories. Defendants produced over 70,000 documents (totaling over 540,000 pages) to U.S. Lead Plaintiff, and U.S. Lead Plaintiff produced 20 documents (totaling 125 pages) to Defendants.  Among the documents produced were documents related to all major theories of liability in the case, Defendants' insurance policies, and U.S. Lead Plaintiff's transactions in ReconAfrica stock.

22.    U.S. Lead Plaintiff also served eight subpoenas for production of documents on service providers to ReconAfrica, including: (i) Core Laboratories Inc.; (ii) Horizon Well Logging, Inc.; (iii) Worldwide Geochemistry, LLC; (iv) Earthfield Technology, LLC; (v) Sproule Incorporated; (vi) Geomark Research, Ltd.; (vii) Schlumberger Limited (Schlumberger N.V.); and (viii) Netherland

Sewell & Associates, Inc.  Third parties produced over 11,000 documents in response to U.S. Lead Plaintiff's subpoenas.

23.    The Parties participated in telephonic conferences with Magistrate Judge Levy to address the status of discovery and related issues on May 18, 2023; September 14, 2023; and January 18, 2024.

**E.    Settlement Negotiations, And The U.S. Settlement's Preliminary Approval**

24.    While actively pursuing fact discovery, U.S. Lead Plaintiff and Defendants agreed to participate in a private mediation with a well-respected mediator of complex cases—Jed Melnick, Esq. of JAMS. U.S. Lead Plaintiff and Defendants exchanged extensive mediation statements and exhibits that addressed, among other things, issues related to liability and damages. The Parties participated in a full-day mediation session on October 18, 2023.  At Defendants' request, the Canadian Plaintiff's counsel also participated in the mediation.  The Parties failed to reach an agreement at the mediation, but the next day, Mr. Melnick recommended in writing that the Parties settle both Actions for a combined $14.5 million Canadian dollar cash payment, subject to certain adjustments, to be allocated among the U.S. Settlement Class and the Canadian Settlement Class.

25.    With Mr. Melnick's assistance, the U.S. Lead Plaintiff and the Canadian Plaintiff continued to negotiate concerning the allocation of proposed settlement proceeds between the U.S. Settlement Class and the Canadian Settlement Class.  On October 24, 2023, Mr. Melnick recommended that 65% of the proposed $14.5 million CAD settlement amount ($9,425,000 CAD) be allocated to the U.S. Settlement Class, and 35% ($5,075,000 CAD) to the Canadian Settlement Class. On October 25, 2023, U.S. Lead Plaintiff and the Canadian Plaintiff accepted Mr. Melnick's recommendation concerning allocation of settlement proceeds, and all Parties accepted Mr. Melnick's recommendation concerning the $14.5 million CAD total settlement amount.

26.     U.S. Lead Plaintiff's counsel then drafted a proposed term sheet to memorialize the global settlement of the Actions, and continued to negotiate with the other Parties concerning such terms over the next two months.  On December 20, 2023, the Parties executed a finalized term sheet, setting out certain components of the settlement in principle.  Over the following two months, the Parties negotiated the terms of the definitive global Stipulation to resolve both this U.S. Action and the Canadian Action, with U.S. Lead Plaintiff's counsel preparing the initial draft. In drafting the Stipulation and its exhibits, U.S. Lead Plaintiff's counsel also worked with a damages expert to craft a plan of allocation that treats U.S. Lead Plaintiff and all other members of the proposed U.S. Settlement Class fairly, which was included in the U.S. Notice attached as an exhibit to the Stipulation. The Stipulation was finalized and executed by all Parties on February 27, 2024.

27.     Also on February 27, 2024, U.S. Lead Plaintiff filed his Unopposed Motion For (I) Preliminary Approval of Class Action Settlement; (II) Certification of The U.S. Settlement Class; and (III) Approval of Notice to the U.S. Settlement Class ("Preliminary Approval Motion"). ECF Nos. 53-55.  On August 8, 2024, the Court held a hearing on the Preliminary Approval Motion, indicated its intention to grant the motion, and directed the Parties "to file a copy of the Supplemental Agreement under seal and to publicly file a revised U.S. Notice containing the edits to paragraph 33 discussed on the record." *See* Minute Entry docket text entered Aug. 9, 2024.  U.S. Lead Plaintiff filed the revised U.S. Notice on August 9, 2024.  ECF No. 59-1.  On August 13, 2024, the Court entered the Order Preliminarily Approving Settlement And Providing For Notice ("Preliminary Approval Order").  ECF No. 60.  On August 15, 2024, Defendants sought leave to file the Supplemental Agreement under seal, which the Court granted, and the Supplemental Agreement was filed under seal on August 26, 2024. ECF Nos. 61-62.

10

28.     Because the Preliminary Approval Order was entered on August 13, 2024 (and certain other requirements pursuant to Stipulation ¶11 had by then been met), payment of the U.S. Settlement Amount was due by September 12, 2024.  Shortly thereafter, counsel for U.S. Lead Plaintiff began to discuss with counsel for Defendants certain issues relating to the amount of payments to the U.S. Escrow Account (at that time totaling $9,524,413.75 CAD) and the exchange rate adjustment calculation of Stipulation ¶12.  The Parties continued to discuss these matters, and on October 7, 2024, entered into a Confirmation of Receipt of U.S. Settlement Amount and Release ("Confirmation") providing for a supplemental payment of $18,432.20 USD to the U.S. Escrow Account from Defendants through their insurers, in full satisfaction of Defendants' obligations under Stipulation ¶¶11-13.  *See* Ex. 7.  This supplemental payment was subsequently received in the U.S. Escrow Account.

