EXHIBIT 10

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------x
                                          21-CV-6176(NRM)
JEFF M. OWEN,
                                          United States Courthouse
          Plaintiff,                      Brooklyn, New York

          - versus -                      April 26, 2023
                                          12:00 p.m.
RECONNAISSANCE ENERGY AFRICA
LTD. ET AL,

          Defendant.

-------------------------------x

          TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE NINA R. MORRISON
                UNITED STATES DISTRICT JUDGE


APPEARANCES

Attorney for Plaintiff:  GLANCY PRONGAY & MURRAY, LLP
                         1925 Century Park East, Suite 2100
                         Los Angeles, California 90067
                         BY:  GARTH AVERY SPENCER, ESQ.
                              EX KANO S. SAMS, II, ESQ.


Attorney for Defendant:  NEAL GERBER & EISENBER, LLP
                         2 N. LaSalle Street, Suite 1700
                         Chicago, Illinois 60602
                         BY:  KARL BARNICKOL, ESQ.
                              SCOTT FISHER, ESQ.

                         PRYOR CASHMAN LLP
                         7 TIMES SQUARE
                         Suite Level 40
                         New York, New York 10036
                         BY:  NICHOLAS GEORGE SAADY, ESQ.


Court Reporter:          SHERNELLE GRIFFITH
                         shernelle.griffith.edny@gmail.com

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                    2

(In open court.)

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Civil cause for an oral argument, 21-CV-6176, Owen v. Reconnaissance Energy Africa LTD, et. al call counsel please state your appearance poured record starting with the plaintiff.

MR. SPENCER:  Garth Spencer on behalf of the plaintiff and with me is my partner Ex Kano Sams.

THE COURT:  Good afternoon.

MR. SAMS:  Good morning.

THE COURT:  Good afternoon.

MR. BARNICKOL:  For the defendants that brought this motion, Nicholas Saady, and my co-counsel Karl Barnickol, and Scott Fisher.

THE COURT:  Good afternoon, everyone.

Please be seated.

Just a couple of logistics.  Thank you all for accommodating this schedule change.  We have a Board of Judge's meeting this afternoon that got moved to a little earlier than I thought.  So we will have you out of here a little earlier, but I appreciate you coming early.

Also, as you maybe to tell, I have lost a bit of my voice.  I just want you all to know that I have taken all the tests that one is supposed to take when one is not feeling well.  They are all negative, but if you can't hear me or

*SHERNELLE GRIFFITH – Official Court Reporter*

PROCEEDINGS                          3

understand me for whatever reason, the microphone should cover it, but please don't hesitate to ask me to repeat the question or anything I may have said.

All right. So we are here for oral argument on the defendant's motion to dismiss. I read the complaint and all your briefs. Thank you all very much. Very thorough.

I have just a few clarifying factual questions for both parties about the nature of ReconAfrica's business plan and I want to make sure I understand in the context of the fraud allegations. So let me ask defense counsel first, you know, I saw a lot of references in your client's public statements, at least until they removed them, to unconventional resources.

Is there any dispute that unconventional resources meant and was intended to only fracking? Was there something else potentially contemplated by your client's reference to unconventional resolutions?

MR. BARNICKOL: No. I think, your Honor, is correct that unconventional resources refers to fracking, but I feel compelled to say -- excuse me. I have to say, but I'm going to have the frog in the throat too.

THE COURT: Yeah. Just pull the mic a little closer to you and that might help.

MR. BARNICKOL: Sure.

I do feel compelled to say thought that this is a

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                    4

company that's in the exploration business.  So conventional or unconventional is not really an issue because -- the business to that, your Honor, was to look for oil.  Until you find oil, you don't know if it's conventional or unconventional.  To the extent that your Honor's question relates to any sort of public statements that were made about unconventional.  Unconventional, I think, is commonly understood to refer to fracking.

THE COURT:  Okay.  So you anticipated my next question, which is help me understand why your client's company being in the exploration business as opposed to the production business is a distinction with a difference when it comes to the allegations in this case?

MR. BARNICKOL:  Sure, your Honor.

So in the course of looking for oil and gas or that the evolutionary life cycle of an oil and gas company, the first thing you have to do is determine whether there's a possibility that there could be something there and in this case ReconAfrica was using their own magnetic surveys to fly an airplane over an area, looking at existing geological data that was in the public record to try and figure out is this a place where oil might exist.  Then the next step, once you do that, is to get a license.  And the license -- so there's a multi-tier listening structure here.  So there's a -- first tier is and exploration license.  And when you get an

*SHERNELLE GRIFFITH - Official Court Reporter*

exploration license, it gives you certain rights that are all specified in the license. But importantly, it's not a license to produce oil. So you can't go drill for oil. What you can do is, you can do seismic surveys where you drive a vehicle in the ground and it shoots sound waves in the ground. And then, as the process progresses, you can then drill test wells. And when the test wells are -- excuse me. The test wells are intended to do is not to find oil, but it is to find the characteristics, the qualities in the rocks that support the possibility or likelihood that there is oil or gas in the area. So you don't necessarily -- I think my recollection is that the license exploration area here is like 6.3 million acres. It's very big. Very big. When you're drilling a test well, you're not looking to hit oil. You're looking to find these characteristics that would suggest, Hey, this is a fruitful area to do more looking.

THE COURT: But ultimately a likelihood of successful production or some potential or promise for successful -- I mean, the point is ultimately, even if it's not your clients that would be doing the extraction, your clients will be exploring so that producers or extractors or whatever the term of art is can then come in and actually get the oil or gas from that targeted area.

MR. BARNICKOL: That's correct.

THE COURT: Okay.

PROCEEDINGS                                    6

MR. BARNICKOL:  I mean, there's no two ways about the fact that some day, some day, if we find oil; we're going to want to produce that oil.  And it's possible that you will find oil there -- it's possible they won't find anything and they haven't said they found anything.  All they've said is that so far the test data has shown that the characteristics that support a further exploration -- characteristic that show that there could be oil and gas there exist in this broad area.

THE COURT:  Okay.

MR. BARNICKOL:  Some day somebody will need to produce oil if it's found.

THE COURT:  Thank you.  I understand that.  I appreciate it.

So let me now ask plaintiff's counsel, I assume that you are going to argue that that is a distinction about a difference for purposes of what the investors were told.  So tell me why.

MR. SPENCER:  You have perfectly anticipated our argument, your Honor.  That it is a distinction of a difference.

The exploration business exists to lead to production.  I mean, it's highly relevant to investors if you're limited in the set of production opportunities to ones that can only be done with conventional versus a much broader

PROCEEDINGS                                    7

set of opportunities that can be extracted with fracking.

Highly material information to investors that they were

entitled to know and that defendant's concealed from the

investors.  So there is a distinction without indifference.

And as the defendant's themselves have said, and I'll direct

the Court's attention to docket number 43-1.  It is an annual

information form filed by ReconAfrica with the Canadian

securities regulator, the defendant's file with their motion

to dismiss.  On page 8 it reads, Recon Africa is a junior oil

and/or gas company currently engaged in the identification,

exploration, and development of oil and/or gas assets via

drilling and/or acquisition with the focusing on the Namibia

and Botswana.

Their own filings say that they are going to develop

the resources.  This distinction of exploration, it doesn't

make a lot of sense to us.  It is a bit of a head scratcher.

They're planning to extract the resources.

THE COURT:  Well, even if they weren't planning to

extract themselves, I take it your argument is that the

testing they were doing, the exploration they were doing, is

of value to their potential investors because once they have

confirmed through tests, some data or some information, that

is likely to yield successful production.  It doesn't

ultimately matter whether they're doing it as long as they're

going to profit from the discovery in some way.

*SHERNELLE GRIFFITH - Official Court Reporter*

MR. SPENCER:  That's correct.

If they want to try to discover a resource and then sell it to another company for the other company to frack, I mean that's kind of the same ultimate result.

THE COURT:  Yeah.  Okay.

So let me ask defense counsel, I know from your brief that you sort of on this production issue represented that your client never made a public statement about prospects for commercial production, but there is also this statement that plaintiff's focus on quite a lot, that your client at one point estimated even with some caveats, a 90 percent chance of regulatory approval.

So what was that 90 percent based on?  And don't you think that whatever it was based on would give prospective investors some indication that production down the road was a pretty sure bet.  I mean, 90 is a pretty high number when we're talking percentages.

MR. BARNICKOL:  I'm not sure what the 90 percent refers to, your Honor, to be clear with you.  So I wanted to talk about the approval though because remember there is a multi-tier licensing structure here.  And so, our client has an exploration license.  But before anyone could produce oil, they have to go first get an exploitation license.  That's the next stage.  Right.  You demonstrated --

THE COURT:  Exploitation and not exploration?

PROCEEDINGS                                    9

MR. BARNICKOL:  Correct.  Exploitation being the second, the next step.

THE COURT:  Right.

MR. BARNICKOL:  So I'm not sure -- I apologize, your Honor.  I'm not sure what the 90 percent regulatory approval relates to, but it just logically couldn't relate to exploitation because we don't even know if there's oil there to be exploited.

