**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RECONNAISSANCE ENERGY AFRICA LTD. SECURITIES LITIGATION | Case No. 1:21-cv-06176-NRM-RM |

## DECLARATION OF MORGAN KIMBALL IN SUPPORT OF U.S. LEAD PLAINTIFF'S MOTION FOR U.S. CLASS DISTRIBUTION ORDER

I, Morgan Kimball, hereby declare and state as follows:

1. I am a Project Manager employed by Epiq Class Action & Claims Solutions, Inc. ("Epiq").[1] This declaration is submitted in support of U.S. Lead Plaintiff's Motion for U.S. Class Distribution Order. The following statements are based on my personal knowledge and information provided by other Epiq employees working under my supervision and, if called on to do so, I could and would testify competently thereto.

2. Epiq was retained by U.S. Lead Counsel, subject to Court approval, to serve as the U.S. Claims Administrator in connection with the U.S. Settlement of the above-captioned class action (the "U.S. Action"). In the Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 60, paragraph 7; the "Preliminary Approval Order"), the Court approved the retention of Epiq as U.S. Claims Administrator. In that capacity, Epiq has, among other things: (a) mailed the U.S. Postcard Notice to U.S. Settlement Class Members and their brokers and other nominees; (b) created and continues to maintain a toll-free helpline for inquiries during the course of the administration; (c) created and continues to maintain a case-specific website and post

---

[1] Unless otherwise defined herein, all capitalized terms have the meanings set forth in the Global Stipulation and Agreement of Settlement, dated February 27, 2024 (ECF No. 55-1; the "Stipulation").

relevant case-related documents on it;[2] (d) caused the U.S. Summary Notice to be published; (e) provided, upon request, additional copies of the U.S. Postcard Notice to U.S. Settlement Class Members, brokers and other nominees; (f) provided, upon request, copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "U.S. Notice") and U.S. Proof of Claim and Release Form ("U.S. Claim Form"); and (g) received and processed U.S. Claims.

3. On December 30, 2024, the Court entered the Judgement Approving Class Action Settlement (ECF No. 71; the "Final Judgment") and the Order Approving U.S. Plan of Allocation of U.S. Net Settlement Fund (ECF No. 72).

4. Epiq has completed the processing of the 5,251 U.S. Claims received as of November 26, 2025, and hereby submits its administrative determinations accepting or rejecting the U.S. Claims in preparation for a distribution of the U.S. Net Settlement Fund to Authorized U.S. Claimants.

**DISSEMINATION OF NOTICE**

5. As more fully described in the Declaration of Morgan Kimball Regarding: (A) Mailing of Notice; (B) Publication of the U.S. Summary Notice; and (C) Report on Requests for Exclusion and Objections, dated November 8, 2024 (ECF No. 68-1), and the Supplemental Declaration of Morgan Kimball Regarding: (A) Mailing of Notice; (B) Requests for Exclusion and Objections; and (C) Claim Forms Received to Date, dated December 9, 2024 (ECF No. 69-4), as of December 9, 2024, Epiq had mailed 17,849 U.S. Postcard Notices to potential U.S. Settlement

---

[2] The case-specific website is: www.ReconAfricaUSSecuritiesSettlement.com (the "Settlement Website").

Class Members, brokers and other nominees that may have purchased or otherwise acquired ReconAfrica U.S. Stock on behalf of U.S. Settlement Class Members. Since that date, Epiq has mailed 1,739 additional U.S. Postcard Notices. In total, Epiq has mailed 19,588 copies of the U.S. Postcard Notice to potential U.S. Settlement Class Members, and to brokers and other nominees that may have purchased or otherwise acquired ReconAfrica U.S. Stock on behalf of Settlement Class Members. A copy of the U.S. Postcard Notice is attached as Exhibit A.

6. Under the provisions of the Preliminary Approval Order and as set forth in the U.S. Notice, each U.S. Settlement Class Member who wished to be eligible to receive a distribution from the U.S. Net Settlement Fund was required to complete and submit to Epiq a properly executed U.S. Claim Form, along with supporting documentation for the transactions and holdings reported therein. Through November 26, 2025, Epiq has received 5,251 U.S. Claim Forms.