**F.      The Canadian Court Has Approved The Canadian Settlement**

29.     On May 23, 2023, Catherine Bowles ("Canadian Plaintiff") initiated the Canadian Action by filing a Notice of Civil Claim in the Supreme Court of British Columbia, asserting causes of action against ReconAfrica for common law negligent misrepresentation primary market liability, statutory law primary market liability under Section 131 of the British Columbia Securities Act ("BCSA"), common law negligent misrepresentation secondary market liability, and statutory secondary market liability under Section 140.3 of the BCSA.

30.     Although brought in different courts under different laws, the Canadian Action and this U.S. Action relate to similar underlying factual allegations concerning ReconAfrica, which form the foundation for both Actions. Generally speaking, the Canadian Action is brought on behalf of the Canadian Settlement Class of non-U.S. investors, whereas the U.S. Settlement Class consists of U.S.

investors.  In addition to being traded on the U.S. OTC market, ReconAfrica stock is also traded on the Canadian TSXV exchange and the Frankfurt stock exchange.

31.    On June 20, 2024, the Supreme Court of British Columbia entered an Order Made After Application (Settlement Approval) in the Canadian Action.  *See* Ex. 8.  In that order the Canadian Court held that "[t]he Canadian Settlement is fair and reasonable and in the best interests of the Plaintiff and Canadian Settlement Class Members and is approved pursuant to section 35 of the Class Proceedings Act, RSBC 1996, c. 50." *See id.* at ¶2.  The Canadian Court further approved: (a) the Settlement Agreement; (b) the Canadian Second Notice; (c) the Canadian plan of Allocation; and (d) the Canadian Claim Form. *See id.* at ¶4.

32.    The Canadian Court's Order Made After Application (Settlement Approval) in the Canadian Action is substantially similar to the form of Canadian Second Order attached to the Stipulation as Exhibit C-6, and so fulfills the requirement of Stipulation ¶49(f) that the Canadian Court approve the Canadian Settlement and enter the Canadian Second Order, as required for the Effective Date of the global Settlement to occur.

### III.    THE RISKS OF CONTINUED LITIGATION

33.    The U.S. Settlement provides an immediate and certain benefit to the U.S. Settlement Class in the form of a non-reversionary cash payment of $9,524,433.75 Canadian dollars and $18,432.20 U.S. dollars (totaling $7,009,759.48 U.S. dollars after conversion and related fees, and before any receipt of interest).  As explained more fully below, there were significant risks that the U.S. Settlement Class might recover substantially less than this amount—or nothing at all—if the case were to proceed through additional litigation to a jury trial, followed by the inevitable appeals.

**A.      Risks To Proving Liability**

34.      The U.S. Action is premised on purported wrongdoing that first came to light in June-September 2021, when Viceroy published a series of reports alleging serious undisclosed problems with respect to ReconAfrica's business, including that it would not be allowed to frack in Namibia, and that ReconAfrica's omission of key data from its reported test well results indicated poor prospects for a commercially viable oil or gas discovery.  While U.S. Lead Plaintiff was able to successfully survive the pleading stage, and his counsel believe they were building a strong evidentiary case, a jury may nevertheless have disagreed.  Indeed, Defendants forcefully argued in their motion to dismiss, and would undoubtedly continue to assert at summary judgment and/or trial, that Defendants made no actionable misrepresentations under federal securities laws.

35.      More specifically, Defendants argued, and would likely continue to argue, that: (a) they fully disclosed to investors the risky nature of oil and gas exploration, and the uncertainty surrounding the regulatory approval process; (b) that their statements were not misleading because they concerned uncertain future events, such as whether oil or gas would be discovered, and whether Namibia would authorize ReconAfrica to extract any discovered resources; (c) Namibia's laws and regulations applicable to fracking were public information, which Defendants had no duty to disclose; and (d) they fully and accurately disclosed results from their test wells as the data became available.

36.      Defendants would no doubt also contest scienter.  While U.S. Lead Plaintiff's counsel believe that they could establish scienter after the development of the evidentiary record, they also recognize the difficulties in proving scienter.  Defendants were likely to continue to dispute scienter on multiple grounds, including that: (a) the Individual Defendants did not possess non-public information demonstrating the allegedly omitted facts were true or that they contradicted the alleged misstatements; (b) Defendants had no plausible motive to mislead investors; (c) the early results of the

13

first two test wells did not prove conventional production was not viable at those sites; and (d) ReconAfrica's personnel changes were unrelated to any alleged fraud.  Even if U.S. Lead Plaintiff advanced past summary judgment and proceeded to trial, substantial uncertainty remains as to how a trier of fact would view each side's narrative of the events at issue.

37.     U.S. Lead Plaintiff would have needed to surmount significant obstacles to obtain evidence required to prove his claims.  Many witnesses to key events in this action reside abroad. Defendants' interrogatory responses identified witnesses in the U.S., Canada, the U.K., France, Germany, Namibia, and Angola.  The prevalence of foreign-resident witnesses makes discovery substantially more difficult and its outcome uncertain, due to the significant efforts, delay and uncertainty associated with attempting to locate, serve, and compel compliance from such individuals under international agreements such as the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.

**B.      Risks To Proving Loss Causation And Damages**

38.     Assuming U.S. Lead Plaintiff overcame the above risks and established Defendants' liability, he would have confronted considerable challenges in establishing loss causation and class-wide damages.  While U.S. Lead Plaintiff would have argued that the declines in the price of ReconAfrica U.S. Stock were attributable to corrective disclosures that occurred on June 24, 2021; June 25, 2021; July 14, 2021; July 15, 2021; August 5, 2021; August 6, 2021; August 9, 2021; August 16, 2021; August 17, 2021; and September 7, 2021,  Defendants argued, and would likely continue to assert, that loss causation was lacking because ReconAfrica experienced a long, gradual stock price decline not caused by the revelation of any fraud. Defendants would also have likely asserted that the volatility in the Company's stock price during the alleged class period was due to an interplay of several factors, including: the high risk nature of oil and gas exploration generally; the challenges of

14

conducting such efforts in an area that does not have a history of oil and gas exploration; concerted opposition to oil and gas exploration from environmental activists; and efforts by short sellers to depress the price of the Company's stock for financial gain.