THE COURT:  So what's it regulatory approval of?  Is it regulatory approval of unconventional resource development?  Is it regulatory approval of something else?  Even if you don't know what the number was based on, what is it a regulatory approval from the Namibian government of?

MR. BARNICKOL:  I'm not sure, your Honor, what the allegation is in that regard because to the best of my knowledge, ReconAfrica has not prognosticated about the likelihood that if oil is found and they get an exploitation license, that exploitation license could allow fracking.  I mean, this is very much an open-ended question.  No one has looked for oil onshore in Namibia.  I think ever.

THE COURT:  Right.

MR. BARNICKOL:  At least in the last 50 years.  So the question of what Namibia may or may not do -- and again, this is a couple of years from now down the road.  What administration is in place all that stuff.  So I sheepishly

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    10

can't respond to the specific 90 percent, but I'm not aware that my client has ever represented anything with respect to any likelihood that it would get an exploitation license to frack given all the preconditions that would have to occur before we got there.

THE COURT: Well, I think -- and I'll ask them to explain, but my recollection is that this came directly from one of your clients published materials earlier on before the Namibian government said in September 2020, we have never granted a license to frack. There is none anticipated. ReconAfrica -- and I am paraphrasing, but is not going to be fracking at least any time in the foreseeable future. And that even though your clients public statements didn't say 90 percent chance of regulatory approval of fracking because your clients published materials said that we are going to pursue conventional and unconventional resources, a reasonable investor would interpret that to mean, we think we've got a 90 percent likelihood of regulatory approval to at least explore or exploit fracking potential, which would require a license and would require regulatory approval. Especially since it hasn't been done. And I understood the plaintiff's argument to be that that prediction without having applied for a fracking license was material and misleading to investors.

So let me ask plaintiff's to explain, if my understanding is correct, is there something that I'm missing

and then I'll have you respond.

MR. SPENCER: Your Honor is exactly correct.

In the complaint we alleged in the February 28, 2019 management information circular filed by the company, they make statements such as --

THE COURT: Slow down just a little bit and pull the mic a little closer to you.

MR. SPENCER: Sorry. I beg your pardon.

But that is correct, your Honor.

And in a February 28, 2019, management information circular filed by the company with Canadian securities regulators and referred to in the complaint in paragraphs 121 to 132, the company made statements such as, reconnaissance is targeting equivalent rocks to hydrocarbon unconventional deposits within the career group. Unconventional as we just discussed being a code word for fracking. And in the very same document, and here I'm referring to paragraph 127 of the amended complaint listed a probability of, "regulatory approval," for development of that resource as, "0.9," and meaning 90 percent. Highly misleading to investors to withhold the fact that you haven't had any discussion with the Namibia of whether you would be allowed to frack when you're putting that kind of number out there.

THE COURT: So I guess since the defendants don't have an alternate explanation for what that number is based

on, and obviously at the 12(b)(6) stage, I have to take the plaintiff's factual obligation as true.

What am I to do with that except to say that they've at least pled a plausible inference of a material omission here?

MR. BARNICKOL:  So I think one of the important points here is that, I don't think that this says -- so this isn't a complete quote.  This is paraphrase of this 2019 circular.  But even based on what the allegation says, they're talking about the probability for development.  So I need to be clear that development doesn't mean production.  Those are not synonymous terms.  Development is -- first to this process of -- because it's not a one step thing.  It's the process of taking a exploration license and using that to ascertain what's viable --

THE COURT:  But are you saying that regulatory approval, which I think was the phrase in that --  I'm sorry.  Was that -- am I right?  Sorry.  Can you --

Was the phrase actually regulatory approval?  What was the 90 percent referring to?

MR. SPENCER:  Yes, your Honor.

The quote is, regulatory approval, and it's listed as 0.9, meaning 90 percent.

THE COURT:  So I guess, there's something that your clients are saying that they are going to need approval for

from the Namibian government to do something in the Kavango basin, whether it is explore or exploit or ultimately have a third-party produce or extract oil and gas, there's some estimate there that they think they're likely to get this approval in Namibia as you said that hasn't been drilled before.

So what were they trying -- what were they telling investors that they were 90 percent likely to get approval to do?

MR. BARNICKOL:  To drill test wells.

THE COURT:  Okay.

MR. BARNICKOL:  To develop the licensed property in a way that further this goal of exploration.  So this, again, the question of what may be under their and how you produce is it -- it's not logically in the minds of either investors or the company's management because nobody's thinking about regulatory approval for a license that may not be necessary because you don't even know what's -- whether there's a viable opportunity to exploit.

THE COURT:  So it's your position that that 90 percent estimate was just on test wells and that they delivered on it when they got the test wells drilled in early 2021.

MR. BARNICKOL:  Correct.

THE COURT:  And what's that based on?

SHERNELLE GRIFFITH - Official Court Reporter

PROCEEDINGS                                    14

MR. BARNICKOL:  It's based on the circumstances because what was the regulatory approval, right, the only thing that was in front of the Namibian government at this stage is exploration.  And again, in addition to the national mining industry boarding and exploration and exploitation license as you have, layers of local regulation, water permits, and things like that, land use permits.  So I am certain that in this context, where they're only exploring, where they only have an exploration license, where they don't know whether there's oil there or not.  I'm certain that the reference to regulatory approval here relates to the approval necessary for exploration.

And, you know, so -- and it's a linear process.  So you explore in one particular area with the test well and then that leads you either to throw your hands up and say nothing there or drill a second test well and third and so forth.  So that's what the regulatory approval here is.  In the context of 2019, it doesn't make any sense.  And it does not say that this is relates to regulatory approval of production.  I mean, that's --  still as we sit here in 2023, your Honor, that's --

THE COURT:  Is it your position that the regulatory approval sought had nothing to do with the fracking in that 2018, 2019 statement?

MR. BARNICKOL:  Absolutely.

THE COURT:  Okay.

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    15

MR. BARNICKOL:  And if I can add one more thing. The quotes from the Namibian government that are referenced in the complaint, those don't say that the Namibian government is opposed to fracking.  Those don't say the Namibian government is highly likely not to allow fracking.  What they say is, the Namibian government hasn't allowed fracking and Recon Africa isn't fracking.  This isn't said, but the subtext is because it's not necessary.  You don't need to frack in order to explore.  That's a production method.

THE COURT:  I mean, I understand your argument.  I think I read those statements a few times and I think particularly in context, and especially with the 12(b)(6) stage, where that statement from the Government was followed -- what came right in the wake of a lot of public criticism of environmental groups, members of the U.S. Senate and others about the possibility of fracking in Namibia by ReconAfrica.  Then a statement that says three different ways, we haven't had fracking, we don't have any plans to have fracking, ReconAfrica hasn't applied for a license and we don't see it happening.  And I'm paraphrasing, but essentially all of a sudden it's not happening followed by your clients removing all references to unconventional resources from their subsequent published materials.

I don't think your strongest argument is that the statement from the Namibian government wasn't a very strong

PROCEEDINGS                                    16

distancing from the possibility of fracking any time in the future.  I think you have other arguments about why these statements may not be misleading, but clearly that statement was intended to and did have an impact on investors perception and the public's perception of whether your company would be able to frack any time in the near future.

Let me just ask plaintiff's counsel to respond to this issue of the regulatory approval piece back in the 2018, 2019.  I didn't see that in the defendant's brief, though I may have missed it.  Other than your bare assertion that regulatory approval meant ultimately permission to at least explorer fracking or get a license to explorer fracking.

What's the basis for saying it was connected to that piece of their business plan?

MR. SPENCER:  Thank you, your Honor.

And I'll say it's not so much a bare assertion as a well pled allegation.  For example, as previously cited paragraph 127 of the complaint, stating that and describing the chance to being able to develop any petroleum deposits found, assuming successful discovery, the circular listed regulatory approval as 90 percent.  In this context, development, certainly does mean production.  If the Court were to take a look at those regulatory filings, I think that would be obviously.  I don't think they are currently in the record.

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    17

What's in the record right now is our well pled allegation of fact.  And there's nothing in the record to contradict that or support the defendants current characterization.  With all due respect to my friend on the other side here, it's clear that he doesn't actually recall the context of this and he's kind of extemporaneously trying to come up with an explanation for it, as best he can to suit his clients needs, but there's really no foundation to say they're related to the test wells -- to give them permission to have the test wells versus what it actually means is 90 percent chance of approval to produce the resource.

THE COURT:  Okay.  Understood.

So let one ask you this:  After as I just eluded to, the Namibian government made the statement and I won't try a third time to paraphrase.  I think we all read it a few times, but made its public statement in September 2020 about fracking licenses and ReconAfrica's potential to frack.  The defendants removed, as you note in your complaint, references to unconventional resources from their subsequent published materials.

Don't you think this was enough to signal to investors that they had in fact pivoted and changed course after the Government's announcement?  Essentially, what else would you have had them do besides remove those references in their published materials.