**PROCEDURES FOLLOWED IN PROCESSING U.S. CLAIMS**

7. In preparation for receiving and processing U.S. Claims, Epiq: (a) conferred with U.S. Lead Counsel to define the project guidelines for processing claims; (b) created a unique database to store U.S. Claim Form details and images of U.S. Claim Forms and supporting documentation; (c) trained staff in the specifics of the project so that U.S. Claims would be properly processed; (d) formulated a system to properly respond to telephone and email inquiries; (e) developed various computer programs and screens for entry of claimants' identifying information, as well as their transactional information; and (f) developed a proprietary "calculation module" that would calculate Recognized Loss pursuant to the Court-approved U.S. Plan of Allocation set forth in the U.S. Notice.

8. U.S. Settlement Class Members, and their banks, brokers, and other nominees, seeking to share in the U.S. Net Settlement Fund were directed in the U.S. Postcard Notice to

3

submit their U.S. Claim Forms online or postmarked by January 9, 2025, and referred U.S. Settlement Class Members to the U.S. Settlement Website and U.S. Notice for additional information on filing a U.S. Claim Form. Among other things, the U.S. Settlement Website allowed U.S. Settlement Class Members to submit U.S. Claims online and provided instructions for nominees on how to submit large U.S. Claims on behalf of multiple U.S. Settlement Class Members.

9.     In the Final Judgment, the Court provided that (a) no new U.S. Claims may be accepted after April 25, 2025; and (b) no adjustments to U.S. Claims, which would result in an increased Recognized Loss Amount may be accepted after August 29, 2025. Should an adjustment be received that results in a lower Recognized Loss Amount, that adjustment will be made, and the Recognized Loss amount will be reduced accordingly.

10.    Of the 5,251 U.S. Claim Forms received by Epiq through November 26, 2025, 1,445 were paper forms or submitted through the U.S. Settlement Website. Once received, paper U.S. Claims were opened and prepared for scanning. This process included unfolding documents, removing staples, copying nonconforming sized documents, and sorting documents. This manual task of preparing the paper U.S. Claims is laborious and time intensive. Once prepared, the paper Claims were scanned into a database together with all submitted documentation. Each paper U.S. Claim Form was assigned a unique Claim Number. The information from each U.S. Claim Form, including the claimant's name, address, account number/information from his, her or its supporting documentation, and the purchase/acquisition transactions, sale transactions, and holdings listed on the U.S. Claim Form, was entered into the database developed by Epiq to process Claims submitted for the U.S. Settlement. Next, the documentation provided by each claimant in support of his, her or its U.S. Claim Form was reviewed to determine: (a) whether the claimant traded in eligible

ReconAfrica U.S. Stock during the U.S. Settlement Class Period; (b) whether the transaction information entered on the U.S. Claim Form was supported by the documentation; (c) that the claimant did not have any additional trades not reflected on his, her, or its U.S. Claim Form; (d) that the name of the claimant matched the information on the trade documentation, or additional documentation was provided to support any name changes; and (e) that the beneficial owner on the trade documentation, or a valid representative, was the person who signed the U.S. Claim Form.

11. In order to process the U.S. Claims, Epiq utilized internal codes to identify and classify any deficiency or ineligibility conditions that existed within the U.S. Claims. The appropriate codes were assigned to the U.S. Claims as they were processed. For example, where a U.S. Claim Form was submitted by a claimant who did not have any eligible transactions in ReconAfrica U.S. Stock during the U.S. Settlement Class Period (*e.g.*, the claimant purchased ReconAfrica U.S. Stock only before or after the U.S. Settlement Class Period), that U.S. Claim would receive a defect code that denoted ineligibility. Similar defect codes were used to denote other ineligible conditions, such as duplicate U.S. Claims. These message codes would indicate to Epiq that the claimant is not eligible to receive any payment from the U.S. Net Settlement Fund with respect to that U.S. Claim unless the deficiency was cured in its entirety.