39.     U.S. Lead Counsel further expects that Defendants would argue that even if some portion of the decline in price of ReconAfrica U.S. Stock was caused by the corrective disclosures, damages were minimal.  Had Defendants prevailed on their loss causation arguments, potential class-wide damages would have been reduced significantly or even eliminated.

40.     Moreover, in order to prove his claims, U.S. Lead Plaintiff would have had to proffer expert testimony demonstrating, among other things: (a) what the true value of ReconAfrica U.S. Stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of ReconAfrica U.S. Stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the disclosures on June 24, 2021; June 25, 2021; July 14, 2021; July 15, 2021; August 5, 2021; August 6, 2021; August 9, 2021; August 16, 2021; August 17, 2021; and September 7, 2021.  Such expert testimony is expensive, time consuming, and subject to rebuttal.

41.     Indeed, Defendants almost certainly would have presented their own damages expert(s), who would have no doubt presented conflicting conclusions and theories for ReconAfrica U.S. Stock price declines on the alleged disclosure dates.  Defendants likely would have challenged U.S. Lead Plaintiffs' expert(s) at the class certification stage, at summary judgment, with *Daubert* motions, and at trial and appeal.  This "battle of the experts" creates an additional litigation risk because the reaction of a trier of fact to such expert testimony is highly unpredictable, creating uncertainty regarding how much weight a judge or jury will accord the analysis of Defendants' competing experts.

15

### C.      Risks Faced In Obtaining And Maintaining Class Action Status

42.      Defendants likely would have argued against class certification.  While Lead Counsel are confident that all the Rule 23 requirements would have been met, and the Court would have certified the proposed class, plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification.  For example, Defendants were likely to argue that ReconAfrica U.S. Stock did not trade in an efficient market, and that therefore reliance cannot be presumed for class members and individual issues predominate over common issues, based on the fact that ReconAfrica U.S. Stock traded over-the-counter and experienced significant price volatility.  While U.S. Lead Counsel believe they could successfully rebut such arguments through an expert report regarding market efficiency, this could create yet another risky "battle of the experts."

43.      Moreover, even if U.S. Lead Plaintiff successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery.  Likewise, even if a class were certified, it would be subject to potential decertification risks.  Class certification was, by no means, a forgone conclusion.

### D.      Other Risks, Including Trial And Appeals

44.      U.S. Lead Plaintiff would have had to prevail at several stages of litigation, each of which present significant risks in complex class actions such as this one.  U.S. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.  In fact, GPM lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions, the expenditure of millions of dollars of attorney and paralegal time, and the expenditure of more than a

16

million dollars in hard costs.  *See In re: Korean Ramen Antitrust Litigation*, Case No. 3:13-cv-04115 (N.D. Cal.).  Put another way, complex litigation is uncertain, and success in cases like this one is never guaranteed.

45.    Even if U.S. Lead Plaintiff succeeded in proving all elements of his case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.  An appeal not only would have renewed the risks faced by U.S. Lead Plaintiff—as Defendants would have reasserted their arguments summarized above—but also would have resulted in substantial additional delay.  Given these significant litigation risks, U.S. Lead Plaintiff and U.S. Lead Counsel believe the U.S. Settlement represents a very favorable result for the U.S. Settlement Class.

### E.    Risks To Collecting Any Judgment

46.    Even if U.S. Lead Plaintiff were successful in overcoming the hurdles faced in proving all the elements of their case at trial, obtaining a jury verdict, and prevailing in any and all appeals, he and U.S. Lead Counsel faced numerous additional risks associated with enforcing any potential monetary judgement.

47.    ReconAfrica is a startup company based in Canada in the risky industry of oil and gas exploration, and its exploration efforts are limited to Namibia and Botswana.  It has never reported an operating profit, has yet to announce a commercially viable oil or gas discovery, and its stock price continues to trade substantially below the highs reached during the U.S. Settlement Class Period (*i.e.*, below USD $1.00 per share for most of the past year).  ReconAfrica's financial statements for the quarter ended June 30, 2024, report only $9.2 million CAD of cash on its balance sheet as of that date, as compared to a $6.7 million CAD loss for the quarter, and note "the existence of material uncertainties that may cast significant doubt on the Company's ability to continue as a going concern."

17

*See* Ex. 9 at 3-4 and 7.[3]  Accordingly, there is no guarantee that ReconAfrica would have sufficient funds to pay a judgment years in the future.

48.     Similarly, there is no guarantee that the Individual Defendants, many of whom reside outside of the United States, would have sufficient funds to pay a substantial judgment.  While ReconAfrica has insurance policies that may contribute to payment of a judgment, the amounts available under those policies were being continually reduced by Defendants' expenses from the ongoing litigation of both the U.S. and Canadian Actions.  As a result, U.S. Lead Plaintiff and U.S. Lead Counsel faced very real risks to their ability to collect any future judgment.