Why wasn't that enough to signal to investors what they needed to know?

MR. SPENCER:  Well, is certainly did signal to investors a change of course away from fracking and towards conventional exploration, which is precisely the problem. That was false.  The company hadn't actually made that pivot. That's just what they were telling investors in order to kind of try to -- this controversy about fracking, all the while still intending to frack as need.  And there's ample evidence of that in the complaint of the records as revealed by Viceroy research.

THE COURT:  V-I-C-E-R-O-Y.

MR. SPENCER:  The company actually refused to rule out fracking when pressed on it on subsequent occasions.  The company's moving papers in fact admit that they are now looking to extract resources by any means necessary.  I don't know what other confirmation there could possibly be that this supposed pivot to conventional production was false from the outset.

THE COURT:  So what is your understanding about where the company's business plans stood after September 2020?

I know they took out these references to unconventional resources.  Was that to signal a lesser focus on it or was that to signal they were actually laid out altogether in the short term or the long?

MR. BARNICKOL:  No.  I think it was the former, your Honor.  I don't think it would be fair for one to tell you that -- again, I feel like I may be beating a dead horse.  In this stage when you're just looking for deposits, that's the mission.  That's the business plan.  Find oil.  And when you find it, you figure out what next.  And you would -- it would not make sense for anybody to look for just unconventional or just conventional, but you would look for any oil and then make a determination after you've found it what the possible means of production would be.

THE COURT:  And the same for gas?

MR. BARNICKOL:  Same for gas.

THE COURT:  Okay.  I guess the -- I guess the concern I have is this:  As you know, under Ganino, G-A-N-I-N-O, we're talking about alleged misstatements or material omissions.  And this goes to the plaintiff's claim that your company was in essence saying one thing and doing another when it came to their post-September 2020 fracking plan.  And then, it was essentially alleged, you know, that you had this so-called media consultant who wasn't really doing media.  His job was actually try to secretly, you know, behind the scenes get the Namibian government, through his political connections, to walk back their recent statement and eventually give ReconAfrica a fracking license.

And your clients have, you know, taken out these

PROCEEDINGS
20

references but still kept it as part of their plan, that there was this huge gap in information to investors about to what extent and how fracking remained part of the plan, which you now agreed that it was still in the mix.  It does feel to me, and I would like to hear your answer to this, that the extent to which that information needed to be disclosed.  Especially given your arguments about production versus exploration that these are very intensely fact specific questions.

At this stage, how can I say that under Ganino there are so obviously unimportant to a reasonable investors that reasonable minds couldn't differ on the question of that importance?

MR. BARNICKOL:  So I think that foreign investor and for ReconAfrica, the question of the value of the stock, right, what is this worth?  Is dependent not on whether some day somebody's going to produce oil or whether oil can be found.  Importantly, it's also not dependent on how you might ultimately be able to produce oil or if you might be able to produce oil.  Right now the value of the stock is dependent on whether you're going to find oil.

THE COURT:  When it comes to fracking, that's also gas.  I mean, that's still in the mix.  Isn't fracking about --

Well, go ahead.

MR. BARNICKOL:  I mean, I think fracking is a means

*SHERNELLE GRIFFITH – Official Court Reporter*

PROCEEDINGS                               21

of producing both oil and gas.

THE COURT:  Correct.

MR. BARNICKOL:  And so, I apologize.  I will just fall in the same -- I genuinely mean oil and gas when I say petroleum reserves.

THE COURT:  Petroleum.  That's fine.

MR. BARNICKOL:  That's the question of value, right.  So if you're an investors you're looking at Recon Africa, what you're trying to determine is what do you think the likelihood is -- the asset is an exploration license, right.  It's not a deposit.  There's no deposits there frackable or unfrackable.  The asset is the license.

And the question is, to what extent do you believe that license and the expertise of management and using the tools of the trade to turn that license into something.  What's the value of that?  That's the only question that the investors have.

THE COURT:  So what is the value of the license?  What would an investor to think this license is valuable versus invaluable when it comes to the reserves in Namibia.

MR. BARNICKOL:  I think it is a couple of things, but the most important are the two things I just said.  So one is, based on the company's disclosures and publicly available information about this area, what is the likelihood that there is a commercially producible petroleum reserve available

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                      22

within the licensed area, right.  So you have both the

company's disclosures, but you also have kind of our

geological knowledge about this particular basin.  There is

onshore production in the areas further south in South Africa.

So there's characteristics about this region that

suggest that there could be oil.  The company is doing testing

that is increasingly supporting, I think in the words of the

company, providing evidence of a working conventional

petroleum system.  The circumstances exist, the circumstances

are right for there to be producible oil there.

THE COURT:  Right.

MR. BARNICKOL:  No longer there is, but the

circumstances are right.  So that's one piece of the value.

THE COURT:  So wait.  Let me just -- now I'm struck.

So I already started to drilled down on this area you were

just talking about.

That statement about signs of a working conventional

petroleum system was an announcement your clients made after

the first round of test well data, correct?

MR. BARNICKOL:  Correct.

THE COURT:  So part of the value to investors was,

for lack of a more precise term, but promising a positive

results.  The nature of the resulted of that test data.  So

that's part of it.  It's not just getting the license, it's

what the work that they did when they got the license to do

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                                    23

the test wells actually yielded, right.

MR. BARNICKOL:  Right.  I do want to like I'll --

THE COURT:  Okay.

MR. BARNICKOL:  -- split layers a bit and say positive is not necessarily the right word, but --

THE COURT:  Yes.

MR. BARNICKOL:  It provided supportive evidence.

THE COURT:  Thank you.

MR. BARNICKOL:  Additional supportive evidence.  And I'm not doing that just to quibble.

THE COURT:  Because positive advice, yes or no, or something, but the nature of the data and what your company told investors about what the data showed from that first or second round of test well exploration is part of the assessment as to the value.  And without getting us too far down a rabbit hole, I think because you keep returning to this question of license to explorer versus as to producing, there's clearly some link in the stock price value between -- not just your company getting a license to look around and see what's there, but actually what they find when they do the initial testing.  Because someone some day is going to want to extract petroleum from those areas and that data shows how likely they are to get a good yield, right.

MR. BARNICKOL:  Right.  But your Honor, every natural resource company in the world starts out looking.  And

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                              24

when you're investing in a startup exploration company, you don't know that they are ever going to find anything.  The question of what may be commercially producible, whether it's an oil well or a mine or a timber forest or whatever, you are betting on there being something there to that can be exploited, right.

These investors aren't betting on what's going to come out of the ground four years down the road, five years down the road, if something is found and if regulatory approvals are granted because they're buying in knowing, for example, that even if oil is found, the Namibian government, forget fracking, the Namibian government could actually refuse to give an exploration license on any terms.

THE COURT:  Right.  Even with those contingencies, the initial data matters.  You're not disputing that, right? They're taking a bet, but there's bets that you make overall with no data and then there's bets that you make a little later on the process with some data.

MR. BARNICKOL:  Agreed.

THE COURT:  Okay.  So I think -- I understand your position on that.

Let me ask plaintiff's counsel about the defendant's truth on the market defense when it comes to the Namibian government and fracking specifically.

I don't think you dispute that the fact that the

PROCEEDINGS                                    25

government had never before allowed fracking or given a

license to frack was publicly available.  I think I understand

your argument to be that it would have been some work and we

don't have a record as to how easy it would have been for a

member of the public or a potential investor to access that

information.  And so, truth on the market, at least at this

stage of the case, isn't viable defense.  But I am concerned

if it is publicly available that this could be one of those

rear cases where truth on the market could dismiss that

portion of your claim at this stage, if it's really a question

about what the government has or hasn't done because that's is

the kind of thing that an investor could research or if they

wanted to call up a government office and make an inquiry.

So why wasn't that something that was sufficiently

publicly available?

MR. SPENCER:  For several reasons, your Honor.

First as we say in our opposition papers, that truth

on the market defense, highly fact intensive, inappropriate

for the motion to dismiss stage unless it's glaringly obvious.

The defendant's have not carried their burden and it is their

burden to establish that this information was publicly known

and publicly available.

Second, there's no way that investors could have

known whether the company had private conversations that did

not lead to the license application yet, but in which they had

PROCEEDINGS                                    26

done some assessment to determine whether Namibian would be open to the fracking idea.  There's no way that could be publicly known even this argument -- and I'll get to it in a second.  Calling up the Namibian government and saying, Hey is ReconAfrica allowed to frack?  Even if that were a viable defense, which it isn't, there's still no way that gets you to the private conversations that the company has or hasn't had with the Government or what research they have or have not done.