12. Because a U.S. Claim may be deficient only in part, but otherwise acceptable, Epiq utilized codes that were only applied to specific transactions within a U.S. Claim. For example, if a claimant submitted a U.S. Claim Form which, in addition to having eligible documented purchases, also listed shares that were transferred into the account but no supporting documentation demonstrating that the transferred shares had been purchased during the U.S. Settlement Class Period was provided, that transfer transaction would receive a transaction-

specific defect code. That code indicated that the shares transferred into the account were not eligible, unless the defect was cured, but the U.S. Claim was otherwise eligible for payment based on the other transactions. Thus, even if the deficiency was never cured, the U.S. Claim could still be partially accepted.

13. Of the 5,251 Claims received by Epiq through November 26, 2025, 3,806 were filed electronically ("Electronic Claims"), by eight (8) entities ("Electronic Claim Filers"). Electronic Claims are typically submitted by, or on behalf of, institutional investors who may have hundreds or thousands of transactions during the U.S. Settlement Class Period. Rather than provide reams of paper requiring data entry, the institutional investors or representatives filing Electronic Claims either mail a computer disc or electronically submit a file to Epiq so that Epiq may electronically upload all transactions to its proprietary database developed for the U.S. Settlement.

14. Epiq maintains a Securities Team to coordinate and supervise the receipt and handling of all Electronic Claims. In this case, the Securities Team reviewed and analyzed each electronic file to ensure that it was formatted in accordance with Epiq's required format, and to identify any potential data issues or inconsistencies within the file. If any issues or inconsistencies arose, Epiq notified the sender. If the electronic file was deemed to be in an acceptable format, it was then loaded to Epiq's database.

15. Once the file was loaded, the Electronic Claims were coded to identify them as Electronic Claims and message codes were applied to denote any deficiencies or ineligible conditions that existed within them. These message codes are similar to those applied to paper and online U.S. Claim Forms. In lieu of manually applying message codes, the Securities Team performed programmatic reviews of the Electronic Claims to identify deficiency and ineligibility

conditions (such as, but not limited to, price per share/net amount validation issues, out of balance conditions, and transactions outside the U.S. Settlement Class Period, *etc*.). The output was thoroughly verified and confirmed as accurate.

16. The review process also included flagging any Electronic Claims that were not accompanied by a signed U.S. Claim Form, which serves as a "Master Proof of U.S. Claim Form" for all accounts referenced on the electronic file submitted. This process was reviewed by Epiq's Securities Team and, where appropriate, Epiq contacted the institutional filers whose electronic files were missing information. This ensures that all U.S. Claims are submitted by properly authorized representatives of the claimants.

17. Finally, at the end of this process, Epiq performed various targeted reviews of the Electronic Claims. Specifically, Epiq used criteria such as the calculated Recognized Loss amounts and other criteria to flag a sampling of electronic filers in order to request additional information, such as that specific purchases, sales and holdings selected by Epiq be documented with confirmation slips or other transaction-specific supporting documentation. These targeted reviews help to ensure that electronic data supplied by claimants does not contain inaccurate information. As set forth in Paragraphs 33-36 below, Epiq also performed additional quality assurance reviews in connection with the largest U.S. Claims.

**<u>EXCLUDED PERSONS</u>**

18. Epiq also reviewed all claims to ensure that they were not submitted by or on behalf of "Excluded Persons," to the extent that the identities of such persons or entities were known to Epiq through the list of Defendants and other excluded persons and entities set forth in the Stipulation and in the U.S. Notice, and through the claimants' certifications on the U.S. Claim

Forms.  Epiq confirmed that the entity that requested exclusion from the U.S. Settlement Class did not file a U.S. Claim.

**ADDITIONAL COMPLEXITIES ENCOUNTERED IN CLAIMS PROCESSING**

19.     Many of the U.S. Claims Epiq received were deficient or ineligible for one or more reasons and were, therefore, subjected to the additional processing, correspondence and telephonic communications described in Paragraphs 20-24 below.