**F.      The U.S. Settlement Is Reasonable In Light Of Potential Recovery In The U.S. Action**

49.     In addition to the attendant risks of litigation discussed above, the U.S. Settlement is also fair and reasonable in light of the potential recovery of available damages.  If U.S. Lead Plaintiff had fully prevailed in each of his claims at both summary judgment and after a jury trial, if the Court certified the same class period as the U.S. Settlement Class Period, and if the Court and jury accepted U.S. Lead Plaintiff's damages theory, including proof of loss causation as to the ReconAfrica U.S. Stock price drop dates alleged in this case—*i.e.*, U.S. Lead Plaintiff's *best-case* scenario—estimated total *maximum* damages are approximately $56.3 million.  Therefore, the U.S. Settlement represents a recovery of approximately 12.4%, which is *more than three times greater* than the 3.8% median settlement recovery in securities class actions from 2014 to 2023, in cases with comparable estimated

---

[3] In July 2024, after the period covered by this most recent quarterly report, ReconAfrica raised approximately $60 million CAD through equity sales.  *See* Ex. 9 at 17 (note 15 titled "Subsequent Events").  However, even with this added funding, obtained by ReconAfrica well after the Parties entered into the Stipulation, there is still significant risk concerning ReconAfrica's ability to fund a substantial judgment years in the future.

damages.  *See* Ex. 4 (Svetlana Starykh and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024, at p. 25 (Fig. 21))).

## IV.   U.S. LEAD PLAINTIFF'S COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

50.     The Preliminary Approval Order (ECF No. 60) directed that the postcard notice highlighting key information regarding the proposed U.S. Settlement (the "U.S. Postcard Notice") be disseminated to the U.S. Settlement Class.  The Preliminary Approval Order set a final fairness hearing for December 19, 2024 ("U.S. Settlement Hearing").  The Preliminary Approval Order also set a deadline of 21 calendar days prior to the U.S. Settlement Hearing (*i.e.*, November 28, 2024) for U.S. Settlement Class Members to submit objections to the U.S. Settlement, the U.S. Plan of Allocation, and/or the Fee Memorandum or to request exclusion from the U.S. Settlement Class.

51.     Pursuant to the Preliminary Approval Order, U.S. Lead Counsel instructed Epiq Class Action & Claims Solutions, Inc.  ("Epiq"), the Court-approved U.S. Claims Administrator, to begin disseminating copies of the U.S. Postcard Notice and publish the U.S. Summary Notice. Contemporaneously with the mailing of the U.S. Postcard Notice, U.S. Lead Counsel instructed Epiq to post downloadable copies of: (a) the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "U.S. Notice"); (b) the U.S. Proof of Claim and Release Form (the "U.S. Claim Form" and together with the U.S. Notice, "U.S. Notice Packet"); and (c) the Complaint, online at www.ReconAfricaUSSecuritiesSettlement.com (the "U.S. Settlement Website").  Upon request, Epiq mailed copies of the Notice Packet to U.S. Settlement Class Members and will continue to do so until the deadline to submit a U.S. Claim Form has passed.

52.     The U.S. Postcard Notice directed U.S. Settlement Class Members to the U.S. Settlement Website to obtain additional information on the U.S. Settlement, including how to file a

19

claim and access to downloadable versions of the U.S. Notice and U.S. Claim Form. The U.S. Notice contains, among other things, a description of the U.S. Action; the definition of the U.S. Settlement Class; a summary of the terms of the U.S. Settlement and the proposed U.S. Plan of Allocation; and a description of a U.S. Settlement Class Member's right to participate in the U.S. Settlement, object to the U.S. Settlement, the U.S. Plan of Allocation and/or the Fee Memorandum, or to exclude themselves from the U.S. Settlement Class. The U.S. Notice also informs U.S. Settlement Class Members of U.S. Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the U.S. Settlement Fund, and for reimbursement of U.S. Litigation Expenses in an amount not to exceed $143,000.00, which may include an application of up to $12,000 for reimbursement of the reasonable costs and expenses incurred by U.S. Lead Plaintiff related to his representation of the U.S. Settlement Class.

53.      To disseminate the U.S. Postcard Notice, Epiq obtained from ReconAfrica's transfer agent the names and addresses of potential U.S. Settlement Class Members (the "Record Holder List") who purchased or otherwise acquired publicly traded ReconAfrica Securities during the U.S. Settlement Class Period. *See* Preliminary Approval Order at ¶7(a); Declaration of Morgan Kimball Regarding: (A) Mailing of Notice; (B) Publication of U.S. Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Kimball Decl."), attached hereto as Exhibit 1 at ¶3.

54.      In addition, Epiq maintains a proprietary database (the "Broker Mailing Database") with the names and addresses of the largest and most common brokerage firms, banks, institutions, and other third-party nominees ("Nominees"). *See id.* at ¶4. On September 11, 2024, Epiq caused the U.S. Postcard Notice to be sent by first-class U.S. mail to the combined 1,275 mailing records contained in the Record Holder List and the Broker Mailing Database. *Id.* at ¶¶5-6. The U.S. Notice instructs Nominees how to request copies of the U.S. Postcard Notice to forward to beneficial owners,

20

request a link to the Notice Packet to email to beneficial owners, or provide a list of beneficial owners' names and addresses to Epiq. *See* Notice at ¶94.

55. As of November 8, 2024, Epiq mailed an additional 3,434 U.S. Postcard Notices to potential U.S. Settlement Class Members whose names and addresses were provided to Epiq by individuals or Nominees requesting that U.S. Postcard Notices be mailed to such persons. *See* Kimball Decl. at ¶8. Epiq has mailed another 13,135 U.S. Postcard Notices to Nominees who requested U.S. Postcard Notices to forward to their customers. *See id.*

56. As of November 8, 2024, a total of 17,844 U.S. Postcard Notices have been mailed to potential U.S. Settlement Class Members and Nominees. *Id.* at *¶*9.

57. On September 23, 2024, in accordance with the Preliminary Approval Order, Epiq caused the U.S. Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*. *See id.* at ¶10; Ex. 1-C (copies of publication confirmations).