And as to the suggestion that, oh, it's easy.  Call up the Namibian Petroleum Commission and say, are you going to let ReconAfrica frack?  That's just not a public fact. Publicly available information is things in SEC filings.  It is kind of absurd to suggest that an individual investors, instead of being able to take the defendant's representations and assertions at face value of the 90 percent chance of regulatory approval, then have to call the Namibian Petroleum Commission and ask whether or not it is true.  That's not my understanding of the standard in the case law and I don't think --

THE COURT:  I guess I don't see their argument as being that an investor could call and find out, do you plan to get Namibia a fracking license.  So they wouldn't just say what are your internal discussions, but they would be able to call and get answers to the factual questions that are part of

the allegations in your complaint about the historical events. So number one, have you every granted a fracking license to anyone before? No. Number two, has ReconAfrica applied for a license and may be even what stage of the process is their a approval?

And that to the extent an investor thought that information was material, they could hired someone or themselves and made that inquiry. And those might be the kind of more basic facts that somebody could find out and it's not up to the company to disclose at every step of the process what they have or haven't done, or just what the history is in that country, whether there's been any fracking, whether anyone has applied, and all of that.

So what's your answer to the historical facts piece?

MR. SPENCER: To the historical facts piece, your Honor, it's similar. The first point is that, this is defendant's burden. They haven't met it to show that this information was publicly known under the case law. The second piece being that -- well, you know, it may be knowable fact that a fracking license never been granted in Namibia, that might be true, but as I was saying, it is certainly not a notable fact that ReconAfrica had not attempted any internal private steps to determine whether they would be allowed to frack in Namibia. That is simply no way that could be in the public record even if defendant's had carried their burden,

which they haven't to show that any of this was in the public record.

THE COURT:  Okay.  What's your answer to that just specific point about the company's own efforts thus far to obtain a license to frack or at least explore the possibility of fracking?  And the fact that the company, while saying very prominently in their business plans before September 2020, that we plan to pursue unconventional resources hadn't actually put in an application yet?

MR. BARNICKOL:  So on that, your Honor, they wouldn't have.  They couldn't have.  You can't file an application for a license when you haven't met the threshold requirements for seeking a license, which would be first to establish a viable exploitation plan, right.  So as you do this process of narrowing down from an exploitation license to try to find producible oil and gas, right.  You're trying to take that 6.3 million acres and find a very small areas.  Because an exploration license only covers a few square kilometers.

So you're trying to find the place where you have the best chance of actually hitting producible oil and you're drilling these test wells kind of trying triangulating and using the seismic data and the other information to find where you're going.  But until you do that, you can't apply for an exploitation license.  ReconAfrica and geologist, the smartest

rock people in the world, would know where to look for oil today; they don't.  So they couldn't have applied.  And so, because you couldn't have applied, it doesn't make sense to argue that the ReconAfrica executives hadn't done the homework to ascertain whether the country would allow fracking.  I mean, they weren't in a position where they could apply for a license.

THE COURT:  So let me ask you this:  If it was so premature and your clients weren't at the stage where they were even ready to pursue a plan to begin the extraction or to get a license, why did they remove all references to unconventional resources from their published materials after the government's announcement?

MR. BARNICKOL:  I think it was because they didn't want people to think that this was something that depended on fracking; one way or the other.  It was putting the cart before the horse.  And I think the recognition that talking too much about unconventional resources or unconventional opportunities was really overly focusing the question. Because the question is, whether there's producible oil, conventional or unconventional.

And if I could go back one second, your Honor, to the point about the -- red herring statement that somebody had to call the Namibian government to say, Hey, have you granted a fracking license to ReconAfrica?  From the plaintiff's own

complaint, if you look at paragraph 166.  They talk about an article in the Namibian newspaper in September of 2020, that has exactly the same disclosure about the quotation that we've covered previously.  So this isn't a question that someone had a fear that this would happen.  This was out in the public.

THE COURT:  Well, the allegation in the complaint is not that this just happened to show up in the newspaper in September 2020, as kind of a standard annual report.  It was in response to international questions and to some extent opposition to your company's business plan.  I mean, this was a lot of complaint details, public attention on this question of whether you would in fact be allowed to frack.  Both because it was potentially an enormous financial value to you and your investors if you could do so successfully down the road.  And because there was opposition from many within and without Namibia about a potential -- so it wasn't just that it was public information that got published in the newspaper.

I guess my question for you still is, how can I say at this stage given how fact intensive so much of the process of exploration of the pre-license process really is in terms of especially exploring these unconventional resources, given that your clients never issued a public statement that really clarified what their plans were.  There was also international cry.  Suddenly the reference to unconventional resources are removed, but they never said actually we realized we

Case 1:21-cv-06176-NRM-RML    Document 68-10    Filed 11/14/24    Page 32 of 71 PageID #: 1595

announced.  This is still part of our plan.  It doesn't totally depend on it.  Here's the extent it is part of our plan.  This is what it depends on.

Why haven't the Plaintiff's not at least pled a plausible claim that this was materially misleading in part because your clients statements were so vague and just removed the references without any explanation?

MR. BARNICKOL:  Well, I think it doesn't plead a claim for the same reason that the court in the Freudian resources case found that that plaintiff failed to state a claim.  So you have a mining and they have a mining plan and Viceroy research issues a supposed research report on the company and says, we see the waste rock volumes are higher than what we would anticipate.  And we think that means -- we interpret that to me that the company is digging around searching for something.  And that that means that the mining plan is not viable.

I think in this context it is sort of the same thing.  The plaintiff here is getting into this whole question of is it convention or is it unconventional, but the real question isn't that.  The real question is, has the company's disclosure about its exploration plan, is that materially misleading.  And I don't think when you're talking about looking for oil it has no connection to fracking.

And I'll grant, your Honor, what you say a second

ago was exactly right.  So if you find oil that can only be exploited by fracking, the ability to get a license that allows fracking is very important, but we don't know.  That could not be material to an investors.  And that's not a fracking question.  Because an investor today is looking at what is the chances that something that we get to step two or -- I don't think it's fair to call it step two, but do for purposes of this argument, step two, and that's material and that's what's not pled.

THE COURT:  So if it wasn't information that investors cared about or needed to know, why did your clients remove it from their public statements?

Why would the reference to unconventional resources come out if it really didn't matter what the roots were to get to petroleum?

MR. BARNICKOL:  I think because my client -- I know because my client was concerned that people were getting ahead of themselves.  That people were looking at this company and saying, it's a fracking company, but that wasn't the impression they wanted to convey to investors.  It wasn't important to them that investors believed them to be a fracking company because no one knew.

THE COURT:  Right.

Okay.  So let me ask you on a related point.  I noticed that your reply didn't address plaintiff's argument

that one reason they think there was conscious material omissions in your client's statements about its business plan after September 2020, is that they hired this so-called media consultant to work for them.  He doesn't seem to have at least done any public media statements other than a few deleted tweets, but that he has a long history of, shall we say close political connections to senior members of the Namibian government, including, I believe, its president at the time.

Whether your client actually had some other reasons for hiring him, if he did do media work, their business plan seems to be something you could develop during discovery, but why was it not at least a plausible inference from the record in the allegation that you haven't responded to that he was actually hired to do was work back channels because fracking was in fact such an essential part of your client being able to yield the petroleum that they had intended prior to September 2020.

MR. BARNICKOL:  I think the burden that the plaintiff has here is a strong inference, not a plausible inference.  That's what they're required to plead.

THE COURT:  Correct.

MR. BARNICKOL:  And it's -- this is just stipulation.  I mean, alleging that someone had previously in roles completely infarcted with ReconAfrica, been involved in influence peddling -- and again, this is all just sort of

allegations.  I don't know whether Mr. Saddy was involved in influence peddling or not.  I would tell the Court that he wasn't or that he was.

THE COURT:  I mean, it had some very specific factual allegations including, I believe a quote directly from him from some previously published material about using phones to work magic, which has a pretty common meaning.  So it was certainly alleged a specific history of, let's say, influence peddling with government officials and specific ties that he had to specific senior officials.  So given that history and given that your clients haven't offered anything else at this stage to explain why he was hired, why does not at least create a strong inference that he was there to obtain ultimately permission to frack and to pursue unconventional resources.

MR. BARNICKOL:  Well, I think partly because he wasn't employed by the company for very long.  It was a matter of a month or two months.  Something like that.

THE COURT:  I think it was five may be, but some period of months.

MR. BARNICKOL:  I agree.  I'll defer to your Honor on the five.

THE COURT:  Yeah.

MR. BARNICKOL:  But separate from that, there has to be a link.  There has to be an allegation that links the

hiring of knowledge tieing to influence peddling.  You can't sort of say he's an influence peddler.  He was hired by ReconAfrica, therefore he must have been hired to engage in influence peddling.  That doesn't follow.

THE COURT:  So what's your response to that, why does that mean you suddenly get to take depositions and you know, go on a fishing expedition to find out what he was there for.

What is specific enough about your knowledge of his history or his role that make the connection between why he was hired on the fracking plan?