20.     During the processing of U.S. Claims, Epiq also encountered "non-conforming" U.S. Claims, which, in general, require significantly more work than ordinary U.S. Claims because of the information contained in or missing from the U.S. Claims, or the manner in which the U.S. Claims were completed.  Non-conforming U.S. Claims include, among other conditions, missing pages, no name or address, U.S. Claim Forms that are blank but submitted with documentation for Epiq to complete, and U.S. Claim Forms that are so materially deficient as to make what is being claimed unrecognizable.

21.     Of the 5,251 Claims received by Epiq through November 26, 2025, 1,445 were paper or online U.S. Claims.  And, of these 1,445 claims, 927, or approximately 64%, were incomplete or had one or more defects or conditions of ineligibility, such as the U.S. Claim Form not being signed, not being properly documented, or indicating no eligible transactions of ReconAfrica U.S. Stock during the U.S. Settlement Class Period.  Much of Epiq's efforts in handling an administration involve claimant communications so that all claimants have a sufficient opportunity to cure any deficiencies and file a complete U.S. Claim.  The "Deficiency Process," which involved contacting claimants and responding to inquiries from claimants either by telephone or email, was intended to assist them in properly completing their otherwise deficient submissions so that they would be eligible to participate in the U.S. Settlement.

22.     If a U.S. Claim was determined to be defective or ineligible, a Notice of Incomplete U.S. Claim Form ("Deficiency Notice") was sent to the claimant describing the defect(s) or condition(s) of ineligibility in his, her or its U.S. Claim and what was necessary to cure any "curable" defect(s) in the claim.  The Deficiency Notice advised the claimant that the submission of the appropriate information and/or documentary evidence to complete the U.S. Claim had to be sent within 20 days from the date of the letter.  The Deficiency Notice further advised that if the appropriate information was not submitted in this timeframe, the U.S. Claim would be recommended for rejection to the extent the deficiency or condition of ineligibility was not cured.  The Deficiency Notice also advised claimants that if they desired to contest the administrative determination, they were required to submit a written statement to Epiq requesting Court review of the determination and setting forth the basis for their request.  Attached hereto as Exhibit B is an example of the Deficiency Notice.

23.     Claimants' responses to the Deficiency Notices were scanned into Epiq's database and associated with the corresponding U.S. Claim Form.  The responses were then carefully reviewed and evaluated by Epiq's team of processors.  If a claimant's response corrected the defect(s), Epiq updated the database manually to reflect the change in status of the U.S. Claim.

24.     Of the 3,806 Electronic Claims received as of November 26, 2025, 2,032 (or approximately 53.4%) were deficient or ineligible.  Epiq used the following process to inform Electronic Claim Filers that their electronic submissions were deficient.  Each filer was sent an email attaching a report that listed the specific U.S. Claims that were deficient or ineligible, along with a list of the specific portions of the U.S. Claims that were deficient or ineligible (the "Transaction Report").  With respect to the Electronic Claims, the Transaction Reports:

(a)     were sent electronically to filers who submitted deficient or ineligible Electronic Claims;

(b)     identified individual transactions and entire Electronic Claims that were found to be deficient or ineligible so that the filer had the opportunity to correct the deficient condition or contest the determination of ineligibility;

(c)     stated that any deficient transactions or Electronic Claims that remain uncured, as well as any transactions or Electronic Claims that were identified as ineligible, were rejected;

(d)     notified the filer that, within 20 days, it could request that the Court review Epiq's administrative determinations if it wished to contest the rejection of any transactions or Electronic Claims; and

(e)     provided Epiq's contact information if the filer had any questions or required assistance.

25.     Responses to the Transactions Reports were reviewed by Epiq's Securities Team, scanned and/or loaded into Epiq's database, and were associated with the corresponding Electronic Claim. If the response corrected the defect(s) or affected the Electronic Claim's status, Epiq manually and/or programmatically updated the database to reflect the change in status of the Electronic Claim.