58. U.S. Lead Counsel also caused Epiq to establish the U.S. Settlement Website, which became operational on September 11, 2024, and maintained a toll-free telephone number to provide U.S. Settlement Class Members with information concerning the U.S. Settlement. The U.S. Settlement Website also allows visitors to submit a claim online, and download copies of the U.S. Notice and U.S. Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and the Complaint. Kimball Decl. at ¶¶11-18.

59. The deadline for U.S. Settlement Class Members to object to the U.S. Settlement, U.S. Plan of Allocation, and/or to the Fee Memorandum or to request exclusion from the U.S. Settlement Class is November 28, 2024. To date, no requests for exclusion have been received. *Id.* at ¶19. Epiq will file a supplemental affidavit after the November 28, 2024, deadline addressing whether any requests for exclusion have been received. To date, no objections to the U.S. Settlement or the U.S.

Plan of Allocation have been entered on this Court's docket or have otherwise been received by U.S. Lead Counsel. *Id.* at ¶20. U.S. Lead Counsel will file reply papers by December 12, 2024, that will address any objections that may be received.

## V.       ALLOCATION OF THE NET PROCEEDS OF THE U.S. SETTLEMENT

60.       Pursuant to the Preliminary Approval Order, and as set forth in the U.S. Notice, all U.S. Settlement Class Members who want to participate in the distribution of the U.S. Net Settlement Fund (*i.e.*, the $7,009,759.48 U.S. dollars initially in the U.S. Escrow Account after conversion of Canadian dollars and related fees, plus any and all interest earned thereon, less: (i) any U.S. Taxes; (ii) any U.S. Notice and Administration Costs; (iii) any U.S. Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court) must submit a valid U.S. Claim Form with all required information either online or postmarked no later than January 9, 2025. The U.S. Net Settlement Fund will be distributed among Authorized U.S. Claimants according to the proposed U.S. Plan of Allocation, subject to Court approval. *See* Ex. 1-B (Notice) at ¶52.

61.       The proposed U.S. Plan of Allocation is detailed in the long-form U.S. Notice. *See* Ex. 1-B (Notice, ¶¶61-79). The U.S. Notice is posted online at the U.S. Settlement Website, is downloadable, and upon request, will be mailed to any potential U.S. Settlement Class Member. If approved, the U.S. Plan of Allocation will govern how the U.S. Net Settlement Fund will be distributed among Authorized U.S. Claimants. The U.S. Plan of Allocation's objective is to equitably distribute the U.S. Net Settlement Fund to those U.S. Settlement Class Members who suffered economic losses as a result of the alleged wrongdoing as opposed to losses caused by market or industry-wide factors or Company-specific factors unrelated to the alleged wrongdoing and takes into consideration when each Authorized U.S. Claimant purchased and/or sold ReconAfrica U.S. Stock. *See id.*

62.    As described in the U.S. Notice, calculations under the U.S. Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that U.S. Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized U.S. Claimants pursuant to the U.S. Settlement.  Instead, the calculations under the U.S. Plan of Allocation are a method to weigh the claims of U.S. Settlement Class Members against one another for the purposes of making an equitable allocation of the U.S. Net Settlement Fund.  *Id.* at ¶61.

63.    The U.S. Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act, and reflects an assessment of the damages that U.S.  Lead Plaintiff contends could have been recovered under the theories of liability and damages asserted in this action.  More specifically, the U.S. Plan of Allocation reflects, and is based on, U.S. Lead Plaintiff's allegation that the price of ReconAfrica U.S. Stock was artificially inflated during the period from February 28, 2019, through September 7, 2021, due to Defendants' alleged materially false and misleading statements and omissions.  The U.S. Plan of Allocation is based on the premise that the decrease in the price of ReconAfrica U.S. Stock following the alleged corrective disclosures on June 24, 2021; June 25, 2021; July 14, 2021; July 15, 2021; August 5, 2021; August 6, 2021; August 9, 2021; August 16, 2021; August 17, 2021; and September 7, 2021, may be used to measure the alleged artificial inflation in the price of ReconAfrica U.S. Stock prior to these disclosures.  *See id.* at ¶¶63-64.

64.    Under the proposed U.S. Plan of Allocation, each Authorized U.S. Claimant will receive his, her, or its *pro rata* share of the U.S. Net Settlement Fund.  Specifically, an Authorized U.S. Claimant's *pro rata* share shall be the Authorized U.S. Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized U.S. Claimants, multiplied by the total amount in the U.S. Net Settlement Fund.  *Id.* at ¶76.

23

65.     An individual U.S. Claimant's recovery under the U.S. Plan of Allocation will depend on several factors, including the number of valid claims filed by other U.S. Claimants and how many shares of ReconAfrica U.S. Stock the U.S. Claimant purchased, acquired, or sold during the U.S. Settlement Class Period and when that U.S. Claimant bought, acquired, or sold the shares.  If a U.S. Claimant has an overall market gain with respect to his, her, or its overall transactions in ReconAfrica U.S. Stock during the U.S. Settlement Class Period, or if the U.S. Claimant purchased shares during the U.S. Settlement Class Period, but did not hold any of those shares through the alleged corrective disclosures, the U.S. Claimant's recovery under the U.S. Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.  *Id.* at ¶¶63, 74.