MR. SPENCER:  Your Honor, as you know, the scienter inquiry while we have to plead a strong inference, it is a holistic inquiry that looks at all the allegations taken collectively and that supplies the link here.  Those allegations are not only that Mr. Cot are daddy was previously involved in bribery scandals or that he was friends with the Namibian president, it also includes allegations that, you know, ReconAfrica's plan never changed.  They always intended to frack, which they are now admitting in court.  It also relates to allegations that the -- I believe it was --

THE COURT:  I think what they admitted, to be fair, that their plan included an intent to explorer fracking and to see if they could get that permission.  I mean, they certainly hoped to frack, but they're not saying our business plan

PROCEEDINGS                                36

rested on that as the sole means or they keys at this stage.

MR. SPENCER:  You're correct that is what they are saying, but we are disputing it, but there is a disagreement about that.

Another part of this holistic scienter inquiry, point to allegations that the chairman of ReconAfrica, I believe it was the chairman, in an interview with Canadian media, I think it was the Globe and Mail newspaper, denied that they hired Mr. Coty when directly asked about it.  Why deny it if it happened?  Unless they are trying to conceal something.  That powerfully adds to the holistic inference of scienter here.  And the company shortly after he denied it had to come out and correct it and admit that they did hire Mr. Coty.  And that's on the piece with Mr. Coty deleting the tweets that he did for Recon Africa.  Why delete those if you are a legitimate media consultant?  This is just one piece of the scienter puzzle, but the allegations as to Mr. Coty do strongly add that holistic inference.

THE COURT:  Let me switch to the test well data for a minute.

What's your answer to the defendant's argument in their reply brief that you just threw out words like mud log and wire land data, may be hoping a Judge that doesn't have a deep familiarity with extraction methods would find it to be a dispute of fact and just let you proceed.

PROCEEDINGS                          37

Tell me what in your complaint actually shows that that data contains something materially relevant to investors that meets the pleading requirements at this stage based on what was obtained and what the defendant's failed to reveal in a timely fashion.

MR. SPENCER:  Your Honor, let me just say it is our hope that you have a profound knowledge of mud logs and wire land logs.

THE COURT:  I only know what is pled and I have to presume it as true.  So whether I have a profound knowledge or a profound ability to read a complaint remains to be seen, but I appreciate that.

MR. SPENCER:  We think that the more the court or anyone knows about this industry and these types of data, the more they will see how misleading the defendant's statements were and how the data that eventually got published was as Viceroy exposed.  For example, what defendant's were telling investors during the class period, we have 200 meters of oil and gas shows.  And the working conventional petroleum system and intervals of stacked source and reservoir rock.

That all sounds pretty good.  Sounds like you might have found commercially viable discovery.  What actually came out when Viceroy published more of the data they withheld, was that there was no topseal on those stacks of rock.  You need topseal to prevent the oil and gas from escaping and to have a

*SHERNELLE GRIFFITH - Official Court Reporter*

commercially exploitable reservoir.

What they also concealed was that there was extremely small concentrations of oil and gas found.  It was primarily water.  There was not enough there to be a commercially viable discovery.  These were terrible results and that is confirmed by Viceroy's reporting, which was based on their consultations with industry experts and geologist.

You can also see it in the markets reaction when the data came out on August 5, 2021.  ReconAfrica published data from first test well that they withheld since April.  That very same day there was huge trading value in the stock and it fell by 12-point-something percent.  So there's a wealth of allegations to corroborate that this was bad data.  Defendant's chose to withheld it from investors because they wanted to inflate the company's prospects.

THE COURT:  What's your answer to the defendant's argument that Viceroy's reports were just journalistic criticisms of the data that was already available.  That it was public.  This wasn't something that they withheld. Viceroy got their hands on data as well.

MR. SPENCER:  There was substantial information in the Viceroy reports that was not public information.  I believe the first report included an interview with the Namibian petroleum Commissioner who told Viceroy, who then printed it in their report, that ReconAfrica would never be

issued a fracking license.  That was not public information previously.  ReconAfrica's consultations with industry experts and geologist were not public information.

There's ample information that was new to the market and that's also shown by the market reaction to the publication of the Viceroy reports, followed by double digit percentages on multiple occasions on heavy trading volume when these reports came out.

THE COURT:  Okay.  Let me ask, you, defense counsel, just to respond to two points and you can do them in whatever you order you want.

One is, plaintiff's counsel argument about why the data was, let's just say, much worse for your client than the initial April 2021 disclosure revealed, specifically on this question of topseal on the rock and the high concentration of water, in with what they had actually mined and tested so far.  And then, the second is, on this question of the Viceroy reports and what was public or nonpublic.

MR. BARNICKOL:  Can I just, as a housekeeping matter, also go back and say with respect to knowledge, there is a response to that the reply brief at the top of page nine.

THE COURT:  Great.  I'll take a look.

Thank you.

MR. BARNICKOL:  In terms of your Honor's questions, there's two big picture responses.  One, is that the criticism

from the plaintiff's and Viceroy, and plaintiff is just adopting Viceroy's interpretation of data that was publicly available, but Viceroy is making a qualitative assessment. And counsel did too, saying there's water.  It's much -- it looks bad, right, but there is no qualitative statement in -- ReconAfrica never commented on qualitatively on what the test results might communicate about commercial production.

Again, commercial production is not on the table. The public statement at issue is the April 15, 2021, press release that says that they found evidence of a working conventional petroleum system.  And when you read the mud log and wireline date to support that -- I mean, Viceroy said, that poor prospects.

THE COURT:  This is the statement that says, The initial analysis of the data from the company's first well confirmed a working conventional petroleum system in the Kavango Basin.

MR. BARNICKOL:  Correct.

THE COURT:  And you're saying it was not false or misleading because it was working.

MR. BARNICKOL:  Yeah.

THE COURT:  What does it mean by working?

MR. BARNICKOL:  All that means is that the circumstances are right for there to be patrol in the ground.

THE COURT:  Right.

MR. BARNICKOL:  Full stop.

THE COURT:  Well, it's a system.  It's not just petroleum there.  Working conventional petroleum system.

MR. BARNICKOL:  That, your Honor, I think that relates to the question of the geographic area, right.  So when you're exploring you're looking at like this.

THE COURT:  Yeah.

MR. BARNICKOL:  But as you zero in and try to find the place to actually exploit, you're going to a much smaller area.

THE COURT:  Right.

MR. BARNICKOL:  So the issue of a system is because explorer trade wells aren't looking for -- not looking for oil.  It might be better to have less water, sure, but you're not looking for oil when you're drilling.

THE COURT:  Why would it be better to have less water.  A higher concentration of water and a higher concentration of oil.

MR. BARNICKOL:  I don't know.  He said that.  I didn't say that.

But what I'm saying is, if you interpret that data as being less supporting of a potential production opportunity down the road, it doesn't -- that doesn't really change anything because when you're drilling you're looking for a system, right.  So broad conditions, right.  You're not

PROCEEDINGS                              42

drilling for oil.  You're looking to try to figure out where to drill next.  And so --

THE COURT:  Then why would your client announce to the world we found evidence of a working conventional petroleum system.

What's the significance of that?

MR. BARNICKOL:  Because the alternative is to say we drilled and we didn't find back that working conventional petroleum --

THE COURT:  So it's your position that -- so if all they do is announce that there's a working conventional petroleum system, that's generally positive news for their investors or potential investors and they don't need to disclose deals like, you know, could you -- is there enough of the topseal to keep the oil and gas from escaping or what's the concentration of water to oil?

That's not something that they actually needed to disclose at that stage?

MR. BARNICKOL:  No.  It's not something that they needed to disclose at that stage.  But more importantly, what I think the plaintiff is ignoring is the data, the wireline and mud log data, was the property of the Namibian government. And that's in their complaint.  And so, the company's nondisclosure is not because the company is trying to conceal anything.  The company is working with the Namibian government

SHERNELLE GRIFFITH - Official Court Reporter

who owns this data and the data is disclosed in August of 2021.  And as counsel said, I don't think it's -- I wouldn't argue that there wasn't a negative market reaction to the data.  It's not that the data is it irrelevant.  Is that the data both doesn't show that the prior statement was false or misleading and that they're separate issues.

THE COURT:  Let me ask you about that negative market reaction.  And here, I'm thinking specifically of August 2021, when your company released additional data.  And that was when there was this, I think you'd agree, was a fairly sharp decline.  Though you refer to it at one point as a slow and steady decline.  First in early August and then later in August after your company's release of the data and then a second Viceroy report.

So what do you think accounts for that slide at that point?

MR. BARNICKOL:  I think that you have investing -- going back to the strategies before.  Investor were looking at this company and saying, what do we think the likelihood is that this exploration license has value.  And I think in the Summer of 2021, the price is going down because investors are looking at it.  And not so much -- and I think your Honor has raised this before, but I want to kind of circle back to it.

It is a hinderance on the value of this company that you have environmental group and national geographic and

Viceroy all out there in the public attacking it, right.  So that is hurting the value of this.  And I think investors, as that summer is going on, are taking a view that the totality of all of these things, it's not a corrective disclosure. There's not something that wasn't known -- that was uniquely known to the defendants that becomes known by virtue of the Viceroy reports or the mud log and wireline data disclosure in August 2021.