### DISPUTED CLAIMS

26.     As noted above, filers were advised that they had the right to contest Epiq's administrative determinations of deficiencies or ineligibility within twenty days from the date of notification and that they could request that the dispute be submitted to the Court for review. More specifically, such persons were advised in the Deficiency Notice or the Transaction Reports that if

10

they disputed Epiq's determinations, they had to provide a statement of reasons indicating the grounds for contesting the rejection, along with supporting documentation. Epiq received 53 requests for Court review. In an attempt to resolve the disputes without necessitating the Court's intervention, Epiq attempted to contact all of the persons requesting Court review, answer all of their questions, fully explain Epiq's determination of the U.S. Claim's status, and attempted to facilitate the submission of missing information or documentation where applicable. Through November 26, 2025, Epiq was able to resolve 49 of the requests for review and four (4) U.S. Claims, submitted by two (2) claimants, have outstanding requests for judicial review of Epiq's administrative determinations to reject the U.S. Claims (the "Disputed Claims" or "Disputed Claimants"). Exhibit C attached hereto contains copies of the Disputed Claims and supporting documentation, the Deficiency Notices sent by Epiq, and the letters and documentation received by Epiq in response to the Deficiency Notices. The documentation has been redacted in each instance to protect confidential information. No U.S. Claim Form exists for these claims as all were submitted online. The Disputed Claims are discussed in Paragraphs 27-32 below.

27. Disputed Claimant No. 1 (U.S. Claim 404) is recommended for rejection because the claim does not calculate to a Recognized Loss pursuant to the U.S. Plan of Allocation. More specifically, Disputed Claimant No. 1 was timely submitted online with supporting documentation reflecting 1,000 shares of ReconAfrica U.S. Stock received on April 30, 2021, by gift. The shares were purchased during the U.S. Settlement Class Period by the donor, who submitted a different claim on behalf of the shares. Accordingly, the shares were deemed a purchase of ReconAfrica U.S. Stock for the calculation of a Recognized Loss Amount *on the donor's claim*.

28. Epiq sent Disputed Claimant No. 1 a Deficiency Notice on July 10, 2025, informing the claimant that the claim is ineligible because the claim did not contain any eligible purchases

11

and/or acquisitions of ReconAfrica U.S. Stock and was, therefore, ineligible to receive a distribution from the U.S. Net Settlement Fund. In response to the Deficiency Notice, Disputed Claimant No. 1 mailed the U.S. Claims Administrator a letter advising that although they did not purchase the 1,000 shares, they did not think that gifts were excluded from being considered a purchase or acquisition, and requested Court review of the claim. Documentation of the same purchases of ReconAfrica U.S. Stock accompanied the letter.

29. The documentation was reviewed and Epiq found no change from the original claim submission. The U.S. Claims Administrator attempted to contact the claimant via telephone to further explain the reason for the claim denial, but was unable to reach the claimant via telephone.

30. Disputed Claimant No. 2 (U.S. Claims 800000903, 800000904, and 800000905) has three U.S. Claims which are recommended for rejection. U.S. Claims 800000903, 800000904, and 800000905 are recommended for rejection because Disputed Claimant No. 2 had a market gain with respect to its overall transactions in ReconAfrica U.S. Stock during the U.S. Settlement Class Period.

31. Epiq sent Disputed Claimant No. 2 a separate Deficiency Notice for each U.S. Claim on May 14, 2025, informing the claimant that the claims are ineligible because they did not calculate to a Recognized Loss under the U.S. Plan of Allocation and were, therefore, ineligible to receive a distribution from the U.S. Net Settlement Fund. In response to the Deficiency Notices, Disputed Claimant No. 2 mailed the U.S. Claims Administrator letters advising that the transactions resulted in a financial loss for the claimant and requested Court review of the claim. Documentation of the same purchases of ReconAfrica U.S. Stock accompanied the letters.

12

32. The documentation was reviewed and Epiq found no change from the original claim submissions. Epiq attempted to contact the claimant via telephone to further explain the reason for the claim denials, but was unable to reach the claimant via telephone.