66.     If the prorated payment to be distributed to any Authorized U.S. Claimant is less than $10.00, no distribution will be made to that Authorized U.S. Claimant.  *Id.* at ¶76.  Any prorated amounts of less than $10.00 will be included in the pool distributed to those Authorized U.S. Claimants whose prorated payments are $10.00 or greater.  In U.S. Lead Counsel's experience, processing and sending a check for less than $10.00 is cost prohibitive.[4]

67.     In sum, the U.S. Plan of Allocation was designed to allocate the proceeds of the U.S. Net Settlement Fund among U.S. Settlement Class Members based on the losses they suffered on transactions in ReconAfrica U.S. Stock that were attributable to the conduct alleged in the Complaint. Accordingly, U.S. Lead Counsel respectfully submit that the U.S. Plan of Allocation is fair and reasonable and should be approved by the Court.

---

[4] If any funds remain after an initial distribution to Authorized U.S. Claimants, as a result of uncashed or returned checks or other reasons, subsequent distributions will be conducted as long as they are cost effective.  Ex. 1-B (Notice) at ¶77.  At such time as it is determined that the re-distribution of funds remaining in the U.S. Net Settlement Fund is not cost-effective, the remaining balance shall be contributed to non-sectarian, not-for-profit organization(s), to be recommended by U.S. Lead Counsel and approved by the Court.

24

68.     To date, no objections to the proposed U.S. Plan of Allocation have been received or filed on the Court's docket.

## VI.     U.S. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

69.     In addition to seeking final approval of the U.S. Settlement and U.S. Plan of Allocation, U.S. Lead Counsel are applying for a fee award of 33⅓% of the U.S. Settlement Fund (or $2,336,586.49, plus interest earned at the same rate as the U.S. Settlement Fund).  U.S. Lead Counsel also request reimbursement of U.S. Litigation Expenses in the amount of $108,332.37, which includes $96,332.37 in out-of-pocket expenses that U.S. Lead Counsel incurred in connection with the prosecution of this action from the U.S. Settlement Fund, and a total of $12,000 to U.S. Lead Plaintiff for his reasonable costs (including lost wages) directly incurred in connection with his representation of the U.S. Settlement Class. The total U.S. Litigation Expenses amount of $108,332.37 is well below the maximum expense amount of $143,000.00 set forth in the U.S. Notice.  The legal authorities supporting a 33⅓% fee award are set forth in the Fee Memorandum, which is being filed contemporaneously herewith. The primary factual bases for the requested fee and reimbursement of U.S. Litigation Expenses are summarized below.

### A.     The Fee Application

70.     U.S. Lead Counsel are applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the U.S. Settlement Class.  As set forth in the accompanying Fee Memorandum, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the U.S. Settlement Class in achieving the maximum recovery.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage-of-the-fund

method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.  Furthermore, as set forth below, though not required in the Second Circuit, U.S. Lead Counsel also respectfully submits that the requested fee is fully supported by a "lodestar multiplier cross-check."

71.     Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, U.S. Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee Memorandum, a 33⅓% fee award is well within the range of percentages awarded in complex class actions with comparable settlements in this Circuit.

### 1.     The Excellent Outcome Achieved Is The Result Of The Significant Time And Labor That U.S. Lead Counsel Devoted To The Action

72.     The following chart summarizes U.S. Lead Counsel's hours and lodestar from the inception of the case through November 1, 2024:[5]

| TIMEKEEPER/CASE | STATUS | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| **ATTORNEYS:** | | | | |
| Robert Prongay | Partner | 94.90 | $1,050.00 | $99,645.00 |
| Kara Wolke | Partner | 52.70 | $1,050.00 | $55,335.00 |
| Joseph Cohen | Partner | 101.75 | $1,195.00 | $121,591.25 |
| Ex Kano Sams | Partner | 120.40 | $1,125.00 | $135,450.00 |
| Garth Spencer | Partner | 581.60 | $925.00 | $537,980.00 |
| Holly A. Heath | Associate | 164.50 | $600.00 | $98,700.00 |
| Sandra Hung | Staff Attorney | 197.20 | $450.00 | $88,740.00 |
| **TOTAL ATTORNEY** | **TOTAL** | **1,313.05** | | **$1,137,441.25** |
| **PARALEGALS:** | | | | |
| Harry Kharadjian | Senior Paralegal | 32.00 | $350.00 | $11,200.00 |
| Paul Harrigan | Senior Paralegal | 20.60 | $325.00 | $6,695.00 |
| John D. Belanger | Research Analyst | 13.00 | $365.00 | $4,745.00 |
| **TOTAL PARALEGAL** | **TOTAL** | **65.60** | | **$22,640.00** |
| **TOTAL LODESTAR** | **TOTAL** | **1,378.65** | | **$1,160,081.25** |

---

[5] Time expended in preparing the application for fees and reimbursement of U.S. Litigation Expenses has not been included.

73.    As set forth above, U.S. Lead Counsel expended a total of 1,378.65 hours in the investigation and prosecution of the U.S. Action through and including November 1, 2024. The resulting total lodestar is $1,160,081.25. The requested fee amount of 33⅓% of the U.S. Settlement Fund equals $2,336,586.49 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 2.01 multiplier of U.S. Lead Counsel's lodestar, and is not only reasonable, but is modest when viewing the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

74.    The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of lodestar-multiplier cross-check. Additionally, the rates billed by U.S. Lead Counsel attorneys ($450-600 per hour for non-partners and $925-1,195 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude. *See* Ex. 5 attached hereto (table of peer law firm billing rates).

75.    Moreover, in addition to drafting the motion for final approval, U.S. Lead Counsel will continue to work towards effectuating the U.S. Settlement in the event the Court grants final approval. Among other things, U.S. Lead Counsel will continue working with the U.S. Claims Administrator to resolve issues with U.S. Settlement Class Member claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. No additional compensation will be sought for this work.