What's happening is I think you just generally see investors looking at the company and saying well, may be the long term value isn't what we thought it was --

THE COURT:  Essentially that, I'm more reluctant to invest in a company even if they're doing what they should be doing, but subject to political attacks because I don't want my money caught up in some political fight or they might not going to get as far as they're going to get because of the criticisms or the politics of it all.

MR. BARNICKOL:  That's one element, yes.

THE COURT:  So what about the fact that the first of the drops in August 2001, that the plaintiff's cites, was not in response to the Viceroy, but was in the wake of your client's release of an additional round of test well data.

Why was that not pleading a strong inference of loss causation at that point?

MR. BARNICKOL:  It doesn't with respect to loss

PROCEEDINGS                                    45

causation.

THE COURT:  Yeah.

MR. BARNICKOL:  Because --

THE COURT:  Your company released some data -- some additional data from the test wells that they had for a few months.  They release it in early August and then there's a stock price drop of -- I had it somewhere.  I think it's around 19 percent.  I could be wrong, but it's a fairly significant drop.

MR. BARNICKOL:  I mean, I think the issue, your Honor, is that the loss causation and the alleged corrective disclosure can never be viewed alone.

THE COURT:  Sorry.  Let me just get there clear for the record.

MR. BARNICKOL:  Sure.

THE COURT:  My read of the complaint is that there was a press release that your client issued on August 5th of 2021, that included some hydrocarbon show reports related to the first test well and added some additional technical data and interpretation.  And then, over the ensuing four to five days from August 5th to August 9th, the company's share price fell by 29.1 percent.

So tell me why that, at the 12(b)(6) stage, doesn't plead loss causation?

MR. BARNICKOL:  Because a disclosure -- in the

*SHERNELLE GRIFFITH - Official Court Reporter*

PROCEEDINGS                              46

context of a corrective disclosure, the public statement by the company can never be looked at alone.  It could only be looked in reference to the allegedly misleading disclosure that preceded --

THE COURT:  Right.

MR. BARNICKOL:  -- right.  So a company showing a press release with bad news that causes a 29 percent drop in the stock is not securities fraud.  It's only securities fraud if one can show that what happened on that day, was the stock price dropped because the market learned that the prior statement was misleading.

Again, there's it no linkage between the statement that they're challenging here.  I think it's April 15, 2021 that says, they found evidence of a working petroleum system. That's the allegedly misleading statement.  And then, the mud log and wireline data disclosure --

THE COURT:  Slow down just a little bit for the court reporter.

MR. BARNICKOL:  Fair enough.  I've been doing good so far.

THE COURT:  Yeah.  You have actually.

MR. BARNICKOL:  That data doesn't correlate with the April 15, 2021, announcement, the public statement, in a way that supports it being a corrective disclosure.  There's no facts alleged to link April and August.

*SHERNELLE GRIFFITH - Official Court Reporter*

THE COURT:  Well, I think the facts allege that you had the data way back before April, didn't release it then, and then effectively were forced to disclose it later.  And that the complaint pleads that it was actually a corrective disclosure because you had the data for months and something made your company decide to release it in August.

Why not release it earlier?  What was the reason?

MR. BARNICKOL:  Because it wasn't there's to release.  Like I said, I can find the citation, your Honor, to the complaint that its --

THE COURT:  I think it's around 242 of the complaint.

MR. BARNICKOL:  243 -- in paragraph 214, there's this discussion about comments made by the petroleum commissioner.  And she talks about it being propriety data belonging the Government.  And paragraph 243, talks about this being the Government's data.  But your Honor, I don't want to get away from the core point that the things said in August of 2015, are not -- they're not -- they're not just facially inconsistent with the things said in April 2015.  And we attached that August press release to the reply brief.  And I believe if your Honor looks at it, you'll see they're -- facially there's no inconsistency.

What happens in August 2015 is there's more information released, but it's not contradictory information.

It's just more information.

THE COURT:  Okay.  Let me just have you address this point about the timing of the disclosure and whether it was contradictory or supplemental.  Our allegation is not that it's, you know, directly contradicted if they said, you know, they said they had 200 meters of gas and it was only 100.  The allegation is that they cherry-picked the data to disclose.  They gave you the good data and held back the bad data .that's why it is materially misleading.  And if you look at the Sgalambo versus Mckenzie case that we cited repeatedly, exact same situation.  Oil and gas exploration company selectively reveals good data about a test well, holds back the bad data, and the Court there had no problems finding that' materially misleading to the investors.

Okay.  Let me ask you a little bit about your allegations regarding the stock sales by a couple of board members and some other corporate insides.

So if they really had access to information that wasn't public that should have been disclosed, that's part of the basis for your fraud claims, why didn't only two of the seven resign?  And similarly with the stock sales, why are we looking at just a small number who exercised these options rather than the whole?  How can we get to the scienter inference from that fact?

I know it's not the only ones that you rely on, but

what should I make up those facts in context.

MR. SPENCER: Certainly so, you know, there's nothing in the record to say why five defendants didn't sell. My personal guess would be they were afraid to engage in an illegal insider trading. They had the information. They decided not to trade on two. Tellingly, the CEO and CFO did decide to trade on it shortly after the stock price doubled when making misleading statements. Selling substantial percentages of their personal holdings, netting hundreds of thousands of dollars each. And as the defendant's --

THE COURT: Let me ask you the flip side of that question, why would they take that risk if they were in possession of this information or knew that what they had done that they were about to release some data that would cause the price to drop?

Why would they be special in that position to take that kind of risk?

MR. SPENCER: We certainly intend to ask them about that at their depositions. If I was to guess, may be they thought they would get away with it. May be they thought no one would notice. Well, certainly, they didn't know that Viceroy research was going to expose their fraud and they probably thought they could do it unnoticed.

THE COURT: Let me ask you a little bit about your scienter allegation.

As you know, I only have to find that your complaint pleads a strong inference of scienter through either the conscious misbehavior or recklessness prone or through an opportunity prong. I wasn't entirely clear whether you were alleging both had been met or one more than the other that you thought readily met the bar.

MR. SPENCER: Your Honor, we believe that both are independently sufficient and then when viewed together that is an even stronger holistic inference of scienter.

THE COURT: Are there any facts specifically that go to motive other than the general one that they owned or had an option to purchase stock in the company.

What specifically do you have that goes to motive?

MR. SPENCER: You have the very suspiciously time and unusual insider stock sales of the CEO and CFO. And an enormous stock offering from the company itself which needed to raise funds to survive, $41 million Canadian dollars, shortly after making this misleading public statements that causes the stock price to skyrocket.

THE COURT: Anything else other than what's in your briefs about this question of the stock sales?

I know you don't at this point because you had your clients be deposed or put in affidavits, any affirmative indication about why they chose to exercise their options at this point or sell their stocks, depending on who we are

talking about, but what are you asking me to draw from that or not draw from that.

MR. BARNICKOL:  I think all I would say, your Honor, is that as the party with the burden of showing a strong inference of scienter, it's not enough to say I looked at the five and didn't sell.  I assume they didn't want to get caught.  And the other thing is, I don't think it's enough to say they sold in the case of Scott Evans and Carlos Escribano, who sold stock -- neither one of them sold even half.  And so, again, I don't -- I don't know how you could get to a strong inference of scienter if, you know, there is really this motivate, I'm going to make a bunch of money off of this, why wouldn't you sell all of it?  Why wouldn't you sell 80 or 90 percent, but they didn't.  At this point --

THE COURT:  I don't think the answer might be in your initial question about not wanting to engage in insider trading.  I think there's a lot of potential speculates.

I guess my more pointed question for you is, given that they aren't just relying on the volume, except that they didn't sell even half of their stocks, and that's a factor that potentially cuts against their argument.  On the other hand, the timing seems very bad for your clients on this record giving the timing of the Viceroy reports and what they knew, at least what the plaintiff's alleging they knew given their positions in the company, was going to be the upcoming

release of the second realm of disclosures about the test well data.

So why is the timing combined with the sales not enough to plead a strong inference of scienter?

MR. BARNICKOL:  I think the timing doesn't track because I think that the first sales by Carlos Escribano and Evans in May of 2017 are somewhat after the market has had a chance to digest the April 15, 2021, press release.  But substantially before the stock hit its peak in June of 2021, and then the sales -- the following sales by Escribano are after the first Viceroy report.  After, you know, by the plaintiff's allegation, the market is learning or has learned. I'm not quite sure what the allegation is.  It's kind of a leaking balloon that gradually spun out of the air.  You know, it's not timed up to disclose or to trade in profit in advance of the corrective disclosure because the corrective disclosure first.

THE COURT:  Do I have the chronology confused because I thought the allegation was that at least with respect to some of the sales, the 2021 supplemental disclosure of the test well data came just after at least one of the two individuals named sold their shares.

MR. BARNICKOL:  No.  Your Honor is correct.  I was making the point that it came after the Viceroy reports started to hit market.