**QUALITY ASSURANCE**

33. An integral part of Epiq's settlement administration projects is its Quality Assurance reviews. These reviews are also labor intensive and time consuming. Specifically, Epiq's personnel worked throughout the entire administration to ensure that U.S. Claims were processed properly; that deficiency and ineligibility message codes were properly applied to U.S. Claims; that deficiency notices were mailed to the appropriate claimants; and that Epiq's computer programs were operating properly.

34. In support of the work described above, Epiq staff designed, implemented, tested and reviewed the following programs for this administration: (a) data entry screens that store U.S. Claim information (including all transactional data included in each U.S. Claim and in any supporting documentation), attach message codes and, where necessary, apply text to denote conditions existing within the Claim; (b) screens for the analyst to review images of the U.S. Claim Form and any supporting documentation; (c) programs to load and analyze transactional data submitted electronically for all Electronic Claims (a load program converts the data submitted into the format required by the calculation program, and an analysis program determines if the data is consistent and complete); (d) a program to compare the claimed transaction prices against the reported market prices of ReconAfrica U.S. Stock to confirm that the claimed transactions were within an acceptable range of the reported market prices; (e) a calculation program to analyze the transactional data for all U.S. Claims, and calculate the Recognized Loss based on the Court-

approved U.S. Plan of Allocation; and (f) programs to generate various reports throughout and at the conclusion of the administration, including lists of all eligible and ineligible U.S. Claims.

35. Epiq's Securities Team also performed a final quality control check once all of the accepted U.S. Claims were processed, deficiency notices were mailed, and deficiency responses were reviewed and processed, to ensure the correctness and completeness of all of the processed U.S. Claims before Epiq prepared its final reports to U.S. Lead Counsel. Here, in connection with this Quality Assurance wrap-up, Epiq: (a) confirmed that the U.S. Claims that are being recommended for approval have no message codes denoting ineligibility; (b) confirmed that U.S. Claims that are being recommended for rejection have message codes denoting ineligibility; (c) confirmed that all U.S. Claims requiring Deficiency Notices were sent such notices; (d) performed a sample review of deficient U.S. Claims; (e) reviewed a sampling of U.S. Claims with high Recognized Loss amounts to confirm Epiq's determinations; (f) sampled U.S. Claims that had been determined to be ineligible, including those with no Recognized Loss calculated in accordance with the U.S. Plan of Allocation, in order to verify that all transactions had been captured correctly; and (g) retested the accuracy of the loss calculation program.

36. As part of its due diligence in processing the U.S. Claims, Epiq also conducted a "Questionable Claim Filer" search of all paper and online U.S. Claims and Electronic U.S. Claims filed in the U.S. Settlement as follows. Epiq maintains a database of known questionable filers. This database contains names, addresses, and aliases of individuals who have been investigated by government agencies for fraudulent claim filing, as well as the names and contact information compiled from previous settlements that Epiq has administered where fraudulent claims were received. Epiq updates the database on a regular basis. The database for the U.S. Settlement was searched for all individuals identified in our Questionable Claim Filer Database. Epiq performed

searches based on name, aliases, address, and city/zip code. In addition, all of Epiq's claim processors are trained to identify any potentially inauthentic documentation when processing claims, including for U.S. Claims submitted by claimants not previously captured in our database as Questionable Claim Filers. Processors are instructed to flag U.S. Claims as "Questionable Claims" and route them to the Project Manager and Securities Team for review. No Questionable Claims were located as a result of these searches.

## DISPOSITION OF U.S. CLAIM FORMS

37. Epiq has completed the processing of the 5,251 U.S. Claims that were either postmarked or received through November 26, 2025, and has determined that 2,160 are acceptable in whole, 163 are accepted in part, and that 2,928 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Court-approved U.S. Plan of Allocation.