76.    As detailed above, throughout this case, U.S. Lead Counsel devoted substantial time to the prosecution of this action. U.S. Lead Counsel maintained control of, and monitored the work performed by lawyers and other personnel on this case. I personally devoted substantial time to this case and oversaw and/or was personally involved in: (a) drafting or reviewing and editing the

27

Complaint, other court filings, various discovery-related materials, and other correspondence prepared on behalf of U.S. Lead Plaintiff; (b) briefing and arguing U.S. Lead Plaintiff's opposition to Defendants' motion to dismiss; (c) communicating with U.S. Lead Plaintiff, engaging with Defendants' counsel on a variety of matters; and (d) mediation and Settlement negotiations. Other experienced attorneys were involved with drafting, reviewing and/or editing pleadings, court filings, various discovery-related materials, and other legal correspondence required in the case, communicating with U.S. Lead Plaintiff, negotiating the terms of the Stipulation, and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, U.S. Lead Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

77. U.S. Lead Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the U.S. Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2. The Magnitude And Complexity Of The Action

78. As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this action presented complex issues not only relating to the law applicable to securities class action claims, but also including the need for U.S. Lead Counsel to understand, among other things, scientific and technical matters relating to oil and gas exploration. The complexities were further heightened given the case's international dimension, involving multiple foreign parties and witnesses.

79. The high-stakes magnitude of the case is amply demonstrated by U.S. Lead Counsel's estimate of total maximum damages of approximately $56.3 million U.S. dollars, and by the fact that

28

U.S. Lead Counsel had already obtained from Defendants and third parties more than 80,000 documents (totaling over 540,000 pages).

### 3. The Significant Risks Borne By U.S. Lead Counsel

80. This prosecution was undertaken by U.S. Lead Counsel on an entirely contingent-fee basis. From the outset, this action was a difficult and highly uncertain securities case. There was no guarantee that U.S. Lead Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, U.S. Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the action, that funds were available to compensate attorneys and staff, and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, U.S. Lead Counsel received no compensation during the course of the action and incurred $96,332.37 in out-of-pocket litigation-related expenses in prosecuting this action.

81. Additionally, U.S. Lead Plaintiff and U.S. Lead Counsel developed and then alleged the Exchange Act claims without information gained through subpoena power, hindered by the PSLRA's automatic discovery stay. *See* 15 U.S.C. § 78u-4(b)(3)(B).

82. Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. U.S. Lead Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See* ¶44, *supra*. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

**4.      The Quality Of Representation, Including The Result Obtained, The Experience And Expertise Of U.S. Lead Counsel, And The Standing And Caliber Of Defendants' Counsel**

83.      As demonstrated by the firm résumé attached hereto as Exhibit 3, U.S. Lead Counsel is a highly experienced and skilled law firm that focuses its practices on securities class action litigation.  Indeed, U.S. Lead Counsel has substantial experience in litigating securities fraud class actions and has negotiated scores of other class settlements, which have been approved by courts throughout the country.  U.S. Lead Counsel enjoys a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.  I believe U.S. Lead Counsel's experience added valuable leverage in the settlement negotiations.

84.      Additionally, the quality of the work performed by U.S. Lead Counsel in obtaining the U.S. Settlement should also be evaluated in light of the quality of the opposition.  Here, Defendants were represented by Neal, Gerber & Eisenberg LLP and Pryor Cashman LLP, both of which are experienced, aggressive, and highly skilled counsel that vigorously represented the interests of their clients throughout this action.  In the face of this experienced and formidable opposition, U.S. Lead Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that were highly favorable to the U.S. Settlement Class.

**5.      The Requested Fee In Relation To The U.S. Settlement**

85.      The amount of the fee requested (33⅓%) in relation to the Settlement Amount ($7,009,759.48 U.S. dollars after conversion of Canadian dollars and related fees) is fair and reasonable.  Courts routinely award fees of 33⅓% in securities class action settlements.  *See* Fee Memorandum § III.C.1.

30

**6.    The Reaction Of The U.S. Settlement Class Supports U.S. Lead Counsel's Fee Request**

86.    As noted above, as of November 8, 2024, a total of 17,844 U.S. Postcard Notices were mailed advising U.S. Settlement Class Members that U.S. Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 33⅓% of the U.S. Settlement Fund.  Kimball Decl. ¶9; Ex. 1-A (U.S. Postcard Notice).  To date, no objection to the maximum potential attorneys' fees request set forth in the U.S. Postcard Notice has been received or entered on this Court's docket.  Any objection received after the date of this filing will be addressed in U.S. Lead Counsel's reply papers, which are to be filed by December 12, 2024.

**7.    U.S. Lead Plaintiff Supports U.S. Lead Counsel's Fee Request**

87.    As set forth in the declaration submitted by U.S. Lead Plaintiff Robert Partovy, he has concluded that U.S. Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the U.S. Settlement Class, and the risks of the action.  *See* Ex. 2 ("Partovy Decl.") ¶¶9-10.  Dr. Partovy has been closely involved in this case, and his endorsement of U.S. Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

88.    In sum, U.S. Lead Counsel accepted this case on a fully contingent basis, committed significant resources to it, and prosecuted the action without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the risks of the action, and the contingent nature of the representation, U.S. Lead Counsel respectfully submit that a fee award of 33⅓%, resulting in a modest multiplier of 2.01, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.    Reimbursement Of The Requested U.S. Litigation Expenses Is Fair and Reasonable**

89.    U.S. Lead Counsel seeks a total of $108,332.37 in U.S. Litigation Expenses to be paid from the U.S. Settlement Fund. This amount includes: $96,332.37 in out-of-pocket expenses reasonably and necessarily incurred by U.S. Lead Counsel in connection with commencing, litigating, and settling the claims asserted in the action; as well as a total of $12,000 to U.S. Lead Plaintiff, pursuant to 15 U.S.C. § 78u-4(a)(4) for his reasonable costs (including lost wages) directly incurred in connection with their representation of the U.S. Settlement Class. *See* Partovy Decl., ¶13.