SHERNELLE GRIFFITH - Official Court Reporter

PROCEEDINGS                                   53

THE COURT:  Started to, but not the second report.

MR. BARNICKOL:  Your Honor is correct.

THE COURT:  So certainly between the first Viceroy report, the second is when the sales happened.

MR. BARNICKOL:  I'm not exactly sure whether it was between the first and the second or between the second and the third, but it was, as your Honor has already said, it was prior to the August 2021 -- or yeah.  The press release we've been discussing.

The other point I need to make is that both of these employees, both Evans and Escribano, are new to the company.  Neither one of them have even been new to the company.  The idea that somehow you can infer something from like when they traded doesn't make sense because there's no sample to compare it against.  These are folks that got hired by the company.  They certainly didn't sell stock the day after they got hired, but they sold stock after, I believe, it's 16 or 18 months of employment.  Something like that.  These are things that executives do.

THE COURT:  But what else is the plaintiff supposed to do?  I mean, at no point prior to taking their depositions is any plaintiff in a securities fraud case is going to have anything other than their employment history and their trading history within that company available to them.  And yet, courts allow those claims to proceed to discovery as long as

holistically there is a strong inference of scienter in part based on that history.

So what else would you have a plaintiff in this position plead or show at this point to actually create that inference when they haven't yet deposed your client to get their explanation about the quantity -- if they sold one or two shares, I would understand, one percent of their holdings. I would understand your point, but given that it was -- even if not half of decent percentage and it was timed, you know, as we've discussed in between these two Viceroy reports and in between the release of the data, the first and second release, what else would a plaintiff need to show to get over that hump?

MR. BARNICKOL:  I think Mr. Spencer has been saying, you know, the inquiries is holistic and I'm not going to dispute that.  And I think what's missing here is what was the information?  What was in the hands of Scott Evens and Carlos Escribano, let's start with May, in May of 2021 when they made these trades?  I guess you would say the mud log and wireline data, but since that doesn't --

THE COURT:  It wasn't their data they maintained it belonged to the Namibian government, but they have access to it, right?

MR. BARNICKOL:  Understood.  What is the basis for concluding that that would later -- we know that it caused the

PROCEEDINGS                    55

stock to decline, but why would Mr. Escribano or Mr. Evans have reason to believe it was going to decline based on that data. I'm not asking that as a hypothetical. I'm asking that question as something that he has the burden of pleading and haven't pled. He hasn't explained why it is that that data in the possession of Mr. Evens or Mr. Escribano in May of 2021, should have made them think, oh, time to get out.

THE COURT: Okay. I'll ask counsel to answer it sine you've put that to him. I think I understood from the complaint what they were pleading. The question of whether it's enough is still one for me to decide, but why don't you take the opportunity to explain what in your complaint actually answers the question.

MR. SPENCER: Mr. Evans and Mr. Escribano are executives with long experience in the oil and gas industry who would know how to read these kind of reports and mud log data and wireline data. And having information in their hands that says, Hey, there's no topseal on these rocks to keep the oil and gas in. That says they're extremely small concentrations of oil and gas compared to water, which is filling up all the rock pores so there's no room for oil and gas in there. That is highly negative information as we saw from the stock price reaction when it was relatedly published and as oil and gas executives, they would know that.

THE COURT: Okay.

*SHERNELLE GRIFFITH - Official Court Reporter*

MR. SPENCER:  Your Honor, if I may.

THE COURT:  Yes.  Go ahead.

MR. SPENCER:  A couple of points I wanted to address because they've come up a few times.  This point about the Namibian government owing the data and this is raised for the first time in the defendant's reply brief so we haven't had time to address it.  That is not what we allege in the complaint.

If we take a look specifically at that paragraph 214, Viceroy wrote in their very first report about their interview with the Namibian Petroleum Commissioner, she confirmed that the Government had received cuttings and mud logs, but that these were proprietary data.  The proprietary there doesn't say to the Namibian government, that's proprietary to Recon Africa.  It's their data.  They can do with it what they choose, which is shown by the fact that they selectively revealed some of the data and not others. Namibian never prevented them from disclosing it.  And there's nothing in the record to show, and defendants haven't cited any Namibian law or contract to show that the company actually was prevented from disclosing it.  In fact we know they weren't because they disclosed some of it.

Furthermore, the other paragraphs that the defendants are referring to, paragraph 243, is when the ReconAfrica following the market's highly negative reaction to

PROCEEDINGS 57

the disclosure of the test well data in early August, the ReconAfrica investor relations manager goes on Twitter and says, you know, among other things, but the core data belongs to the government. Now's, that's kind of a self-serving statement from their investor relations manager that shouldn't be taken at face value. In any event, he's only talking about core data, not mug logs, not wire lines.

THE COURT: What's the difference between core data and mud logs and wireline data.

MR. SPENCER: Part of the well program was to get mud log data, part of it was to get wireline data, and part of it was to take what are called side wall cores, where, you know, deep in the well you kind of stickout a core sideways, pull it in and see what that core looks like.

THE COURT: Oh, I see. So when he says core data, he's not referring to it in the colloquial sense of the core of the matter, the most important data. He's referring to the literal core within the rock that they were exploring.

MR. SPENCER: That's right. He's not even disputing that the mud log and wireline data is Recon Africa's. He's talking about side well core data here.

THE COURT: Okay. Whether or not that's true, that's certainly a different -- I mean, you agree I have to accept that as a truthful allegation that he was referring specifically to data that he believes the plaintiff contends z

*SHERNELLE GRIFFITH - Official Court Reporter*

that the government had proprietary interest only in a portion of the data.  I have to credit that at this stage.

Why is that not as significant --

MR. BARNICKOL:  I'm sorry, I don't think that's what this says.  I mean, your Honor can read it and draw your own conclusions.  And I'm not going to tell you how to read it, but that's not what this says.  And it is my understanding too as a matter of Namibian law that that's not true.

THE COURT:  Yeah.

MR. BARNICKOL:  But putting that aside, I think your Honor is on the right track, but it's whatever is outlined in the complaint.

THE COURT:  Okay.  What was that paragraph again?

MR. SPENCER:  That's in paragraph 243.

THE COURT:  Thank you.

Let me ask defendants about the controlled person liability claim and make sure I understand what I do and don't need to decide on that issue.  I understand that in your opening brief you argue that the plaintiff failed to state a claim for controlled personal liability because they haven't pled a primary violation; is that right?

MR. BARNICKOL:  That's correct.

THE COURT:  So just so we're all on the same page, it's my understanding that even if I do find that they pled a primary violation that resolves the controlled person lability

claim at least at this stage of the litigation. And if I don't, then it would fail.

MR. BARNICKOL: That's fair.

THE COURT: All right. It's now 1:25. Why don't we take a break for about 20 minute and come back at 1:45. And we can go off the record just to talk about the logistics of that.

Thank you.

(Off the record.)

(A short recess was taken.)

THE COURTROOM DEPUTY: All rise.

(Judge enters the courtroom)

THE COURT: You all can be seated.

All right. After reviewing the complaint, the parties' briefs, underlining authorities, and additional materials in the record, and hearing argument from both parties on the record, I'm going to deny the defendant's motion to dismiss in its entirety and we'll state a summary of my reasons on the record.

As all parties are aware, on the current rule 12(b)(6) and 9(b) posture, I must accept as true all factual allegations in the amended complaint and draw all reasonable inferences from those facts in the plaintiff's favor. I also must, of course, find that the plaintiff's complaint satisfies the heightened pleading requirements of the Private Securities

Litigation Reform Act of 1995 and Rule 9(b) of the Federal Rules of Civil Procedure by stating the particularity of the circumstances constituting fraud.

For each of the claims that the defendant's have moved to dismiss, and applying the standards outlined above, I find that the defendants have not met their burden of proving that the allegations in this complaint do not state with particularity the circumstances constituting fraud.  I'll begin with the material misrepresentation and omission of fact allegations and then move onto scienter and loss causation and finally the controlling persons claim.

First, the disputes primarily concern whether the plaintiff has alleged with particularity that there was material information the defendants had a duty to timely disclose, but failed to do so in violation of Section 10(b) of the Exchange Act and SEC rules 10(b-5(a) through (c).  A defendant's duty to disclose may be violated where "secret information renders prior public statements materially misleading."  That's from the Second Circuit's decision *In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993)*. Here, the parties dispute whether the defendants had a duty to disclose first, certain information bearing on whether Namibia had ever allowed or would fracking;

Second, whether after September 2020 report in the -- that periodical called the Namibian came out, fracking

remained part of the defendants business plan.  And if so, to what extent;

And third, certain aspects of the initial test well data regarding the potential viability of conventional oil and gas production.

I find, first, that the plaintiff has alleged that the defendants did not disclose that they had not actually applied for a license to conduct fracking in Namibia as of September 18, 2020, that the Namibian government had not granted fracking licenses before, and the plaintiff has sufficiently alleged materiality of those facts.  At the complaint stage, of course, I may not dismiss an alleged omission on the grounds that it is not material unless that statement or omission is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  That's from *Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000)*. Having considered the alleged omissions in light of the defendants published statements, I find that the defendants have not their burden Ganino.