38. The 2,928 wholly rejected U.S. Claims are recommended for rejection by the Court for the following reasons:

### Summary of Rejected Claims

| Reason for Rejection | Number of Claims |
| --- | --- |
| Claim Did Not Result in a Recognized Loss | 2,340 |
| No Eligible Purchases During the U.S. Settlement Class Period | 265 |
| Deficient Claim with Condition of Ineligibility Never Cured | 226 |
| Claim Withdrawn by Request | 7 |
| Duplicate Claim | 55 |
| Late (received after April 25, 2025) | 35 |

**TOTAL**[3]                                                                                    **2,928**

39.     A list of the U.S. Claims and Epiq's recommendations as to their disposition is contained in the U.S. Administrator's Report attached hereto as Exhibit D.  Exhibit D-1, entitled "Timely Eligible U.S. Claims," lists all timely filed, accepted U.S. Claims, and states their Recognized Loss amounts.  Exhibit D-2, entitled "Rejected U.S. Claims," lists all wholly rejected U.S. Claims, and states the reason for their rejection.  For privacy reasons, Exhibit D provides only the claimant's Claim Number and Recognized Loss amount or Reason for Rejection (no names, addresses, Taxpayer ID, or Social Security Numbers are disclosed).

40.     Epiq has determined that 2,323 U.S. Claims should be accepted.  The Claims recommended for acceptance represent total Recognized Losses of $15,627,919.36 USD under the Court-approved U.S. Plan of Allocation.

41.     According to the Court-approved U.S. Plan of Allocation, each Authorized U.S. Claimant will be allocated their *pro rata* share of the U.S. Net Settlement Fund based on his, her or its Recognized Loss in comparison to the total Recognized Loss of all Authorized U.S. Claimants.

### FEES AND DISBURSEMENTS

42.     Epiq agreed to be the U.S. Claims Administrator for the U.S. Settlement in exchange for payment of its fees and expenses.  U.S. Lead Counsel received regular reports of and invoices for all of the work Epiq performed with respect to provision of notice and the administration of the U.S. Settlement and authorized the claims administration work performed herein.

---

[3] Several of the denied claims contain multiple rejection reasons.

43.     The cost of the administration of the U.S. Settlement through November 30, 2025, totals $101,079.82 USD, all of which has been paid.  Additionally, Epiq has estimated that the cost of conducting the initial distribution of the U.S. Settlement, which will be reserved prior to the initial distribution, will be no more than $9,000 USD, *see* Exhibit E hereto.  Therefore, Epiq respectfully requests the Court approve fees in the amount of $9,000 USD.  Should the estimate of fees and expenses to conduct the initial distribution exceed the actual fees and expenses, Epiq will refund the difference to the U.S. Net Settlement Fund once the initial distribution is completed.

44.     Should the Court concur with Epiq's determinations concerning the accepted and rejected U.S. Claims, Epiq recommends the following distribution plan (the "U.S. Distribution Plan"):

(a)     Epiq will conduct an initial distribution (the "Initial U.S. Distribution") of the U.S. Net Settlement Fund, after deducting the payments previously allowed and requested herein, and after payment of any taxes, the costs of preparing appropriate tax returns, and any escrow fees as follows:

(i)     Epiq will calculate award amounts to all Authorized U.S. Claimants by calculating their *pro rata* share of the U.S. Net Settlement Fund in accordance with the U.S. Plan of Allocation.

(ii)     Epiq will, pursuant to the terms of the U.S. Plan of Allocation, eliminate from the Initial U.S. Distribution any Authorized U.S. Claimant whose *pro rata* share of the U.S. Net Settlement Fund, as calculated under subparagraph (a)(i) above, is less than $10.00 USD.  Such claimants will not receive any distribution from the U.S. Net Settlement Fund and Epiq will send letters to those Authorized U.S. Claimants advising them of that fact.

(iii)     After eliminating claimants who would have received less than $10.00 USD, Epiq will calculate the *pro rata* share of the U.S. Net Settlement Fund for Authorized U.S. Claimants who would have received $10.00 USD or more pursuant to the calculations described in subparagraph (a)(i) above ("U.S. Distribution Amount").

(iv)     In order to encourage Authorized U.S. Claimants to promptly deposit their payments, all distribution checks will bear a notation "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF ISSUE DATE."