90.    As detailed below, U.S. Lead Counsel is seeking reimbursement of a total of $96,332.37 in out-of-pocket costs and expenses. The costs and expenses incurred in the U.S. Action are reflected on the books and records of my firm. These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of the expenses incurred. The expenses reflected in in the table below are the total litigation expenses actually incurred by U.S. Lead Counsel:

| CATEGORY OF EXPENSE | AMOUNT PAID |
|---|---|
| COURIER AND SPECIAL POSTAGE | $96.30 |
| COURT FILING FEES | $500.00 |
| DOCUMENT MANAGEMENT | $27,164.70 |
| EXPERTS – ECONOMETRIC (LOSS CAUSATION, DAMAGES AND PLAN OF ALLOCATION) | $29,990.00 |
| PRIVATE INVESTIGATORS | $6,162.00 |
| MEDIATORS | $9,938.66 |
| ONLINE RESEARCH | $3,090.77 |
| PRESS RELEASE | $110.00 |
| SERVICE OF PROCESS | $2,391.12 |
| TRANSCRIPTS | $172.20 |
| TRAVEL AIRFARE | $5,500.07 |
| TRAVEL AUTO | $2,435.22 |
| TRAVEL HOTEL | $8,083.21 |

| | |
|---|---|
| TRAVEL MEALS | $698.12 |
| **Grand Total** | **$96,332.37** |

91.     The U.S. Postcard Notice and Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $143,000.  Ex. 1-A (Postcard Notice); Ex. 1-B (Notice) at ¶¶5, 80. The total amount requested by Lead Counsel and Lead Plaintiff, $108,332.37, falls well below the $143,000 that U.S. Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the U.S. Postcard Notice and U.S. Notice.  If any objection to the request for reimbursement of U.S. Litigation Expenses is made after the date of this filing, U.S. Lead Counsel will address it in its reply papers.

92.     From the beginning of the case, U.S. Lead Counsel were aware that they might not recover their out-of-pocket expenses.  U.S. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this action.  Accordingly, U.S. Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

93.     One large component of expenses, $29,990, or approximately 31.1% of the total expenses, was expended on the retention of experts—two in the field of loss causation and damages. These experts were consulted at different points throughout the litigation, including on matters related to the preparation of the Complaint, negotiation of the U.S. Settlement, and on preparation of the proposed U.S. Plan of Allocation.

94.     Another large component of expenses, $27,164.70, or approximately 28.2% of the total expenses, was expended on a document database for review of the over 80,000 documents obtained by U.S. Lead Counsel in discovery from Defendants and third parties.

33

95.    Another significant component of expenses, $9,938.66, or approximately 10.3% of the total expenses, was expended on mediation fees, which mediation led to the Parties' agreement to resolve this action through the Settlement.

96.    The other litigation expenses for which U.S. Lead Counsel seek reimbursement are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These litigation expenses included, among other things, court fees, service of process costs, cost of publishing press releases as required by the PSLRA, photoimaging, postage and delivery expenses, travel expenses associated with attending court hearings and mediation, and the cost of on-line legal research.[6]

97.    Finally, as stated above, U.S. Lead Plaintiff Robert Partovy seeks reimbursement, pursuant to 15 U.S.C. § 78u-4(a)(4), of his reasonable costs (including lost wages) directly incurred in connection with his representation of the U.S. Settlement Class, in the total amount of $12,000. *See* Partovy Decl., ¶¶12-13. Robert Partovy is a successful doctor, having worked as a Family Physician for approximately 23 years. *See id.*

98.     Dr. Partovy worked closely with U.S. Lead Counsel throughout the pendency of this action in connection with his service as U.S. Lead Plaintiff.  For example, Dr. Partovy: (a) produced his trading records to U.S. Lead Counsel; (b) moved to be appointed lead plaintiff in this action; (c) communicated with his attorneys regarding the posture and progress of the case; (d) reviewed significant pleadings and briefs filed in this action; (e) reviewed significant Court orders and discussed them with his attorneys; (f) provided documents, and written responses and objections, to Defendants' requests for the production of documents; (g) responded to interrogatories; (h) consulted with U.S.

---

[6] Travel expenses relate primarily to attendance at the mediation and hearings on the motion to dismiss, the motion for preliminary approval and the motion for final approval of class action settlement.

34

Lead Counsel regarding the settlement negotiations; and (k) evaluated and approved the proposed U.S. Settlement. *See* Partovy Decl., ¶¶3-6.

99.     To date, no objection to the U.S. Litigation Expenses has been filed on the Court's docket.  In my opinion, the U.S. Litigation Expenses incurred by U.S. Lead Counsel and U.S. Lead Plaintiff were reasonable and necessary to represent the U.S. Settlement Class and achieve the U.S. Settlement.  Accordingly, U.S. Lead Counsel respectfully submit that the U.S. Litigation Expenses should be reimbursed in full from the U.S. Settlement Fund.

## VII.    CONCLUSION

100.     In view of the significant recovery for the U.S. Settlement Class and the substantial risks of this action, as described herein and in the accompanying Final Approval Memorandum, I respectfully submit that the U.S. Settlement should be approved as fair, reasonable, and adequate and the proposed U.S. Plan of Allocation should be approved as fair and reasonable.  I further submit that the requested fee in the amount of 33⅓% of the U.S. Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of $108,332.37 in U.S. Litigation Expenses, which includes the PSLRA reimbursement for costs in the total amount of $12,000 to U.S. Lead Plaintiff Robert Partovy, should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of November, 2024, in Wilmington, North Carolina.

*/s/ Garth Spencer*
Garth Spencer

35