Further, under Second Circuit case law, a company may be required to disclose alternate approaches to its announced business goals, but "whether consideration of the alternate approach constitutes material information remains a question for the trier of fact."  That's from *Time Warner, 9*

*F.3d at 268*. Here, I find that plaintiff has pled with particularity that after removing references to "unconventional resources" from their published statements after the September 2020 announcement, the defendants should have disclosed their plans to continue to explore a possibility of fracking. Specifically, I find that the issue of whether the defendants were required to disclose these plans throughout the class period as material information about their alternate approaches to petroleum exploration is a question that's inappropriate for dismissal at this stage of the litigation.

While the defendants have argued that much of the information at issue was publicly available, concerned future facts, or was covered by risk disclosures, I find those questions to be highly fact-specific inquires that make dismissal inappropriate at this time and that plaintiff's allegations meet the pleading requirements of the PLSRA.

Likewise, with respect to the statements about test well data that defendant's made initially in April 2021, I find the plaintiff has sufficiently alleged that the defendants made material omissions when they failed to disclose key results of this data at that time. I am aware as we discussed today, the defendant's vigorously dispute the plaintiff's claim that the mud logs and wireline logs in test wells undermined ReconAfrica's prospects for oil and gas

exploration or was otherwise material facts that needed to be reconciled with the defendants other statements at that time. But these arguments are appropriate for summary judgment or trial, after further development of the record.  And at this stage of the case, the plaintiff has sufficiently pled that these are omitted facts that a reasonable investor would view as material.

Second, I find the plaintiff has pled a strong inference of scienter by both one alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  And in addition, by alleging facts to show that the defendants had both motive and opportunity to commit fraud.  That is from, among other cases, *Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 78 (2d Cir. 2021)*.  As the U.S. Supreme Court instructed in *Tellabs, Inc. v. Makar Issues and Rights, Ltd.,* a court must holistically ask would, "a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *551 U.S. 308, 326 (2007)*.

With respect to circumstantial evidence of conscious misbehavior or recklessness, I find that the complaint sufficiently pleads facts raising a strong inference that the defendants made conscious decisions not to disclose material information.  The plaintiff plead with particularity in the complaint facts from which I believe the following inferences

PROCEEDINGS                                        64

can be withdrawn at this stage of the litigation:

One, that when the defendants announced that the test well data revealed a working conventional petroleum system in the Kavango basin, the defendants cherry-picked the data that they released at that time, and consciously did not disclose material information about the quality of their data from the test wells; in particular, that they failed to disclose data regarding a relative lack of topseal on the rock as well as the negative impact of water saturation on their prospects for oil and gas recovery, and I find that they have pled sufficiently that after ReconAfrica made that initial incomplete announcement, its stock price surged.

Second, that the defendants early on projected a 90 percent chance of regulatory approval to mine the unconventional resources without any reliable basis to believe that Namibia would allow them to explorer or conduct fracking. On this point, I recognize that as the defendants asserted today, that even though they have argued that this statement related only to permission to drill test wells, not to fracking, I must accept as true what I find to be a well pled allegation by the plaintiff that this statement was intended to refer to regulatory approval of fracking.

Third, plaintiff has alleged that after the Namibian government issued a September 2020 press release disavowing any intent to allow ReconAfrica or any other entity to

fracking, the defendants removed all references to unconventional resources from their published statements.  But the complaint plausibly alleges that fracking remained a key part of the defendants business plan even without any viable prospects to do so.  And further alleges that the defendants mislead the public by privately relying on what they believed were political connections that could be leveraged within the Namibia by their so-called media consultant to get the Namibian government to change its position, a person they hired in the immediate wake of the government's announcement in September 2020, and whose relationship to the company, defendants initially denied before later acknowledging it existed.

I do note that the defendants have raised various challenges to the reliability or significance of the specific facts I've cited above, to which the plaintiff's seek to approve their claims.  Defendants argue, for example, that Viceroy was a short seller and had no access to nonpublic information, and that Viceroy reports allegedly exposing flaws in the defendants business plan based on test well data were bias and unreliable.  But on this record and under the applicable case law on reports by short sellers, I find that these arguments are fact-intensive ones that certainly do not render the plaintiff's allegations implausible on their face. The defendants challenges are appropriately reserved until

after the record has been fully developed, and do not entitle them to an order of dismissal at this stage.

I also find that the plaintiff stated with particularity allegations that the defendants have acted or -- excuse me.  Did act with a required motive and opportunity to support a strong inference of scienter.  Among these are allegations that the company itself made a $41 million Canadian dollar public offering of stock in May 2021, doubling the amount previously raised, that its CEO, Defendant Evans, sold 29 percent of his stock after holding it for just 18 months; that its CFO, Defendant Carlos Escribano, sold 43 percent of his stock two weeks prior to the substantial declines in stock price that began on August 5, 2021; and that other non-director insiders had suspiciously timed exercise of their stock options followed by immediate sales of large quantities of their holdings, just prior to the time when the defendants released additional test well data in August 2021.

The plaintiff has also alleged that the defendants had at least two suspiciously timed resignations of board members one year or less after they joined the company, including one who resigned just two weeks before the defendant's April 15, 2021, press release claiming active petroleum system.  While the defendants are, of course, free to develop and present evidence as the litigation progresses, that there were other factors which promoted these

resignations, retirements, and stock trades, at this stage of the litigation, these well-pled facts, raise a strong inference of scienter that is at least as strong as any opposing inference.

Third, I find that the plaintiff has adequately pled loss causation. A plaintiff generally does so when he or she alleges that the shares price "fell significantly after the truth became known through an expressed, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson v. Newlink Genetics Corp., 965 F.3d 165, 179 (2d Cir. 2020)*. The Second Circuit has deemed this a fact-based inquiry.

Here I find that the plaintiff have plead with particularity that the defendants were effectively forced to disclose additional test well data in August 2021, following the initial Viceroy reports, and that significant stock price -- excuse me. Significant declines in stock price, which resulted from those disclosure. For example, the plaintiff has pled that on August 5, 2021, ReconAfrica belatedly published additional data from its first test well, after which its stock prices declined from 29.1 percent in the ensuing four days. After further Viceroy reports in August 2021, analyzing that data, the stock price declined by an additional 19.9 percent.

Even though the defendants have pointed out that the

stock price continued to decline in the coming weeks and months, the timing and nature of these initial decreases are clearly significant enough to survive a motion to dismiss on the issue of loss causation.

Finally, I find insufficient grounds to dismiss plaintiff's claim for a violation of Section 20(a) of the Exchange Act against the individual defendants.  If the plaintiff shows, "a primary violation by the controlled person;

Second, control of the primary violator by the defendant;

And third, that the defendant was in some meaningful sense a culpable participant in the controlled person's fraud."

I must find that the elements have been met for a prima facie case of control person liability.  That's from, among other cases, *ATSI Commc'ns. Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)*.

As we discussed today at oral argument, this aspect of the defendants motion to dismiss rest solely on their claim that the plaintiff failed to plead the first element of this test, namely, a primary violation under Section 10(b), because I have found that the amended complaint did adequately plead a primary violation of 10(b), this claim fails.

Thus, for the reasons above, I find that the

plaintiff has plausibly alleged with particularity allegations of material misrepresentation or omission, scienter, loss causation, and control person liability.  The defendants motion to dismiss the amended complaint is therefore denied.

All right.  That concludes everything I have on the motion to dismiss under my individual rules and procedure. The next step would be for you all to schedule a conference with the Magistrate Judge to discuss discovery plan.  Of course, you are free at any time to let the Magistrate Judge know if you believe it would be fruitful to engage in mediation or settle discussions either prior to or contemporaneous with conferral or conference over any discovery plan, but I will leave that to your own judgment and experience at this stage.

All right.  Anything else either party wishes to address with me while you have me today?

MR. BARNICKOL:  Your Honor, I think we should also get an answer date established.  I can do that by --

THE WITNESS:  Yes.

MR. BARNICKOL:  -- with agreement with the plaintiff's counsel or we can do it by court order.  It doesn't matter.

THE COURT:  That is correct.  Why don't you confer and let me know what's agreeable.  I rather let you do it and set a schedule if you can't agree, you are free to come to me.

PROCEEDINGS

70

And at that point, I will leave you to Judge Levy.

Anything else from plaintiff's counsel?

MR. SPENCER:  Nothing further from plaintiff.

Thank you, your Honor.

THE COURT:  Thank you very much.

MR. BARNICKOL:  Thank you.

Sincerely, your Honor, thank you for giving us the time.

THE COURT:  Thank you very much.  Take care.

*     *     *     *     *

(Proceedings adjourned at this time.)

(Whereupon, the matter was concluded.)

*     *     *     *     *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/ Shernelle Griffith                    May 16, 2023

SHERNELLE GRIFFITH                 DATE

*SHERNELLE GRIFFITH*
*Official Court Reporter*