(v)     Authorized U.S. Claimants who do not cash their Initial U.S. Distribution checks within the time allotted will irrevocably forfeit all recovery from the U.S. Settlement.  The funds allocated to all such stale-dated checks will be available to be re-distributed to other Authorized U.S. Claimants in the Second U.S. Distribution as discussed below.  Similarly, Authorized U.S. Claimants who do not cash their second or subsequent distributions (should such distributions occur) within the time allotted will irrevocably forfeit any further recovery from the U.S. Net Settlement Fund.

(b)     After Epiq has made reasonable and diligent efforts to have Authorized U.S. Claimants cash their Initial U.S. Distribution checks, but no earlier than six (6) months after the Initial U.S. Distribution, if cost-effective to do so and in consultation with U.S. Lead Counsel, Epiq will conduct a second distribution of the U.S. Net Settlement Fund (the "Second U.S. Distribution").  During the Second U.S. Distribution,  any amounts remaining in the U.S. Net Settlement Fund after the Initial U.S. Distribution, after payment of Notice and Administration Expenses (including the estimated costs of such Second U.S. Distribution), Taxes, and any escrow fees, will be distributed: (i) first, if U.S. Lead Counsel, in consultation with Epiq, determines

sufficient funds remain to warrant the processing of U.S. Claim Forms received after April 25, 2025, such claims will be processed, and any such late claims that are otherwise valid, together with any late adjustments to U.S. Claim Forms received after August 29, 2025, will be paid distribution amounts or additional distribution amounts to bring them into parity (in terms of the ratio of their Recognized Claims to their Distribution Amounts) with other Authorized U.S. Claimants who have cashed their checks ("Post April 25 Authorized U.S. Claimants"); and (ii) second, on a *pro rata* basis to all Authorized U.S. Claimants who cashed their Initial U.S. Distribution check and would receive at least $10.00 USD from such distribution based on their *pro rata* share of the remaining funds after accounting for distributions to be made to the Post April 25 Authorized U.S. Claimants. If U.S. Lead Counsel, in consultation with Epiq, determines it is not cost effective to process U.S. Claim Forms received after April 25, 2025, or adjustments to Claim Forms received after August 29, 2025, those claims will be not be processed or adjusted, and the Second U.S. Distribution will be limited to Authorized U.S. Claimants in the Initial U.S. Distribution who cashed their Initial U.S. Distribution check and would receive at least $10.00 USD from such distribution based on their *pro rata* share of the remaining funds.

(c)     In order to allow a final distribution of any funds remaining in the U.S. Net Settlement Fund after completion of the Second U.S. Distribution, whether by reason of returned funds, tax refunds, interest, uncashed checks, or otherwise, Epiq will conduct a further distribution of the U.S. Net Settlement Fund not less than six (6) months after the Second U.S. Distribution, if cost effective. All funds remaining in the U.S. Net Settlement Fund, after deducting Epiq's unpaid fees and expenses incurred or to be incurred in connection with administering the U.S. Net Settlement Fund (including the estimated costs of such distribution), and after the payment of any Taxes, the costs of preparing appropriate tax returns, and any escrow fees, will be distributed to

Authorized U.S. Claimants who cashed their Second U.S. Distribution checks in an equitable and economic fashion. Additional re-distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until U.S. Lead Counsel, in consultation with Epiq, determines that further re-distribution is not cost-effective. At that point, the residual balance will be contributed—subject to Court approval—to the Public Justice Foundation, a nonsectarian, not-for-profit 501(c)(3) organization.

(d)     Unless otherwise ordered by the Court, one year after the Initial U.S. Distribution, or the Second U.S. Distribution if it occurs, Epiq will destroy the paper copies of the U.S. Claim Forms and all supporting documentation, and one year after all funds have been distributed, Epiq will destroy electronic copies of the same.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on January 21, 2026, at Seattle, Washington.

Morgan Kimball

# CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of January, 2026, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Garth Spencer
Garth Spencer